UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
BASSEM YOUSSEF,                          )
           Plaintiff,               )
                                   )
       v.                          )     Civil Action 1:11-cv-01362 (CKK)
                                   )
ERIC HOLDER                              )
U.S. Attorney General,                   )
           Defendant.               )
)

**PLAINTIFF BASSEM YOUSSEF'S MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR
<u>SUMMARY JUDGMENT</u>**

Stephen M. Kohn, Bar # 411513
David K. Colapinto, Bar # 416390
KOHN, KOHN & COLAPINTO
3233 P Street, N.W.
Washington, DC 20007
Tel.: (202)-342-6980
Fax.: (202)-342-6984
sk@kkc.com
dc@kkc.com

June 21, 2013

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. v

FACTS ................................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.      SUMMARY JUDGMENT STANDARD ................................................ 2

II.     SUMMARY JUDGMENT MUST BE DENIED ON THE RETALIATION
        COUNT ................................................................................................... 3

        A.      There is a Dispute of Material Facts as to Whether Zarone and Other
                Members of the Career Board had Knowledge of Youssef's Protected
                Activity ....................................................................................... 4

                1. Standard for Demonstrating Knowledge ............................... 5

                2. Mr. Zarone had Knowledge of Mr. Youssef's Discrimination Case..... 5

                        i. Role as Mr. Youssef's Supervisor ............................... 5

                        ii. Reading of Mother Jones Article ............................. 6

                        iii. Equivocation During Deposition Testimony ........... 7

                        iv. Participation in the Midterm Evaluation 7

                3. Other Members of the Career Board had Knowledge of the Title VII
                Participation ............................................................................ 8

                        i. Mr. Fernandez ........................................................... 8

                        ii. Mr. Chase ................................................................. 8

                        iii. Mr. Castro ............................................................... 9

        B.      Taken in the Light Most Favorable to Mr. Youssef, the Facts
                Unquestionably Create a Dispute of Material Facts on the Causation
                and Pretext Issues ..................................................................... 10

                1. Temporal Proximity Functions as Evidence of Both Causation and
                Pretext in this Case ................................................................. 10

2. The Facts Suggest a Retaliatory Animus of Mr. Zarone Towards Mr. Youssef's Protected Activity, This Animus Tainted the Career Board's Evaluations of Mr. Youssef's Application for Promotion .................. 12

    i. Zarone's Negative Comments ........................... 13

    ii. Denial of Knowledge ................................. 13

3. The Facts Set Forth in Part III Relating to the Demonstration of Pretext for the Discrimination Count Also Provide for a Finding of Pretext on the Retaliation Issue ......................................... 14

III.   SUMMARY JUDGEMENT MUST BE DENIED ON THE DISCRIMINATION COUNT ........................................................ 15

   A.   Legal Standard ............................................. 15

   B.   Dissemble Pretext Test ..................................... 16

    1. Zarone's Attempt to Deny Any Knowledge of the Legal Proceedings ................................................ 17

    2. Phony Performance Review ................................ 18

    3. Overturned PAR Scores .................................. 19

    4. Fernandez .............................................. 20

    5. Fernandez Made Youssef Acting Section Chief ............. 21

   C.   Four Corners Argument .................................... 22

   D.   Objective Criteria ......................................... 23

IV.   DEFENDANT'S ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT ARE UNFOUNDED AND WITHOUT MERIT ................... 24

   A.   None of the Career Board Members are of the Same Protected Class as Mr. Youssef ............................................. 25

   B.   Castro was Aware of Mr. Youssef's National Origin ........... 25

   C.   Messrs. Zarone and Fernandez Did Not Treat Mr. Youssef Favorably ................................................. 27

    D. The FBI's Claim, that Mr. Youssef Cannot Prove Causation is Without Any Factual or Legal Basis ................................................................................................ 28

V.    DEFENDANT'S ARGUMENTS THAT POWERS WAS MORE QUALIFIED THAN YOUSSEF ARE WITHOUT MERIT .............................................. 29

    A.    Mr. Youssef's Objective Qualifications .................................................. 29

    B.    The FBI'S Criticism of the Manner in Which Mr. Youssef Filled Out His FD-954 is Without Merit .............................................................. 31

    C.    The FBI's Argument that Powers was the Better Qualified Candidate is Without Merit ................................................................................................ 31

        1. The FBI's Argument that Youssef's FD-954 Simply Demonstrated That Youssef Had Performed his Job is Inconsistent With the FBI's Analysis of Powers' Application ................................................................................. 32

        2. The FBI's Attempt to Demonstrate that Powers' "Competency" in the Area of Counterterrorism was Superior to the Mr. Youssef's is Frivolous ................................................................................................ 37

CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998)...............3, 14, 16, 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...........................2

*Boone v. Clinton*, 675 F.Supp.2d 137 (D.D.C. 2009).............................5

*Broderick v. Donaldson*, 338 F.Supp.2d 30 (D. D.C. 2004).......................3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).................................2

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001).......................10

*Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000)..............................15

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).............................14

*FEC v. Toledano*, 317 F.3d 939 (9th Cir. 2002)................................7

*Glass v. LaHood*, 786 F. Supp. 2d 189 (D.D.C. 2011)..........................25

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012).........................16

*Howard v. Gray*, 821 F. Supp. 2d 155 (D.D.C. 2011)............................2

*Hunt v. Cromartie*, 526 U.S. 541 (1999).......................................2

*Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009).............................5

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1992)..........................26

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).......................15

*Mitchell v. Baldrige*, 759 F.2d 80 (D.C. Cir. 1985)..........................10

*Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005).............................22

*Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133 (2000)..............16

*Smith v. Brown & Williamson*, 108 F. Supp.2d 12 (D.D.C 2000).................26

*Tao v. Freeh*, 27 F.3d 635 (D.C. Cir. 1994)...................................2

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)................................... 16

*Tyler v. RE MAX Mt. States, Inc.*, 232 F.3d 808 (10th Cir. 2000)........................... 22

*Woodruff v. Peters*, 482 F.3d 521 (D.C. Cir. 2007)......................................... 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BASSEM YOUSSEF,                  )
         Plaintiff,          )
                             )
        v.                     )        Civil Action 11-1362 (CKK)
                             )
ERIC HOLDER                      )
U.S. Attorney General,           )
         Defendant.          )
_____)

## PLAINTIFF YOUSSEF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Bassem Youssef, by and through the undersigned counsel, hereby files his opposition to Defendants' March 1, 2013 motion for summary judgment. In setting forth his opposition, the Court is respectfully referred to Plaintiff Bassem Youssef's Opposition to Defendant's Statement of Material Facts Not In Dispute and Plaintiff's Statement of Material Facts in Dispute submitted herewith.

## FACTS

Plaintiff hereby incorporates, by reference, his Opposition to Defendant's Statement of Material Facts Not In Dispute and Plaintiff's Statement of Material Facts in Dispute (hereinafter, "Plaintiff's SOF") and the exhibits filed herein as the Statement of Facts[1].

---

[1] Plaintiff's Exhibit 14 is the Affidavit of Mr. Bassem Youssef. This document has been signed by Mr. Youssef and submitted to the FBI for pre-publication clearance. Upon its clearance by the Bureau, it will be filed with the court under separate cover.

**ARGUMENT**

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322; *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Factual disputes "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 254. Summary judgment is not available "if material facts are at issue, or if undisputed, are susceptible to divergent inferences." *Howard v. Gray*, 821 F. Supp. 2d 155, 159 (D.D.C. 2011) (citing *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

When considering a motion of summary judgment, a court may not make credibility determinations. *Howard v. Gray*, 821 F. Supp. 2d 155, 159 (D.D.C 2011) (citing *Anderson*, 477 U.S. at 255). Instead, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Id.* at 255. "Outright admissions of impermissible . . . motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 543 (1999). Consequently, "[s]ummary judgment...is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Id.* at 543.

## II.   SUMMARY JUDGMENT MUST BE DENIED ON THE RETALIATION COUNT

The process for establishing retaliation for protected activity is similar to the one required for showing discrimination under Title VII. The plaintiff must first provide a *prima facie* case of retaliation by a preponderance of the evidence, this includes showing that: (1) plaintiff has engaged in statutorily protected activity; (2) plaintiff was subjected to an adverse employment action; and (3) a causal connection exists between the two. *Broderick v. Donaldson*, 338 F.Supp.2d 30, 38 (D. D.C. 2004). Once the plaintiff articulates a *prima facie* case of retaliation, the defendant has a burden to proffer a non-retaliatory justification for its actions. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998). Once the defendant has articulated a non-retaliatory justification for its actions, the presumption created by the *prima facie* case is rebutted and plaintiff has a full and fair opportunity to demonstrate through presentation of his own case that the proffered reason was not the true reason for the employment decision. *See Id.*

Defendant concedes the first two elements of the *prima facie* case. First, they acknowledge that Youssef engaged in a protected activity by filing an EEO complaint and initiating a lawsuit claiming that he had suffered race-based employment discrimination in violation of Title VII of the Civil Rights Act. Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, p. 22 (March 1, 2013) (hereinafter, "FBI Brief"). Defendant also concedes that the failure to promote Youssef constitutes an adverse employment action. *Id.* Defendant's main contentions are that the officials accused of the retaliation were not aware of the protected activities, and that there is no causal connection between these activities and the denial of

3

the promotion. Additionally, defendant argues that there was a non-discriminatory justification for the adverse employment action taken against plaintiff, namely the failure to promote Mr. Youssef to the position of Assistant Section Chief. As set forth below, these arguments are without merit.

### A. There is a Dispute of Material Facts as to Whether Zarone and Other Members of the Career Board had Knowledge of Youssef's Protected Activity

In their Motion for Summary Judgment, defendant argues that summary judgment should be granted because Youssef cannot demonstrate that the relevant officials had knowledge of his EEO activity. This argument is without merit and is not supported by either law or fact.

A key Career Board member, Mr. Zarone, downgraded Mr. Youssef on his performance review *one day* before the Career Board met, and that these downgrades were based on Mr. Zarone's own admission that Mr. Youssef was involved in a "legal matter." If Mr. Zarone knew that the "legal matter" was the Title VII proceeding, defendant's ability to obtain summary judgment in this case would be critically compromised. Zarone's actions, taken just one day before his participation in the Career Board create a window into his retaliatory animus towards Youssef, this creates a strong inference that his scoring of Mr. Youssef's "competencies" was tainted.

Mr. Zarone attempted to cover up his knowledge that the "legal matter" referred to in his notes was in fact a Title VII proceeding. Zarone testified under oath that he did not know that Mr. Youssef's legal matter referred to his EEO case. *See* FBI Brief, p. 22, citing to Zarone sworn declaration. *See also* Ex. 20 (Zarone Deposition, Tr. 49, lines 6-14). As set forth below, strong evidence exists from which a jury can conclude that this

statement is false. Mr. Zarone's lie about this key fact not only constitutes strong evidence of causation, but also supports an ultimate finding of intentional discrimination. *Boone v. Clinton*, 675 F.Supp.2d 137, 147 (D.D.C. 2009) (misrepresentation by defendant's witness . . . could undermine the credibility of their neutral justification for not promoting [plaintiff] and could help raise the specter that it was pretextual.").

The facts in this case create a clear dispute of material fact as to whether Mr. Zarone knew that the "legal matter" referenced in his notes related to Mr. Youssef's discrimination case. Pl. Opp. To Def. Stat. of Facts, ¶ 53. There is also a dispute of material fact as to whether Mr. Zarone lied in his initial sworn affidavit about this matter.

## 1.      Standard for Demonstrating Knowledge

Plaintiff can set forth facts that create a material dispute on the "knowledge" issue by either direct or circumstantial evidence. It is well settled in the D.C. Circuit that to survive a motion for summary judgment, an employee need not provide direct evidence that supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did. *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) ("(Plaintiff) need only offer circumstantial evidence").

## 2.      Mr. Zarone had Knowledge of Mr. Youssef's Discrimination Case

### i.      Role as Mr. Youssef's Supervisor

Mr. Zarone's claim that he did not have knowledge that Mr. Youssef's "legal matter" was protected activity lacks all credibility. Mr. Zarone was Mr. Youssef's direct supervisor during a major portion of Mr. Youssef's pre-trial EEO proceedings. As his first line supervisor, Mr. Zarone was in charge of overseeing Mr. Youssef's leave. Ex. 14, Youssef Affidavit, ¶ 39 . It is inconceivable that Mr. Youssef could be absent for days

and that Mr. Zarone would have never asked or known about the EEO activities involved in his absence.

### ii.     Reading of *Mother Jones* Article

Mr. Zarone admitted in his deposition that he discussed an article about Mr. Youssef that appeared in the magazine *Mother Jones* with another FBI official (Jeanine Santa). According to Zarone, "Santa alerted me [to the article, and told me] you might want to be aware because you are the boss." Ex. 20, Zarone Deposition, Tr. 29, lines 10-16. Thereafter, Mr. Zarone obtained a copy of the article and read it. *Id.*, Tr. 29, lines 20-21. Zarone also remembered that he "pulled up" the article because it had a "catchy title," and because Mr. Youssef was "one of the unit chiefs I was supervising." *Id.*, Tr. 30, lines 9-12. Mr. Zarone confirmed that the article he discussed with Santa was Plaintiff's Exhibit 13, a May 14, 2009 article published in *Mother Jones* entitled "The FBI's Least Wanted: Why was one of the bureaus' top terror cops exiled to a desk job."

This article, for which Mr. Zarone admits to "pulling up," remembering its title and having reviewed it at the time, contains information creating a significant factual dispute as to the scope of Mr. Zarone's knowledge when he used the phase "legal matter," and whether or not Mr. Zarone lied when he denied any such knowledge.

The article states as follows:

In the very first paragraph: *"He's [Youssef] sued the bureau for discrimination."*

In the second paragraph: *"The FBI's failure, Youssef says, is a result of deeply rooted institutional discrimination against Middle Easterners."*

Later in the article, recounting Mr. Youssef's career and his allegation that he was sidelined after the 9/11 attacks, the author wrote: *"Finally, in July 2003 Youssef gave up hope and filed suit for discrimination."*

Ex. 13. *See also* Pl. Opp. To Def. Stat. of Facts, ¶¶ 137-140.

### iii.      Equivocation During Deposition Testimony

Furthermore, in his deposition Mr. Zarone equivocated as to the scope of his knowledge of Mr. Youssef's EEO activity. During his deposition, Mr. Zarone stated "I don't know" or some form thereof seventy-seven times. One such time his statement was in regards to whether Mr. Youssef had informed Mr. Zarone that EEO is a protected activity under FBI rules, to which Mr. Zarone responded "he may have." Ex. 20 (Zarone Dep. 49). Mr. Youssef's recollection of this fact was not vague. Ex. 14, ¶ 38.

Mr. Zarone's "memory lapses" and repeated failures to recall significant events creates a genuine issue of material fact, permitting a jury to draw "negative inferences about his state of mind." *EEC v. Toledano*, 317 F.3d 939, 951 (9th Cir. 2002). Facts related to his repeatedly evasive testimony are set forth at Pl. Opp. To Def. Stat. of Facts, ¶ 132.

### iv.      Participation in the Midterm Evaluation

During Youssef's 2009 mid-year "progress review" meeting with Mr. Zarone, Zarone raised the issue of Mr. Youssef's frequent absences. Mr. Youssef explained that the reason for his absence was his involvement in "a legal EEO matter." Ex. 2 (Youssef to Heimbech, November 4, 2009); Ex. 14 (Youssef Affidavit, ¶ 38).

Mr. Youssef provided a detailed account of this mid-year progress review meeting when he appealed his final 2009 PAR ratings to the Assistant Director. As set forth in his

letter to the AD, Youssef told Zarone that many of has absences were "in connection with scheduled depositions regarding my legal EEO matter." Ex. 2, p. 1.  At the meeting Zarone told Youssef that the matters causing him to take leave were major "detractors," but in response Mr. Youssef "reminded him" that the "EEO is a protected activity." *Id.*

### 3.    Other Members of the Career Board had knowledge of the Title VII Participation

#### i.    Mr. Fernandez

Mr. Fernandez was the Chair of the Career Board, he appointed the other three members of the Board, and he had the authority to vote in order to break any tie between candidates being considered for the position in question. He met personally with the candidate who was ultimately selected for the position prior to the Career Board proceeding; another Career Board member, Mr. Zarone, arranged this meeting. Defendant concedes that Mr. Fernandez had knowledge of Mr. Youssef's Title VII participation at all times relevant to this case. FBI Brief, p. 22.

#### ii.    Mr. Chase

Mr. Chase admitted that he was aware that Mr. Youssef was involved in a legal matter, but also claimed that he was unaware that this lawsuit involved an EEO complaint. FBI Brief, p. 22.  However, Mr. Youssef claims that he had discussed his EEO matter with Mr. Chase before the Career Board meeting. Ex. 14, ¶ 7.  Additionally, Chase and Youssef both attended a meeting in which Mr. Youssef alleged derogatory language was directed toward him by a third party due to Youssef's protected activities.  The internal investigation that followed this incident resulted in Chase being interviewed by upper management, and based on Mr. Youssef's understanding of that incident, Mr. Youssef's participation in EEO proceedings should also have been discussed.  This

incident is explained in Ex. 14, Youssef Affidavit, ¶¶ 7-11. For these reasons, the issue of whether or not Chase had knowledge of the EEO complaint is at the very least a dispute of material fact, which for the purposes of summary judgment must be viewed in the light most favorable to the plaintiff.

### iii.   Mr. Castro

Like Mr. Chase, Mr. Castro also claims to have had no knowledge of Mr. Youssef's EEO complaint, but asserts that he only knew that Mr. Youssef was involved in a legal matter. FBI Brief, p. 22. As set forth in Mr. Youssef's affidavit, Mr. Castro and Mr. Youssef had numerous conversations about Youssef's EEO matter. Ex. 14, ¶ 6 ("Mr. Castro and I discussed my EEO lawsuit on numerous occasions in the hallway between his office and mine. We had become friendly at work . . . he expressed sympathy with my plight and told me that he believed there was discrimination and retaliation within the FBI.").[2]

---

[2] In addition to the evidence regarding individual Board member knowledge, there is abundant circumstantial evidence that all members of the Career Board knew of Mr. Youssef's EEO activities. *See* Pl. Opp. To f Facts, ¶¶ 53-57. All members knew that Mr. Youssef was involved with an on-going legal case against the FBI. FBI Brief, p. 22. Three of the four Career Board members admit to knowing that Mr. Youssef was Arab-American or of Middle Eastern descent. Ex. 9, p. 2; Ex. 10, pp. 2-3 and Ex. 11, pp. 2-3. Inexplicably, one Board member, Mr. Castro, denied knowing Mr. Youssef's "race or national origin," despite having known him for "two years" and having considered him a "friend." Ex. 12, pp. 2-3. The FBI's current representation of Mr. Castro's testimony is puzzling, especially given the testimony of Mr. Youssef regarding their extensive conversations about discrimination in the FBI, Ex. 14, ¶ 6, and given his deposition testimony where even Castro contradicts the FBI's current presentation of the facts. Plaintiff's Statement of Facts That Are In Material Dispute, ¶ 73. Moreover, it was well publicized both within the FBI and the worldwide media that Mr. Youssef had been raising EEO concerns over a long period of time. *Id.*, ¶¶ 76-77.

**B.**     **Taken in the Light Most Favorable to Youssef, the Facts Unquestionably Create a Dispute of Material Facts on the Causation and Pretext Issues**

The FBI argued that Mr. Youssef could not demonstrate sufficient evidence of causation on the retaliation count. As set forth below – there was very close temporal proximity between Mr. Youssef's protected activity and defendant's adverse employment action taken against Mr. Youssef. Moreover, the repeated actions and statements of Mr. Zarone evince clear retaliatory animus towards Mr. Youssef. Taken together, these indicate not only that Mr. Youssef's protected activity is what caused defendant to take an adverse employment action against him, but also that defendant's proffered non-retaliatory justification for this action is pretexual.

**1.**     **Temporal Proximity Functions as Evidence of both Causation and Pretext in this Case**

The temporal proximity in this case is of extremely high evidentiary value, and consequently satisfies both the "causation" and the "pretext" elements of Mr. Youssef's claims. In this case temporal proximity is established not simply by the timing of a protected disclosure in relationship to an adverse action, but between a demonstration of animus toward a protected disclosure by a key deciding official, and the participation of that official in the adverse action itself.

As to the causation issue, as a matter of law it is well established that a "very close" temporal proximity between the time that a protected action is taken and the time at which an adverse employment action is taken can, standing alone, be sufficient to prove a causal link between the two. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). While there is disagreement among the courts as how close in time the two actions must be to

10

support an inference of causation, the D.C. Circuit has made clear that when less than one month separates the protected activity and the adverse employment action, no more is necessary for the adoption of such an inference. *See Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).

On October 22nd, 2009, whatever resentment towards Bassem Youssef that had been simmering in the heart of Arthur Zarone boiled to the top. It was on this day that Zarone completed and signed Youssef's PAR for 2009 and submitted it to Armando Fernandez for signature. Ex. 4 (2009 PAR). This PAR was remarkable in two respects: it indicated that in Zarone's view, Youssef's performance had declined in five critical elements, and that he also considered Youssef's performance as only "successful" in three categories. The year before Mr. Zarone had given Mr. Youssef higher ratings in each of these five critical elements, none of Mr. Youssef's ratings were at a level as low as "successful." Ex. 3, Youssef 2008 PAR.

Mr. Zarone included a handwritten note along with the PAR explaining his justifications as follows:

> **Issue:** drop of performance level from 08 → 09
> **Distractors** (sic)
> Legal Matter
> OIG Report.

Ex. 1, p. 1 (typed out) and p. 4 (original handwritten note).

These negative comments demonstrate that Mr. Youssef's performance was *lowered* by Mr. Zarone based, in whole or part, on Mr. Youssef's engagement in protected activity. Moreover, this animus towards Mr. Youssef's protected activity was not just reflected in Zarone's notes, but Zarone also officially lowered five of Mr. Youssef's ratings from the previous year.

This information is critical because the Career Board sat to review plaintiff's application for the promotion in question on October 23rd, 2009, exactly *one* day after Mr. Zarone gave Mr. Youssef a negative PAR. Independently, this is enough to suggest a causal link exists between plaintiff's EEO complaint and the adverse employment action subsequently taken against plaintiff. At this point preparations for plaintiff's EEO litigation were still ongoing. This satisfies the temporal proximity requirement imposed by the courts because there was literally no gap in time between the protected activity and the adverse employment action.

Mr. Zarone's note clearly establishes causation. But it is also evidence of pretext and provides strong evidence as to the ultimate question of intentional retaliation.

**2.      The Facts Suggest a Retaliatory Animus of Mr. Zarone Towards Mr. Youssef's Protected Activity, This Animus Tainted the Career Board's Evaluation of Mr. Youssef's Application for Promotion**

As previously discussed, Arthur Zarone was one of three individuals responsible for sitting on the Career Board that reviewed plaintiff's application for promotion, and that ultimately took an adverse action against plaintiff. The record indicates not only that Mr. Zarone took negative actions against Mr. Youssef, but also that these actions were driven by a desire to retaliate against Mr. Youssef for engaging in protected activity, and that Mr. Zarone suffered convenient memory lapses when pressed for information concerning these actions. Viewed in a light most favorable to the plaintiff, these facts suggest not only that plaintiff's protected activity was the cause of the adverse employment action taken by defendant, but also show that defendant's proffered non-discriminatory justifications for its actions are mere pretext for retaliatory intent.

### i.    Zarone's Negative Comments

It is uncontested that Mr. Zarone was one of the three persons responsible for rating Mr. Youssef during the Career Board proceeding, and that his ratings could have had a determinative impact on the selection process. It seems implausible that animus reflected during the PAR review process regarding plaintiff's protected activities, literally the day before he sat down to participate on the Career Board that would ultimately deny Mr. Youssef's application for promotion, would not impact Zarone's thought process in these proceedings. Mr. Zarone was responsible for one third of the scores given to Mr. Youssef by the Career Board, and was also responsible for one third of the scores given to Powers, the candidate who was selected. *See* Pl.'s Opp. to Def. Stat. of Facts, ¶¶ 100, 101, 106.

### ii.    Denial of Knowledge

Mr. Zarone not only took it upon himself personally to take actions that seem designed to harm plaintiff's career in retaliation for his involvement in a lawsuit against defendant (e.g. preparing a negative PAR one day in advance of the Career Board's consideration of plaintiff for the promotion in question that created an employment record that negatively accessed key elements of Mr. Youssef's performance), but also subsequently denied knowledge of plaintiff's involvement in protected activity. As set forth above, the evidence suggests that Mr. Zarone lied when he stated under oath that he was unaware that the "legal matter" referred to in his notes was related to Mr. Youssef's EEO case. Whether or not Mr. Zarone lied is ultimately a jury question. But as a matter of law evidence of the lie also constitutes strong evidence of pretext and strong evidence on the ultimate question of whether or not the FBI intentionally retaliated against Mr.

Youssef. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *Boone v. Clinton*, 675 F.Supp.2d 137, 147 (D.D.C. 2009).[3]

For these reasons, it seems imperative that the motivations of Arthur Zarone, whose involvement in the Career Board's voting and deliberative process could very well have been dispositive of plaintiff's opportunity to successfully gain the promotion for which he applied, be presented before the jury so that his credibility may be put to the test. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1299 (D.C. Cir. 1998). Moreover, the extensive direct and circumstantial evidence of retaliation within the selection process sets forth a factual dispute that mandates a denial of summary judgment. *Id.*, 156 Fd.3d 1299 ("As we have said, an employment discrimination plaintiff is not limited to arguing that the employer's explanation is wrong on the merits, but he can also attempt to s how by other means that the explanation was made up to disguise illegitimate bias").

3.  **The Facts Set forth in Part III Relating to the Demonstration of Pretext for the Discrimination Count Also Provide Support for a Finding of Pretext on the Retaliation Issue**

In order to avoid unnecessary repetition, Plaintiff incorporates by reference the evidence set forth in Parts III and IV (i.e. evidence of pretext justifying a denial of

---

[3] The two other voting members of the Career Board also denied knowing that Mr. Youssef's "legal matter" involved a Title VII claim. As set forth above, these denials, which evidence strongly suggests were lies, also raise credibility issues material to the issues of motive, pretext and the ultimate question of intentional retaliation. Additionally, it appears quite suspicious that all three Career Board members would acknowledge that they only knew that Mr. Youssef had a legal action, yet all three would give identical testimony that they were somehow unaware that the action related to Mr. Youssef's discrimination case, despite the publicity that surrounded that claim and Mr. Youssef's testimony that he had conversations with all three members, during which his Title VII case was acknowledged. Finally, Mr. Castro's denial regarding his knowledge of Mr. Youssef's ethic background also creates a *Desert Palace* issue. *See* Pl. Opp. To Def. Stat. of Facts, ¶ 73.

summary judgment in the discrimination count) into this section of the brief. Much of the evidence set forth below that demonstrates pretext on the basis of national origin would also support a finding of pretext on the basis of retaliation.

## III.   SUMMARY JUDGMENT MUST BE DENIED ON THE DISCRIMINATION COUNT

### A.    Legal Standard

Plaintiff's discrimination claim is in keeping with the three-pronged burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order to set forth a case of discrimination resulting in failure to promote actionable under Title VII, the plaintiff must establish *prima facie* discrimination by showing that: (1) he is a member of a protected class; (2) he applied and was qualified for an available position; (3) he was not selected; and (4) either somebody outside plaintiff's protected class was chosen to fill the position. *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000). Defendant concedes that Plaintiff has stated a *prima facie* case by establishing that he "is of Egyptian national origin, was on the list of qualified candidates for the ASC position but was not selected; and Powers, the selectee, was not a national origin minority" (Def.'s Mem. Summ. J. 8).

Once a *prima facie* case of discrimination has been established, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory justification for the challenged adverse personnel action. *McDonnell Douglas Corp.*, 411 U.S. at 802. If the defendant succeeds in articulating such a justification, the burden shifts back to the plaintiff to offer sufficient evidence from which a jury could infer that defendant's rationale was merely a pretext for discrimination. *See Id.* at 804. Pretext can be shown "either directly by persuading the court that a discriminatory reason more likely

15

motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

When reviewing whether summary judgment is justified in an employment discrimination case, after the defendant has provided a legitimate nondiscriminatory reason, "the one central inquiry on summary judgment is whether the plaintiff produced sufficient evidence for a reasonable to jury to find that the employer's asserted non-discriminatory reason [or non-retaliatory reason] was not the action reason and the employer intentionally discriminated [or retaliated] against the plaintiff on a prohibited basis." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012); *Aka v. Wash. Hosp. Ctr.*, 525 F. 3d 1222, 1298 (D.C. Cir. 2008).[4]

**B.   Dissemble Pretext Test**

As stated above, the plaintiff can prove pretext by "by showing the employers proffered explanation is unworthy of credence." *Id.* One way of proving this is by providing evidence that "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 147 (2000). The Defendant claims that Youssef cannot prove pretext because there is no evidence from which an

---

[4] The Supreme Court has held that "qualifications evidence" standing alone, "may suffice, at least in some circumstances," to show that an employer's proffered justification is pretext for discrimination. *Ash v. Tyson Foods Inc.*, 546 U.S. 454, 457 (2006). In this case Mr. Youssef does not solely rely on a limited qualification-test basis for demonstrating discrimination. Indeed, as explained in the section on retaliation, and in this section on discrimination, there is overwhelming evidence of bias and pretext in the promotional decision making process, in addition of qualifications-related evidence that create clear disputes of material fact on this issue. *Paterson v. McLean Credit Union*, 491 US 164, 188 (1989).

inference of discrimination may be drawn. (Def.'s Mem. Summ. J. 21). The Defendant has provided no undisputed evidence to prove that there are no factual disputes.  In contrast, Mr. Youssef has set forth evidence that the Defendant is dissembling the facts based upon: (i) Zarone's (and other Career Board members') attempt to deny any knowledge that the legal matters for which Mr. Youssef was engaged were EEO related; (ii) Zarone and Fernandez's creation of a contrived issue to justify their downgrade of Youssef in his performance review; (iii) the two performance ratings lowered by Zarone on the day before the Career Board met that were eventually overturned by the Assistant Director of the FBI's Counterterrorism Division because they could not be justified; (iv) Fernandez met personally with the candidate the Career Board would eventually select prior to the Board meeting, this meeting between Fernandez and Powers was facilitated personally by Zarone; and (v) Mr. Zarone lowered Mr. Youssef's performance ratings in five categories, and graded him merely "successful" in three categories just one day before the Career Board meeting.

### 1.   Zarone's Attempt to Deny Any Knowledge of the Legal Proceedings

Youssef had a protected right to take off official time on an EEO matter without being retaliated against. *See* Ex. 19, Deposition of Armando Fernandez, at 46:9 – 47:8 ("Based upon your knowledge of EEO matters within the FBI, can an employee take off official time to work on an EEO matter, yes or no?" With proper documentation, yes, sir. And can the FBI downgrade an employee's PAR because they took official time to work on an EEO matter, yes or no?  To take official time to work on an EEO matter, no sir.) However, throughout this litigation Zarone has attempted to show that he had no knowledge that Youssef was involved in any EEO related litigation.

The evidence regarding Zarone's (and the other two voting Career Board members') denial of knowledge that Mr. Youssef's legal matter concerned EEO issues, taken in the light most favorable to Mr. Youssef, creates a jury question on issues related to credibility, pretext and discriminatory bias.

## 2.    Phony Performance Review

Once the performance review was illegally downgraded in response to Youssef's protected right to take time off for his EEO claim, Zarone and Fernandez had to fabricate an excuse to justify the downgrade in five major categories and a low "successful" rating in three categories.  This resulted in a false allegation that Youssef was responsible for mishandling contract negotiations concerning the renewal of services provided by telecommunications companies to the FBI. *See* Ex. 19, Tr. 22, line 10 – Tr. 23, line 4 (Fernandez deposition) ("Do you think these absences impacted his ability to function effectively as Unit Chief?  Yes . . . he didn't instruct his people under him to follow through on projects; he would just leave . . . many times over and they would say Bassem never told us to do anything . . . I instructed Art Zarone to do it [discuss with Bassem the current issues] I found out about one project that had not been taken care of . . . it turned out he had dome minimal work on the contract and we were about to lose the contract with a 'telecommunications' carrier.")

Testimony regarding Mr. Youssef's alleged performance problem relating to the telecommunications contract negotiation is a complete fabrication. Mr. Youssef did not have any performance problems related to the contract renewal issues.  In fact, Mr. Youssef properly negotiated the contract renewals, and responsibility for the delay in approval of the contracts rested with the FBI Office of General Counsel, which had to

review and approve the contracts. Ex. 14, ¶¶ 29-36. However, Mr. Youssef was able to resolve this issue by reaching an agreement with the telecommunications companies to continue to provide service on an invoice basis until the General Counsel's office approved the agreements. Ex. 14, ¶¶ 32-34.

Not only was this so-called delay not the result of any performance issues within Mr. Youssef's Unit, but Mr. Youssef was able to reach an agreement with the companies which permitted the FBI to continue to receive the services they needed while also giving the Office of General Counsel the time it needed to complete its review. The fact that Zarone and Fernandez were forced to create a fictitious performance issue to justify their own biases and illegal actions proves a serious factual dispute that can only be decided by a jury. Moreover, if the jury were to credit Mr. Youssef's version of events, this incident would constitute further evidence of motive, pretext and intentional discrimination under the *Desert Palace* line of cases.

### 3.     Overturned PAR Scores

Once Zarone completed his PAR review of Youssef and downgraded his performance review, the downgraded PAR ratings were approved by the Chairman of the Career Board, Mr. Fernandez. Ex. 3 (2009 Youssef PAR). Youssef, who had performed his work to the highest standards of the FBI, appealed his performance review to Assistant Director of Counterterrorism Michael Heimbach. Ex. 2 (Youssef appeal letter). Upon review of the matter, Assistant Director Heimbach upgraded two critical elements on Youssef's performance review. *See* Ex. 20, Zarone Deposition at 58:2-19 (citing to a letter by memo by Assistant Director Michael Heimbach to Youssef, "I concur you have adequately demonstrated an outstanding rating in critical elements number two and four .

. . . I will ensure critical elements two and four are changed to outstanding."); Ex. 5 (Heimbach memo). Heimbach's decision to upgrade two elements of Mr. Youssef's PAR is strong evidence that Mr. Zarone and Mr. Fernandez had negative views of Mr. Youssef which could not be objectively sustained. Zarone's admission that these views were premised on Mr. Youssef's "legal matter," in which Mr. Youssef was attempting to resolve a discrimination concern, undermines the FBI's argument on this matter.

### 4.   Fernandez

When Youssef applied for a position as an Assistant Section Chief, he faced a Career Board hand picked by Mr. Fernandez that included Zarone. *See* Ex. 19, Zarone Deposition at 55:21-56:22. Mr. Youssef was the only applicant for whom Fernandez did not interview or speak to prior to the Career Board meeting. *Id.* at 50:4 – 52:3 ("Usually when I have a posting and I am the point of contact, Mr. Bassem has been the one and only person that has not approached me . . . usually when a person is interested in the job, you let people know hey, I want this job, I'm interested, and this is why I'm interested. And, again, I found that extremely odd that he would not approach me . . . I had a call from two candidates and a face-to-face from one of the candidates.")

Even though Youssef was following the rules by not discussing the matter with Fernandez, he was chastised for his efforts. Youssef was not chosen to be the Assistant Section Chief, but instead the position was given to Mr. Daniel Powers, whom Zarone personally introduced to Fernandez, and who was the only candidate to have a face-to-face meeting with Zarone. *Id.* at 52:1-22. There are factual disputes as to what was discussed during the face-to-face meeting between Fernandez and Powers, as well as the reason Zarone personally arranged for the meeting between Fernandez and Powers prior

to the meeting of the Board.   These actions are clearly suspicious, and demonstrate evidence of bias and disparate treatment between Youssef and Powers.

###     5.        Fernandez Made Youssef Acting Section Chief

Immediately after the Career Board made its decision denying Youssef the Assistant Section Chief (ASC) position, a most inconsistent state of events occurred. Fernandez appointed Youssef Acting ASC, as Zarone had left this position and Powers had not yet taken over. *See* FBI Exhibit, Deposition of Youssef, 10:1-13:20. Fernandez, who was the Chairman of the Career Board, had severely questioned the effectiveness of Youssef as a Unit Chief in order to justify the decision not to promote him. *See* Ex. 10, Fernandez Deposition 22:10 – 24:9. Fernandez had approved the downgraded performance review of Mr. Youssef and testified that he discussed these Youssef performance issues with Zarone.

If Fernandez thought that Youssef was so incompetent as to his job, why did he appoint him Acting ASC?  The ASC is the top aide to Fernandez, so if Youssef were such a poor employee why would Fernandez give him the acting position and then ask him to stay longer?  *See* FBI Exhibit, Youssef Deposition 11:15, 13:12-20 ("I was asked by the section chief . . . I have a recollection of me saying I would do it for a month.  He asked me to stay longer.  I actually didn't want to, but obviously he's the section chief.  He said, I want you to stay longer, so I stayed longer.")

The PAR downgrade, combined with Mr. Fernandez's deposition testimony that was highly critical of Mr. Youssef's performance immediately before the Career Board meeting, simply cannot be squared with Fernandez's decision to appoint Mr. Youssef as the Acting Assistant Section Chief.  Based on this conflict, a strong inference can be

made that Zarone and Fernandez lied about these so-called performance issues in order to justify Youssef's non-selection and the performance downgrade.

Evidence that Zarone and Fernandez lied about these issues is fully supported by Mr. Youssef's sworn affidavit, *see* Exhibit 14, ¶¶ 29-36.

Again, this evidence that Zarone and Fernandez fabricated the performance issue related to the telecom negotiations is evidence of motive, pretext and intentional discrimination/retaliation under the *Desert Palace* standard.

C.    **Four Corners Argument**

The FBI emphasizes that an applicant's examples demonstrating their competency in an application for promotion are supposed to be rated on their written content only. Erkan A. Chase Decl., ¶ 6 (noting that voting members of the LCB are instructed to use "four corners" approach to rate competency examples). This is not how Powers and Youssef's applications were compared, as LCB members were willfully ignorant of material on Youssef's examples, but considered outside information regarding Powers'. Evidence indicating that an employer misjudged an employee's performance or qualifications calls into question whether the stated reason for its action is a pretext masking prohibited discrimination. *Tyler v. RE/MAX Mt. States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (citing *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). A plaintiff can demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005) " (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

In their discussion of Mr. Powers' application, there is an abundance of evidence that the Career Board members ignored the "four corners" of Mr. Powers' FD-954, and presumed or aggrandized his statements in a manner that made his application appear stronger then written. The factual basis for this is set forth in Plaintiff's Opposition to Defendant's Statement of Material Facts Not in Genuine Dispute and Plaintiff's Statement of Material Facts in Dispute (hereinafter, "Plaintiff's Opposition to Defendant's Statement of Facts"), ¶¶ 30-31, 33-36 and 43-44.

On the other hand, no such benefit of the doubt was extended to Mr. Youssef. Not only was he strictly held to the "four corners" of his FD-954, much of the information in his document was completely ignored. Many of Youssef's accomplishments, which are well known throughout the FBI and which are matters of public record, were cavalierly brushed off by the Board members in a manner that demonstrated willful ignorance at best, and outright misrepresentation at worst. The factual predicate for this argument is laid out in detail in Plaintiff's Opposition to Defendants' Statement of Facts, ¶¶ 32, 37-38, 40, 45-46.

Given the differing amounts of knowledge the board demonstrated when considering the weight of Youssef and Powers' awards, and the evidence of bias demonstrated in the above-cited factual predicates, as a matter of law it must be left to a finder of fact to determine whether the Board's evaluation constituted pretext.

### D.    Objective Criteria

Once an employer elects to use subjective criteria for promotional decisions, "courts traditionally treat explanations that rely heavily on subjective considerations with caution." *Aka*, 156 F.3d at 1298. The FBI structured its promotional process focusing on

23

highly subjective criteria, such as "leadership," "judgment," and "interpersonal ability." Ex. 6, Job Posting, pp. 2-3. As explained in *Aka*, employers who abandon objective criteria when making promotional decisions risk creating a jury question over such decisions. Indeed, the court went so far as to warn that "heavy use" of subjective criteria such as "'interpersonal skills' could support an inference of discrimination. *Aka*, 156 F.3d at 1298. Unquestionably, the FBI used subjective criteria to evaluate the candidates for the Assistant Section Chief position. Thus, the ability of the FBI to rely on the Board members' subjective opinions of Youssef and Powers is compromised. The FBI cannot choose to rely heavily on subjective criteria, and then complain when it is pointed out that such criteria can easily mask bias, discrimination and retaliation.

However, as is explained in the next section in some detail, the two promotional criteria relied upon by the FBI in the summary judgment brief to justify the selection of Powers can still be evaluated based on objective criteria. Both Powers and Youssef responded to questions concerning their experience in counterterrorism. Their respective responses can be compared, as the FBI attempted to do in its brief. Furthermore, because both Powers and Youssef relied upon their experiences as Legal Attachés in responding to questions concerning "leadership," the respective responses of the two candidates on this criteria can also be evaluated, as the FBI also attempted to do in its brief.

IV.    **DEFENDANT'S ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT ARE UNFOUNDED AND WITHOUT MERIT**

The FBI has articulated several reasons as to why Mr. Youssef was not discriminated against based on his national origin. (1) Messrs. Castro, Fernandez and Chase were national origin minorities themselves and thus were incapable of discriminating against Mr. Youssef; (2) Mr. Zarone was not aware of Mr. Youssef's

national origin; (3) Messrs. Zarone and Fernandez treated Mr. Youssef favorably; (4) Mr. Youssef did not mention discrimination in an informal counseling session; (5) the FBI had a legitimate non-discriminatory reason for it's adverse action; (6) Mr. Youssef cannot prove causation; (7) and Mr. Youssef cannot prove pretext.

All of these arguments are completely without merit for the reasons set forth above and for additional reasons set forth in this section.

### A.   None of the Career Board Members Are of the Same Protected Class as Mr. Youssef

Defendant cites *Glass v. LaHood* in its motion for summary judgment, which held that being in the *same* protected class undermines an inference of discrimination. 786 F. Supp. 2d 189, 216 (D.D.C. 2011). However, in that case the ultimate selectee shared the exact same racial characteristics as the complainant, and their supervisor was, like the complainant, a woman. Mr. Youssef has not alleged sex discrimination and none of the Career Board members were of Egyptian national origin or Arab-American. The final selectee was Caucasian. The FBI offers no evidence that one national origin minority is incapable of discriminating against another. There is no factual basis whatsoever that an Africa-American or a Hispanic-American or a Turkish-American cannot harbor animus against an Arab-American. The FBI offers absolutely no case support for this argument, other then cases that cut against them (i.e. are limited to discrimination between persons of the *same* protected characteristics).

### B.   Castro Was Aware of Mr. Youssef's National Origin.

Defendant asserts that Castro, "was not aware of Youssef's national origin" and therefore "he cannot be said to have acted because of it." FBI Brief, p. 9. They repeated this assertion on page 11 of their brief. *Id.* P. 11 ("...one voting member was unaware of

25

Youssef's national origin . . .''). These assertions are false and misleading. Castro admitted at his deposition that he perceived Mr. Youssef to be of Middle Eastern descent. Ex. 22, Castro Deposition, Tr. 32, lines 1-3. Furthermore, based on the representations made in Mr. Youssef's affidavit, the assertions made by defendant (and by Castro in some of his sworn statements) are not credible. Ex. 14, ¶ 6.

In a further effort to prove that no discriminatory animus existed, defendant relies upon Castro's self-serving declaration that "as someone who is a minority, I would not have allowed or participated in a discussion regarding the applicant's race, national origin, or any other protected characteristic" (FBI Brief, p. 9). However, courts place no credence in a self-serving affidavit that conflicts with one's own previous deposition at the summary judgment state. *See Smith v. Brown & Williamson*, 108 F. Supp.2d 12, 17 (D.D.C 2000); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1992). Indeed, Castro admits to witnessing discrimination against minorities within the FBI without reporting it. Ex. 22, Tr. 26, lines 11-13 and Tr. 58, lines 5-20. Castro's admission that he witnessed discrimination and failed to report it cuts against his self-serving testimony as to how his status as minority would have somehow caused him to prevent discrimination against Mr. Youssef. When it came to his career, Mr. Castro admitted to remaining silent when he personally witnessed discrimination. Moreover, Mr. Castro's admitted silence raises an issue as to whether or not he engaged in official misconduct. FBI employees are required to report discriminatory conduct as part of their official duties. The failure to make such a report is misconduct. Ex. 14 , Youssef Affidavit, ¶ 40.

### C.     Messrs. Zarone and Fernandez did not treat Mr. Youssef favorably

The FBI contends "Zarone and Fernandez treated Mr. Youssef favorably." (FBI Brief, p. 9). Specifically, defendant notes that Mr. Fernandez asked Mr. Youssef to serve as Acting ASC after Mr. Zarone transferred out of the position. *Id.* at 9.

As explained above, perhaps most the most confounding aspect of defendant's claim in this regard is how defendant can attempt to square Mr. Youssef's appointment as Acting ASC with its agents' arguments that Mr. Youssef was not selected to permanently fill the position for performance related issues. Mr. Fernandez claimed that Mr. Youssef was single-handedly to blame for complications in retaining a telecommunications contract, stating that Mr. Youssef had "dropped the ball" and that "Youssef had not worked on this contract." (*See* Pl.'s Opp. to Def. Stat. of Facts, ¶ 14). This is not compatible with defendant's assertion of favorable treatment following Mr. Zarone's transfer and does not infer a lack of discriminatory intent. Rather, Mr. Youssef was asked to serve as the ASC because he was qualified for the job, not because of Fernandez's favorable opinion.

Furthermore, defendant claims that Mr. Youssef received favorable treatment from Mr. Zarone, arguing that this can be seen by Mr. Zarone's overall review of Mr. Youssef's annual performance as "Excellent" during the years 2008 and 2009. This argument is baffling. While Mr. Zarone did indeed give Mr. Youssef an overall rating of "Excellent" in 2009, he downgraded Mr. Youssef's performance on his PAR in five different areas, and gave him the very low "successful" rating in three areas, on the day before to the Career Board meeting, in five critical categories. (See Pl.'s Opp. to Def.'s Statement of Facts 11). This downgrade mentions Mr. Youssef's "legal matter" as a

27

"distractor" (*sic*). (See Pl.'s Opp. to Def.'s Statement of Facts 12). Two of these downgrades were revoked on appeal by the Assistant Director of the FBI. This is hardly favorable treatment.

### D.   The FBI's Claim That Mr. Youssef Cannot Prove Causation is Without Any Factual or Legal Basis.

Defendant argues that "mere awareness" of Mr. Youssef's EEO complaint is not sufficient to establish a retaliatory motive. FBI Brief, p. 26. Regardless of whether this claim is accurate, Mr. Youssef has relied on more than "mere awareness" of his EEO complaint in establishing causation. The negative PAR for Mr. Youssef that Mr. Zarone completed and that Mr. Fernandez approved just one day before the Career Board's consideration of Mr. Youssef's application for promotion clearly indicates far more than "mere awareness" of Mr. Youssef's EEO claim. Zarone's action in downgrading five critical elements of Mr. Youssef's performance, and his decision to rate Mr. Youssef with the very low "successful" rating on three critical performance elements, demonstrates that Mr. Zarone had a very negative view of Mr. Youssef as an employee the *day before* he cast his vote on the Career Board. It is this negative opinion of Mr. Youssef, based in whole or in part on Mr. Youssef's being "distract[ed]" by his "legal matter," (i.e. his EEO case), that creates an inference of discrimination (and retaliation). This level of proof is far beyond the "mere awareness" line of cases the FBI relies upon.

Furthermore, as explained above, Mr. Zarone's post-hoc attempt to lie about his knowledge that the underlying "legal matter" was EEO related is devastating to the FBI's case under the *Desert Palace* line of cases.[5]

_____

[5] Defendant also argues that the "most telling" indication that Mr. Youssef was not the victim of discrimination was his failure to mention this in an informal meeting in which

## V.   DEFENDANT'S ARGUMENTS THAT POWERS WAS MORE QUALIFIED THAN YOUSSEF ARE WITHOUT MERIT

On pages 11-21 of their brief the FBI sets forth its case that Mr. Powers had better qualifications then Mr. Youssef for obtaining the Assistant Section Chief position. As set forth below, these arguments are without merit.

### A.   Mr. Youssef's Objective Qualifications

Before addressing the specific merits of the "qualifications" arguments raised by the FBI, it is important to note that Mr. Youssef's qualifications far surpassed those of Mr. Powers based on key information contained in the official application filed by each candidate, known as the "FD-954" filing. It is also important to note that the statements made in Youssef's FD-954 were subject to objective verification by the FBI, and are *not* simply grandiose statements put forward by Mr. Youssef (as defendant implies). Ex. 15, pp. FBI 3403-04.

A comparison of the FD-954 demonstrates the following "objective" information about each candidate:

- At the time Mr. Youssef was a highly experienced FBI case agent, with responsibility as the coordinator for the investigation into the Blind Sheik's

---

he alleged that he believed he was a victim of retaliation. FBI Brief, p. 10. What is "most telling" about defendant's argument is the fundamental weakness of their entire defense if they believe this to be their "ace in the hole." Mr. Youssef's failure to reiterate his belief that he was the victim of employment discrimination in no way affects his claim before this court. As a matter of law, Mr. Youssef's discrimination claim was properly and timely filed and has been fully preserved. During the informal counseling stage of this proceeding (i.e. before Mr. Youssef was required to file a formal complaint and explicitly set forth the basis for the complaint), Mr. Youssef did meet with an EEO counselor to discuss the retaliatory PAR given by Mr. Zarone. The fact that Mr. Youssef focused on the handwritten notes of Zarone, which demonstrated retaliation, during his counseling sessions, in no way acted to diminish his belief that he was also the victim of discrimination. The FBI can point to no evidence whatsoever that indicates that Mr. Youssef informed the EEO counselor that his case did *not* also concern discrimination.

organization (i.e. the investigation into the first World Trade Center attack), Mr. Powers was still working as a highway patrolman in Juniper, Florida. Compare Ex. 7, p. 2 with Ex. 8, p. 2.

- While both candidates highlighted their experience as Legal Attachés' as examples of "competency," Mr. Youssef served as a Legal Attaché in the Middle East (an area of particular import for combating Middle Eastern terrorism) for 41 months, while Mr. Powers only served as an Attaché for 15 months, in a country not as directly involved in international terrorism as Saudi Arabia and the other Gulf nations served by Youssef. Compare Ex. 7, p. 2 with Ex. 8, p. 2.

- Mr. Youssef served "on numerous occasions" as the Acting Section Chief of CXS. Mr. Powers never served as Acting Section Chief for CXS. The CXS section is the very section for which the person selected for the promotion would serve. The Acting Section Chief position is actually at a higher level then the Assistant Section Chief level. Ex. 7, p. 1;

- Mr. Youssef served in two Unit Chief positions in CXS while Powers never held a position in CXS. *Id.*

Significantly, the FBI completely ignores the radical differences in experience and seniority between Youssef and Powers. However, the Career Board rules do permit Boards to evaluate these types of factors. Ex. 15, FBI page number 3440 ("Totality of Experience").

**B.      The FBI's Criticism of the Manner in Which Mr. Youssef Filled Out His FD-954 is Without Merit**

Defendant accuses Mr. Youssef of being lazy on his FD-954 submission.   They state that he "simply resubmitted a prior unsuccessful FD-954" as his application for the Assistant Section Chief position.  FBI Brief, p. 14.

However, the facts portray a different scenario.    Prior to submitting his application for the position in question, the FBI  had posted a notice seeking applications for the *same job*, i.e. an Assistant Section Chief within the CXS.  Mr. Youssef applied for the job.  However, the FBI pulled the listing, negating Mr. Youssef's application.  When Mr. Youssef contacted the employment office and asked why they had pulled the notice he was informed that the FBI wanted to "increase the candidate pool."  Significantly, had Mr. Youssef been the only applicant for the position, the FBI would have been compelled to grant him that promotion.

Instead, the FBI pulled the listing, and the position was re-listed.   When Mr. Youssef applied for the re-listed position, the prior FD-954 contained most of the information he need to fully set forth his competencies, so changes to the two documents were minimum.  Ex. 14,  ¶¶  2-5, Youssef Affidavit.

**C.      The  FBI's  Argument  That  Powers  Was  the  Better  Qualified Candidate is Without Merit**

The FBI predicates its argument on the contention that the Career Board members found that Powers' "individual examples effectively conveyed skilled abilities" more effectively than Mr. Youssef's had.  FBI Brief, p. 13.  This is a very important argument for the FBI to make because, under the controlling case law, if Mr. Youssef can demonstrate that Powers' was not the most qualified candidate, a jury question can be

raised that permits a finding for Youssef even without reliance upon the overwhelming evidence of bias and retaliation in this case.   In other words, case law supports the proposition that the qualifications issue may, standing alone, be sufficient to justify denying the FBI motion. *Ash v. Tyson Foods Inc.*, 546 U.S. 454, 457 (2006).

1.    **The FBI's Argument that Youssef's FD-954 Simply Demonstrated That Youssef Had Performed His Job is Inconsistent With the FBI's Analysis of Powers' Application**

Defendant commenced its attack on Mr. Youssef's FD-954 by asserting that Powers' application set forth strong examples of leadership, while Mr. Youssef's simply set forth activities expected of any FBI agent.  To make this point defendant quoted from this section of Mr. Powers' FD-954:

> Powers' examples . . . explained that he had 'identified the resources needed [for the investigation], directed the establishment of a command post, ensured the successful return of six murdered Americans . . . called together and chaired meetings with over twenty members of the two separate governments. . . [and] tasked investigators and intelligence officers not only from the FBI, but also from the CIA . . .

FBI Brief, p. 13.

Relying on this quotation from Powers' FD-954, the FBI argued that Career Board member Chase found this example "demonstrated skill in leading a team" etc., and that Zarone found that this example "showed skilled leadership." *Id.*  In contrast, these two Career Board members argued that Youssef's leadership example "simply showed Youssef performing tasks" that would be expected of any Unit Chief or Legal Attaché. FBI Brief, pp. 15-16.

However, defendant's argument is weak and defective. First, the example cited above by defendant merely sets forth performance items that would be "expected from any Legal Attaché." Ex. 14 (Youssef Affidavit, ¶ 12).  Identifying resources needed for

an investigation, establishing a command post, working to ensure the return of the bodies of U.S. citizens who died abroad, and chairing large intergovernmental meetings on matters of interest to the FBI are standard functions for an FBI Legal Attaché. *Id.*

Mr. Youssef's FD-954, on the other hand, lists numerous items that are unique and demonstrate strong leadership. For example: Mr. Youssef was named the *first* Chief of one of the four Units in CXS. Thus, in addition to effectively managing and leading a unit (which all of the Career Board members would know consisted of approximately fifty persons) that already existed and simply needed a new Chief, Mr. Youssef had to "establish" the Unit's entire "infrastructure, mission, goals and objective and procedures where none had previously existed." He was also responsible for building the Unit from the bottom up. The Unit started with just four employees and, through Youssef's leadership and direction, grew to 445 employees. Furthermore, Youssef developed a system to provide assistance to "various foreign security services," helping them to exploit their computer media. Mr. Youssef "enabled the FBI to acquire computer media from various foreign intelligence services" that were thereafter exploited by his DocEx Unit. Ex 7, Youssef FD-954, p. 3(Competency: Leadership Example 1). This is not simply the work of any Unit Chief, as most Unit Chiefs do not have to build out the Unit they are to manage, and do not show the type of skilled leadership to create a successful program working with foreign intelligence agencies.[6]

---

[6] Moreover, the leadership and skills demonstrated in this Competency Leadership example related *directly* to the work being performed within the CXS, the section for which Mr. Youssef was seeking the Assistant Section Chief position. Clearly, the leadership experience set forth above demonstrated that Mr. Youssef had advanced knowledge of the CXS programs and had the ability to lead in this area.

The FBI's attempt to brush over the significant "leadership" skills demonstrated in the Leadership Competency Example 2 further demonstrates the biased actions of the Career Board members. Portraying the leadership competencies set forth in this example as simply a Legat doing his job is remarkable, especially given the example cited to by the FBI as proof that Mr. Powers was a strong leader.

In example 2, Youssef uses the Kobar Towers attack as a predicate example upon which his leadership skills were based. Kobar Towers concerned a direct attack on America, resulting in 19 U.S. service members being killed. Given the context of this attack, and the forces responsible for this attack, it was well known at the time as one of the major terrorism investigations undertaken by the United States. Ex. 14, ¶ 13.

Mr. Youssef points that he was named the *first* Legal Attaché in Riyadh. Again, being named the "first" implies to any objective and non-biased observer that this individual, in order to succeed in his or her task, will need strong leadership skills not necessarily needed by someone who simply comes in and fills the shoes of a leader in an existing office. Mr. Powers did not establish the Legat office in India.

Mr. Youssef informed the Career Board that far from simply managing a pre-existing office, he "opened and established the operational/administrative framework of the Legat Office and built an impressive liaison base of prominent law enforcement and intelligence officials in Saudi Arabia as well as the other six Gulf states." Ex. 7, p. 3.

Mr. Youssef did not simply "chair a meeting," he build a strong network in order to enable the FBI to liaise with intelligence agencies throughout a region of the world that plays a fundamental role in the number one priority of the FBI: combating Middle Eastern terrorism that directly threatens Americans.

Mr. Youssef then explained that at the time he was named the Legat, "relations with Saudi officials were strained." Again, this is highly significant based on the position of Saudi Arabia in the context of obtaining intelligence information in the effort to protect America from another attack from Middle Eastern terrorists. Mr. Youssef then explained how he provided extraordinary leadership in determining the root cause of the strained relations, and implemented a program that actually fixed the problem.

It is well known that the principle role of an FBI Legat is to effectively liaise with foreign governments. Ex. 14, ¶ 14 (Youssef Affidavit). The leadership necessary to properly perform the job of Legat is, for the most part, to be judged on the results obtained by the leader of the FBI in a foreign country. Mr. Youssef stated, and it was confirmed by the review of his application, that he provided the leadership necessary to help solve the "strained" relations between the United States/FBI and a key partner in the War on Terror.

In contrast, there is nothing in the statement cited to by Chase and Zarone that demonstrated extraordinary effective leadership while Powers served as a Legat. There is no indication that India was hostile to working with the United States on the Mumbai attacks, or that Powers had to go beyond his expected performance levels to somehow figure out how to create the "trust" necessary to have Indian intelligence agencies work with U.S. intelligence agencies on this attack. Moreover, Powers stated that he chaired a meeting with numerous representatives from various entities, he did not state that many of these entities were resistant to cooperation, or that he had to perform some extraordinary function to get them to attend the meetings, let alone provide valuable intelligence.

The difficultly in comparing two "competencies" on a highly subjective area such as leadership is obvious.   However, when these competencies are broken down to objective criteria, comparisons can be made.

For example, in the area of being a Legal Attaché: (1) Youssef established an effective office; Powers simply took over a pre-existing office; (2) Youssef served as a Legal Attaché for 41 months, Powers only served for 15 months; (3) Youssef provided leadership in an investigation of a terrorist attack directly aimed at America; Powers provided leadership in an attack in which U.S. citizens were not the primary targets; (4) Youssef provided leadership in the Middle East, in the area of the world that is the subject area of the most important terrorist investigations impacting the United States, while Powers was stationed in India; (5) Youssef's leadership resulted in an actual material and significant increase in the successful liaison between key partners in the War on Terror while there is no indication that Powers' work resulted in any breakthrough between high ranking intelligence officials in the US and India. Compare Ex. 7 (Youssef FD-954), p. 3 with Ex. 8 (Powers FD-954, p. 3-4).

Thus, when stripped of the FBI's hyperbole, an objective analysis of the "leadership" competency demonstrates that Mr. Youssef's presentation on his FD-954 was far superior to Powers', especially if this Court reviews the two competencies in the light most favorable to Mr. Youssef, for which it must in this summary judgment proceeding.

2.     The FBI's Attempt to Demonstrate That Powers' "Competency" in the Area of Counterterrorism Was Superior to Mr. Youssef's is Frivolous

The second area for which the FBI attempted to demonstrate that Powers' competencies in counterterrorism (CT) were somehow stronger then those of Mr. Youssef was in the area of counterterrorism. In this area, where Mr. Youssef is without question an international star, the FBI's attempt to demonstrate that Mr. Powers' had stronger CT competencies then Mr. Youssef flunks any reasonable or non-biased analysis.

Each candidate was required to set forth two separate and independent examples of their competency in the CT area. These are referred to as examples 1 and examples 2, and are separately analyzed.

*CT Competency Example 1:* In his first CT competency, set forth on page 357 of Powers' FD-954, Mr. Powers stated that he was "responsible for managing and leading" "an international terrorism investigation." Ex. 8, p. 8. Powers did not describe this investigation as "complex," a term he used to describe a second investigation he worked on set forth in his second CT competency. Powers states that the result of the investigation led to the "subjects voluntarily leav(ing) the United States." He then states that some of his subordinates (not him) were nominated for the FBI Director's award, but apparently these persons did not receive the award. *Id.* This investigation occurred in the FBI's relatively small Indianapolis field office.

In comparing Power's first CT competency with Mr. Youssef's first CT competency, Chase was critical of Youssef, stating that Youssef did not "articulate case agent responsibilities or use of sophisticated techniques." FBI Brief, p. 15. The actual

37

facts demonstrate a very different picture. First, defendant speculates that the "information" Mr. Youssef obtained from an "active terrorist cell in 1993" was obtained *"following* the first World Trade Center bombing. FBI Brief, pp. 14-15. The FBI's discussion of the timing of Youssef's casework is inaccurate. The intelligence was obtained *before* the first World Trade Center bombing. Although Mr. Youssef did not provide the date on which he obtained his intelligence, the discussion in the competency demonstrates that the intelligence and some of his key investigatory work occurred before the first bombing.

It is a matter of widespread public knowledge (widely discussed and analyzed in the public arena and the CT-communities as a result of the inquiry into the 9/11 attacks) that the FBI Newark office requested a FISA on the Blind Sheikh but was *denied*. In other words, Newark could not obtain the necessary intelligence based on their investigation to obtain permission to execute a FISA. However, it is also widely known in the public domain, and was part of the detailed public discussions surrounding the inquires into why the World Trade Center was successfully attacked *twice* by Middle Eastern terrorists, that shortly *before* the first World Trade Center attack, the Newark office did obtain sufficient intelligence to obtain the FISA warrant. Ex. 14, ¶ 16.

As explained in the FD-954, Mr. Youssef was responsible for the information necessary for the "predication" of what in fact are sophisticated intelligence tools on the Blind Sheikh. Ex. 7, p. 8. As is fully demonstrated in the public record, this predication was obtained *before* the first bombing.

Chase states that the first Youssef CT competency failed to demonstrate Mr. Youssef's use of "sophisticated techniques" in conducting an intelligence operation. This

is completely false. The following sophisticated techniques are set forth in Mr. Youssef's FD-359 [Ex. 7, p. 8]:

Use of a "CT Asset:"   The successful use of a "CT Asset" is the most sophisticated and difficult technique employed in any counterterrorism investigation. The ability to successfully use such human assets is not only the most important and difficult technique in counterterrorism, but led to the United States obtaining invaluable intelligence, as explained in Mr. Youssef's FD-954 (used as predication for searches on the Blind Sheik prior to the first World Trade Center bombing; used to justify an "AG search," used to obtain "voluminous intelligence" "instrumental in developing additional intelligence on previously unknown targets worldwide"). Also see, Ex. 14, ¶ 17.

Canvassing other "strategic assets:"   This means that Mr. Youssef was able to obtain information from other assets to corroborate the CT Asset. These tools are very sophisticated, and although most are highly sensitive they are well known to seasoned FBI agents. Also see, Ex. 14, ¶ 18.

Compiled information necessary for, requested from and thereafter obtained [deleted] from FBI HQ:  The FBI has deleted this technique from Mr. Youssef's released FD-954. The same technique was also obtained by Powers, but the FBI disclosed that technique in its brief as a prime example of a sophisticated technique relied upon by Chase in rating Powers. Both Powers and Youssef stated that they used this sophisticated technique. But the similarities between the two, and the level of sophistication between these two techniques ends there. Mr. Youssef was able to obtain this "technique" under pre-Patriot Act law, when it is well known that these types of techniques were rarely used, and an abundance of highly sophisticated intelligence was needed in order to obtain

permission to use the technique.  Mr. Powers used the technique post-Patriot Act, when these types of techniques were far easier to obtain.  What is even more remarkable about the level of sophistication necessary to obtain approval to utilize this technique was the fact that the FBI's Newark office, which had central responsibility for the Blind Sheikh investigation, was *not* able to, independent of Youssef, obtain permission to use this technique. Also see, Ex. 14, ¶ 18.

Execution of an AG Search Warrant:  The execution of an AG (i.e. "Attorney General") search warrant is a highly sophisticated technique. *See* Ex. 14 ¶ 20.  These warrants are very difficult to obtain DOJ approval for, and are harder to obtain than a FISA.  The search capacity of the AG Search warrant is even more intrusive then a FISA. Powers did not state that he had ever obtained such a warrant, or had used such a warrant in an investigation.

Powers' statement that he obtained NSLs for this investigation does not demonstrate the utilization of any sophisticated technique.  NSLs are very easy to obtain, can be approved by any FBI official (including FBI official in the local field office) and only need proof of the existence of a preliminary investigation.  They are among the least sophisticated investigative tools at the disposal of an FBI agent.  This is in contrast to a FISA, which needs the subject to be the target of a full investigation and court approval. An AG Search Warrant also must be court approved, but also must be approved personally by the Attorney General or his or her designee.  Ex. 14, ¶ 21.

Defendant's contention (set forth through Chase's testimony), that Mr. Youssef failed to "articulate case agent investigation responsibilities" in his first competency is completely false and unsupportable on the record.  Breaking down the content of Mr.

Youssef's first CT competency demonstrates this point: (1) "I received information from a CT Asset:" A case agent receives information from assets. (2) "I compiled all the relevant intelligence and requested [deleted] from FBIHQ:" A case agent complies the relevant intelligence and files the request for a "deleted." (3) "I managed [deleted] targets and executed an AG search on another target:" A case agent manages the techniques on "targets" referenced in this sentence, and has the responsibility for executing an AG search. Only a case agent has the background and case knowledge to properly execute these techniques. (4) "the intelligence developed throughout my investigation:" In this clause Mr. Youssef refers to the investigation as "my investigation." FBI agents do not conduct personal investigations. If an investigation is "my investigation," they are in fact the case agent. Any other understanding of this clause would be nonsensical. (5) "the voluminous intelligence derived from my [deleted] targets:" Mr. Youssef used the word "my" to identify the targets of his investigation. Again, a case agent has such targets, and only a case agent would refer to a target as "my target." *See* Ex. 7, Youssef FD-954, p. 8 (CT competency example 1). Also see, Ex. 14, ¶¶ 22-24 (role of case agent).

Significantly, both Chase and the FBI ignore other items in the first CT competency that further differentiates the Powers and Youssef in a manner that can be analyzed objectively. Youssef's example concerned his leadership and skill in the most important counterterrorism operation conducted by the FBI in the 1990's -- the investigation into the First Word Trade Center bombing, into the terrorist cells associated with Al-Gama's Al-Islamlyah, and the terrorist activities of Sheikh Omar Abdel Rahman. Mr. Powers' investigation concerned a person who was not even arrested by any law enforcement agency, and was permitted to voluntarily leave the country.

41

Additionally, results do matter. Was the application of the techniques fruitful, and were the actions of the case agent productive? A highly successful operation demonstrates the true competency of the agent in an objective context. Again, whatever investigation Mr. Powers conducted, the results of the investigation were de minimis. A target was asked to voluntarily leave the United States. No arrest was made, and there is no indication that any valuable intelligence was obtained from his Power's use of all of the sophisticated techniques applied. Ex. 8, p. 9.

On the other hand, the investigation discussed by Mr. Youssef achieved extraordinary results, remarkable even today. These included: (1) The ability to obtain permission to conduct highly sophisticated (and apparently still confidential) search techniques on one of the most dangerous international terrorists in American history; (2) The ability to obtain intelligence from assets necessary to obtain the "predication" needed to conduct searches on these terrorist persons and cells; (3) The ability to make the FBI aware that the activities of the terrorist cell that would conduct the first World Trade Center bombing was not limited to the New York/Newark areas, but also existed secretly in Southern California. It can be noted here that there is not indication that any successful Middle Eastern terrorist was carried out in Southern California;[7] (4) Obtaining "voluminous intelligence" related to this dangerous terrorist organization that proved to

---

[7] The inference in Youssef's CT competency # 1 that his discovery of an AGAI cell in Southern California may have actually prevented real and deadly attacks by this terrorist organization in this area is implicit by the fact that no such attack occurred. However, it needs to be noted that in Youssef CT competency # 2, it is confirmed that Youssef's investigation and activities "disrupted" "several operations" that were being planned by this dangerous terrorist organization. The actual accomplishments obtained by Mr. Youssef may still be confidential, and thus not permitted to be explicated in an FD 954, but the direct and clear implication that his investigation was highly successful protecting American lives is clear from the information provided in the FD-954.

be "instrumental in developing additional intelligence on other previously unknown targets worldwide." Ex. 7, p. 8.

Objectively, there is no comparison between the Powers investigation and the Youssef investigation as set forth in the first CT competency. A jury can reasonably find that Mr. Youssef's competency in this area far and away exceeded that of Mr. Powers. Taken in the light most favorable to Mr. Youssef, the evidence on this issue demonstrates significant bias within the Career Board, based on the Board's willfully ignoring this clear evidence.

*CT Competency Example 2*:   The information contained in the second CT competency related to Mr. Powers that is open to an objective analysis concerns the one investigation Powers decided to focus on. Powers highlighted the case in which he was responsible for one investigation concerning a "homegrown terrorist that led to significant intelligence being generated to further FBI national collection efforts and FBI Indianapolis Division domain awareness." Ex. 8, p. 9 (Powers FD-954).

An objective comparison with Mr. Youssef's CT Competency Example 2 is very easy to make. *See* Ex. 7, Youssef FD-954, p. 8. First, the target of the Powers investigation was "a homegrown terrorist." In contrast, the target of Mr. Youssef's investigation was the AGAI, the terrorist organization that was responsible for the First World Trade Center bombing. Second, the intelligence gathered by Mr. Powers helped in the FBI's "collection efforts" and "domain awareness." In contrast, the intelligence obtained by Mr. Youssef was "singular in nature, highly valuable, not just to the FBI, but to other members of the Intelligence Community." Third, Mr. Powers describes the intelligence he collected as "significant," but does not explain how it was actually used in

43

any case, or whether it was used in any case.  In contrast, Mr. Youssef explains that his intelligence was used against the most dangerous Middle Eastern terrorist organization operating in the United States at the time, and actually resulted in tangible positive impacts: "Several operations and cell members were disrupted." Finally, the example set forth by Powers in CT Competency Example 2 did not result in any objective recognition related to Power's contribution to the effort to combat terrorism.

Powers obtained no awards for his efforts.  In contrast, for the CT work performed in Youssef CT Competency Example 2, Mr. Youssef was awarded the "Director of Central Intelligence Award ("DCI")."[8]

Finally, in analyzing this competency, the importance of the fact that the intelligence obtained by Mr. Youssef led to an actual "disruption" cannot be downplayed or completely ignored. Ex. 7, p. 8. These "disruptions" save lives and are the heart of the counterintelligence mission.  The "disruptions" caused by Mr. Youssef's important work and leadership may never be known to the American people, but given who Youssef's targets were, and the fact that these same targets were able to accomplish deadly attacks in New York (and internationally), they had to be well known to the Career Board

---

[8]

Regardless, the objective evidence demonstrates that the DCI award was a most prestigious award.  A candidate had to be nominated by the head of his agency (in the case of Youssef, the Director of the FBI made the nomination), and was awarded by the Director of Central Intelligence.  Members of all twelve U.S. intelligence agencies competed for the award. Ex. 14 (Youssef Affidavit, ¶ 25). Interestingly, none of the Career Board members testified that they knew what the DCI award was. Given the highly prestigious nature of this award, and the fact that it was highly coveted within the intelligence community, these denials simply are not credible. Ex. 14, ¶ 25.  However, assuming that all of these highly trained, experienced veteran supervisors within the FBI, all of whom worked in counterterrorism, did not know what this award was, they should have asked.  Mr. Youssef had limited space to set forth his competencies, and was reasonable in assuming that experienced veteran agents would know of this award.

members. As a matter of law, these accomplishments, which were ignored by the Board, now create a jury question.

## CONCLUSION

For the reasons set forth above, plaintiff urges that defendant's motion for summary judgment must be denied.

Respectfully submitted,

_____/s/_____
Stephen M. Kohn, sk@kkc.com
David K. Colapinto, dk@kkc.com
Kohn, Kohn & Colapinto, LLP
3233 P Street N.W.
Washington, D.C. 20007
(202) 342-6980
(202) 342-6984 (fax)