# EXHIBIT 11

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 01-24-2011 BY 60324/UC/BAW/SAB/bls

WASHINGTON, D.C.

## SIGNED SWORN STATEMENT

I, Erkan A. Chase, Assistant Section Chief, assigned to
the Communications Exploitation Section, Counterterrorism
Division, of the Federal Bureau of Investigation (FBI), do hereby
solemnly swear (or affirm) the following:

I have been advised by Supervisory Special Agent (SSA)
Laura L. Henry of the Office of Equal Employment Opportunity
Affairs (OEEOA) of the FBI, that she is investigating a
complaint of employment discrimination (FBI-2010-00046) pursuant
to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is Bassem Youssef, Unit
Chief, and that the allegations accepted for investigation are
whether he was discriminated against and subjected to a hostile
work environment based on race (Arabic), national origin (Middle
Eastern) and reprisal for prior participation in protected EEO
activity when from approximately February 2006 through January
21, 2010, including, but not limited to the following: (a) he was
the subject of a joint investigation by the FBI's Office of
Professional Responsibility and the Department of Justice's
Office of the Inspector General (OIG); (b) he was confused by FBI
personnel with another Special Agent with an Arabic sounding
name; (c) he was excluded from attending the FBI Director's

Page 1 of ___5___ pages                    Affiant's Initials (EC)

briefs; (d) he experienced hostility from the FBI's Office of the
General Counsel in connection with deposing the FBI Director; (e)
various employees in the FBI and the OIG made derogatory and
negative comments about him; (f) he was excluded from
participating in decisions affecting his unit; (g) on October 4,
2007, he was threatened with termination; (h) on October 26,
2009, he received his performance appraisal report with a rating
of "Successful" on three critical elements, which was a lower
rating than what he believes he deserved; (i) on November 24,
2009, he received notification that he was not selected for an
Assistant Section Chief position in the Communications
Exploitation Section of the FBI's Counterterrorism Division; (j)
on January 20, 2010, he was threatened with discipline when an
OIG report was issued with findings made against his reputation;
and (k) on January 21, 2010, he was threatened with an
investigation and discipline.

Name:  Erkan A. Chase

Enter on Duty Date:  March 31, 1996, as a Special Agent (SA)

Race:  African American

National Origin:  American

        I first became aware of UC Youssef's participation in
EEO protected activity when I was notified by the EEO
Investigator on September 14, 2010.  I do not know UC Youssef's
race.  Based on personal observation and conversation that I have

Affiant's Initials _EC_

had with UC Youssef, I perceive UC Youssef's national origin to be Egyptian. I have worked with UC Youssef since I reported to the Communications Exploitation Section (CXS) in 2006. At that time, I was the Unit Chief (UC) of the Digital Media Exploitation Unit (DMX). In 2008, I reported to my current position as the Assistant Section Chief (ASC), Technical, CXS.

With respect to issue (i)(on November 24, 2009, he received notification that he was not selected for an Assistant Section Chief position in the Communications Exploitation Section of the FBI's Counterterrorism Division), during my career in the FBI, I have participated in numerous Career Boards. On October 23, 2009, I participated as a voting member on a Local Career Board (LCB) for an ASC (Operations) position, CXS, Job Posting #2009-1000. I also possibly served as the minority representative on the LCB. 'The three voting members of the LCB included ASC Arthur J. Zarone, ASC Hipolito "Polo"Castro, and me. Armando Fernandez, Section Chief (SC), CSX, served as the chairperson and was non-voting.

There were a total of four candidates for the position, including UC Youssef. Prior to the date of the LCB, I reviewed the Candidate Qualification Forms (FD-954) for each of the four candidates and ranked each candidate. UC Youssef's FD-954 was very good. UC Youssef did very well in certain categories. I

Affiant's Initials

recall that Supervisory Special Agent (SSA) Daniel P. Powers' FD-954 was better than UC Youssef's FD-954.

During the LCB, each voting member indicated his independent ranking of the candidates. The LCB unanimously ranked SSA Powers as the number one ranked candidate for the position.

There were no discussions concerning the candidates' age, color, religion, disability, national origin, race, or gender, at any point before, during, or after the LCB deliberations. Additionally, there were no undocumented, informal communications between LCB members and other individuals regarding the candidates for this position. Further, the LCB's deliberations were tape recorded.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Henry.

I have read this statement consisting of five (5) pages. The entire statement is true and complete to the best of my knowledge and belief.

I have been instructed by SSA Henry, the EEO investigator, not to discuss this interview or share the contents of this statement with anyone other than the person(s) conducting this interview, representatives from the Office of Equal Employment Opportunity Affairs, the Office of General Counsel,

Page 4 of __5__ pages          Affiant's Initials 

the Ombudsman, and/or an FBI Employee Assistance Program (EAP) counselor. I have been told that if I decide to discuss this matter with anyone other than referenced above, I must first obtain authorization from the EEO Officer or her designee. I also understand that my failure to comply with this confidentiality provision could subject me to disciplinary action.

I declare under penalty of perjury pursuant to 18 U.S.C. 1621 that the foregoing is true and correct. Executed on September 16, 2010.

_____
Erkan A. Chase

Page 5 of __5__ pages                    Affiant's Initials

# EXHIBIT 12

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 01-21-2011 BY 60324/BAW/SAB/bls

WASHINGTON, D.C.

## SIGNED SWORN STATEMENT

I, Hipolito Castro, Jr., Assistant Section Chief, assigned to the Terrorist Financing Operations Section, Counterterrorism Division, of the Federal Bureau of Investigation (FBI), do hereby solemnly swear (or affirm) the following:

I have been advised by Supervisory Special Agent (SSA) Laura L. Henry of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI, that she is investigating a complaint of employment discrimination (FBI-2010-00046) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is Bassem Youssef, Unit Chief, and that the allegations accepted for investigation are whether he was discriminated against and subjected to a hostile work environment based on race (Arabic), national origin (Middle Eastern) and reprisal for prior participation in protected EEO activity when from approximately February 2006 through January 21, 2010, including, but not limited to the following: (a) he was the subject of a joint investigation by the FBI's Office of Professional Responsibility and the Department of Justice's Office of the Inspector General (OIG); (b) he was confused by FBI personnel with another Special Agent with an Arabic sounding name; (c) he was excluded from attending the FBI Director's

Page 1 of __5__ pages                    Affiant's Initials 

briefs; (d) he experienced hostility from the FBI's Office of the General Counsel in connection with deposing the FBI Director; (e) various employees in the FBI and the OIG made derogatory and negative comments about him; (f) he was excluded from participating in decisions affecting his unit; (g) on October 4, 2007, he was threatened with termination; (h) on October 26, 2009, he received his performance appraisal report with a rating of "Successful" on three critical elements, which was a lower rating than what he believes he deserved; (i) on November 24, 2009, he received notification that he was not selected for an Assistant Section Chief position in the Communications Exploitation Section of the FBI's Counterterrorism Division; (j) on January 20, 2010, he was threatened with discipline when an OIG report was issued with findings made against his reputation; and (k) on January 21, 2010, he was threatened with an investigation and discipline.

Name: Hipolito Castro, Jr.

Enter on Duty Date: September 8, 1991, as a Special Agent (SA)

Race: Puerto Rican

National Origin: Puerto Rican/American

I have known UC Youssef for approximately two years. I consider him to be a friend. Approximately one and a half years ago, during a casual conversation, UC Youssef mentioned to me that he had a pending legal matter against the FBI. UC Youssef

Page 2 of __5__ pages                    Affiant's Initials 

did not provide any details, nor did I inquire about the matter.
I officially became aware of this specific EEO complaint when I
was contacted by an EEO Investigator on this date.

 I do not know UC Youssef's race or national origin.
When I look at a person, I see a person and do not view the
person in the context of race or national origin.  UC Youssef is
very friendly, easy going, and seems to be a good person.

 I am currently the Acting Section Chief but an
Assistant Section Chief (ASC) in the Terrorist Financing
Operations Section (TFOS), Counterterrorism Division (CTD).
Prior to my current assignment, I was a UC in the Finance
Intelligence Analysis Unit.

 With respect to issue (i) (on November 24, 2009, he
received notification that he was not selected for an Assistant
Section Chief position in the Communications Exploitation Section
of the FBI's Counterterrorism Division), during my career in the
FBI, I have participated in numerous Career Boards both as a
chairperson and as a voting member.  On October 23, 2009, I
participated as a voting member on a Local Career Board (LCB) for
an ASC position, Job Posting #2009-1000, in the Communications
Exploitation Section (CXS).  The voting members of the LCB
included ASC Arthur J. Zarone and me.  I believe the third voting
member was ASC Erkan Chase.  Armando Fernandez, Section Chief
(SC), CSX, served as the chairperson and was non-voting.

Page 3 of __5__ pages     Affiant's Initials _____

There were a total of three or four candidates for the position, including UC Youssef.  Prior to the date of the LCB, I reviewed the Candidate Qualification Forms (FD-954) for each of the candidates and ranked each candidate.  UC Youssef's FD-954 was competent.

During the LCB, each voting member indicated and discussed his independent rating of requested skills leading to the ranking of candidates.  The LCB unanimously ranked SSA Daniel Powers as the number one candidate for the position.

There were no discussions concerning the candidates' age, color, religion, disability, national origin, race, or gender, at any point before, during, or after the LCB deliberations.  Additionally, there were no undocumented, informal communications between LCB members and other individuals regarding the candidates for this position.  Further, the LCB's deliberations were tape recorded.

I would like to add that I am a minority and would not have allowed any discussion regarding the candidates' race, national origin, or any other protected characteristic.  I really believe in being fair and made every effort to fairly evaluate the candidates based on a review of their FD-954s.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Henry.

Page 4 of ___5___ pages                    Affiant's Initials 

I have read this statement consisting of five (5) pages. The entire statement is true and complete to the best of my knowledge and belief.

I have been instructed by SSA Henry, the EEO investigator, not to discuss this interview or share the contents of this statement with anyone other than the person(s) conducting this interview, representatives from the Office of Equal Employment Opportunity Affairs, the Office of General Counsel, the Ombudsman, and/or an FBI Employee Assistance Program (EAP) counselor. I have been told that if I decide to discuss this matter with anyone other than referenced above, I must first obtain authorization from the EEO Officer or her designee. I also understand that my failure to comply with this confidentiality provision could subject me to disciplinary action.

I declare under penalty of perjury pursuant to 18 U.S.C. 1621 that the foregoing is true and correct. Executed on September 16, 2010.

_____
Hipolito Castro, Jr.

Page 5 of ___5___ pages                    Affiant's Initials _____

# EXHIBIT 13

# MotherJones

# The FBI's Least Wanted

*Why was one of the bureau's top terror cops exiled to a desk job?*

By Bruce Falconer | Thu May. 14, 2009 2:39 AM PDT

The FBI's highest-ranking Arabic-speaking agent is a ghost. He goes to work each day, but walks the halls like an empty suit. Fellow agents whisper about his loyalty and talk about throwing him "off the roof." Bassem Youssef, after all, is the whistleblower [1] at the center of two of the FBI's biggest ongoing scandals: its rampant abuse of national security letters [2]to access confidential information on US citizens, and its failure to recruit Arabic-speaking agents. [3] He's sued the bureau for discrimination and has been sidelined to a paper-pushing job. Yet he won't quit—he remains determined, he says, to fight the war on terror, even if he has to battle his bosses to do it.

It wasn't always so. In the mid-1990s, if you were to call the FBI and ask for Bassem Youssef, the switchboard operator would tell you there was no such person. Known in those days by his alias, Adam Shoukry, Youssef was a star counterterrorism specialist, one of only a few agents in bureau history whose work was deemed so sensitive that the attorney general allowed him to go undercover within the FBI itself. Almost a full decade before the 9/11 attacks, he managed to penetrate "Blind Sheikh" Omar Abdel-Rahman's Islamic Group, which carried out the 1993 World Trade Center bombing. (Some of its key members later joined Al Qaeda [4], which Youssef identified as a threat long before it was on most intelligence agents' radar.) The details of Youssef's service during this period remain classified, but his value as an agent was such that, in November 1994, he received the Director of Central Intelligence Award, a high honor reserved for the intelligence community's

Case 1:11-cv-01362-CKK   Document 47-4   Filed 06/21/13   Page 15 of 99

most skilled operators.

But after 9/11 Youssef's once-rising star came crashing down. He charges that he was suddenly bypassed for counterterrorism assignments because of his ethnicity, a fate emblematic of a larger problem with the bureau's approach to counterterrorism. Since 2001, the FBI's budget has grown 114 percent, from $3.3 billion to $7.1 billion in fiscal year 2009; today, its 12,000 special agents include just 57 with even rudimentary knowledge of Arabic [5]. Only six—including Youssef—were rated "advanced professional" in the language as of 2006. By comparison, the New York Police Department has more than 60 Arabic-speaking cops. The FBI's failure, Youssef says, is a result of deeply rooted institutional discrimination against Middle Easterners—a population the bureau should be recruiting in droves, but instead has largely shut out.

Though a pariah to his fellow agents, Youssef remains a senior FBI official with a top-level security clearance. I spent nearly a year trying to gain an interview with him; when the FBI finally gave permission, it came with the requirement that Youssef's lawyer be present to ensure that the conversation did not stray into sensitive areas. (The bureau itself declined to comment about his case.)

We met on a cold, overcast day at the Georgetown office of Stephen Kohn, one of Washington's leading whistleblower advocates (and Linda Tripp's [6]one-time attorney). Youssef arrived looking every bit the G-man stereotype: dark suit, black tie, starched white shirt. Slight of frame, with close-cropped, charcoal-gray hair and brown eyes, he was easygoing and quick to smile, though his bitterness occasionally showed through. On the way to a nearby restaurant, we joked about the public-relations obstacle course I'd overcome to get permission to meet him.

Born in Cairo in 1958 to parents who were both accountants, Youssef grew up in an affluent neighborhood and studied at an English-language prep school. In 1972, when he was 13, the family relocated to Southern California, where Youssef quickly embraced everything American. He went on to attend California State University-Los Angeles, but his dream was to fly F-14 Tomcats. (*Top Gun* had just come out.) He made it through the initial rounds of pilot testing, and even had his head measured for a flight helmet, but ultimately failed on account of his mild colorblindness. (He couldn't distinguish a shade of green displayed on fighter-plane instrument panels.) Youssef sulked for a couple of months before taking a friend's advice to meet with a local FBI recruiter. A year and a half later, having passed an exhaustive series of background checks, he moved to Virginia.

Youssef became a hot commodity at the bureau, where he single-handedly doubled the number of native Arabic speakers. In 1988, right after graduating from the training academy at Quantico, he was assigned to St. Louis, where he joined a small team of agents hunting US-based associates of Abu Nidal, the leader of a Palestinian extremist group. It was a heady time for the young agent; he cut his teeth doing surveillance, making arrests, and conducting interrogations in Arabic.

As his reputation spread, Youssef says, agents in other field offices and at FBI headquarters frequently approached him for advice on their own cases. Before long, he transferred to the Los Angeles field office, where, for security, he assumed the identity of Adam Shoukry.

It was in L.A. that Youssef achieved a major intelligence coup. He had tried to obtain a wiretap on a terrorist cell associated with the Islamic Group weeks before the 1993 World Trade Center attack. After the bombing, Youssef and his supervisors set up an intelligence-gathering operation to

reach inside Abdel-Rahman's organization. "It's a very, very difficult group to penetrate," says one of Youssef's former supervisors, Edward Curran, a 38-year FBI veteran who is now deputy director of New Jersey's Office of Counter-Terrorism. "[Youssef] did it. He did it day and night. He was out on the street, was taking opportunities...He knew how to exploit them more than any other person in the office." The specifics of Youssef's work have never been made public, but court documents suggest that by flipping one of Abdel-Rahman's key associates, Youssef puzzled together much of the Islamic Group's membership. "You can't even begin to describe it," says Curran. "Bassem *was* the counterterrorism program. He was the entire program."

It was no surprise when Youssef became the FBI's legal attaché to Saudi Arabia in February 1997. The previous summer, a high-rise apartment complex called the Khobar Towers, home to about 2,000 US military personnel stationed at King Abdul Aziz Air Base, had been torn apart by a truck bomb, killing 19 and injuring 372. Historically, the Saudis had been reluctant to cooperate with US investigators, sometimes beheading suspects before they could be interrogated. But Youssef's knowledge of the culture quickly ingratiated him to his Saudi counterparts, who enjoyed teaching the FBI man the subtleties of Saudi slang. Within three months of his arrival, according to an FBI report drafted in 2000, Youssef's "efforts led to the establishment of direct communications with senior officials of the Mahabith [Saudi Arabia's security service] which had previously been unavailable to US Embassy personnel." These contacts helped pave the way for a first-ever meeting between then-FBI director Louis Freeh and top Saudi officials, after which the FBI was given access to all six Khobar bombing suspects.

Youssef, though, had moved on to another target: He was increasingly

troubled by the growing threat posed by Al Qaeda and, according to the report, became "preoccupied with Bin Laden's current status and whereabouts." In 2000, after four years in Riyadh, he was given a post at the National Counterintelligence Center, an interagency task force housed at the CIA's Virginia headquarters. But in April 2001, program restructuring eliminated his position. He was still waiting for reassignment on September 11, 2001.

After 9/11, the bureau—mortified by its failure to pick up the attackers' trail despite multiple opportunities—went into overdrive. It pulled hundreds of agents from its criminal division, even rookies from Quantico, into counterterrorism work. Youssef's phone, though, never rang. When he finally got his new assignment in March 2002, he was sent to the Document Exploitation Unit, a team of low-level agents tasked with reviewing evidence recovered in Afghanistan and elsewhere. A lower-ranking agent with no counterterrorism pedigree became his supervisor. Stunned, Youssef called his congressman, Rep. Frank Wolf (R-Va.), for help.

On June 28, 2002, FBI director Robert Mueller was called to a meeting in Wolf's office; he found Youssef waiting for him. The agent explained that he had tried hard to find a counterterrorism assignment through the appropriate channels, but now felt he had no recourse but to approach the director personally. Mueller said he'd look into the matter and assured Youssef that he would suffer no retaliation.

For a year, nothing happened. Finally, in July 2003, Youssef gave up hope and filed suit for discrimination.

As it turned out, the meeting with Mueller had sealed his fate. Unbeknownst to Youssef, two days earlier Mueller had signed off on his request for a transfer to the International Terrorism Operations Section, the FBI's lead unit

in the fight against Al Qaeda. But the director seemed to have had a change of heart. The transfer never came through, and Youssef didn't learn of Mueller's move until years later.

Youssef's meeting with Mueller also appears to have ignited a whisper campaign about his loyalty. According to an affidavit filed by one FBI agent, Youssef's colleagues gossiped that he was a Muslim (he's actually a devout Christian), that he "had refused to carry out orders...because of his religious faith," and that his time in Saudi Arabia had been an embarrassment to the bureau. None of this was true, but similar allegations dogged the two agents who replaced Youssef in Riyadh: an Egyptian Muslim who was accused of refusing to wear a wire, and an American convert who had been Youssef's assistant and previously worked airport security for the bureau.

Much of Youssef's trouble securing a position after 9/11 may have stemmed also from the FBI's astonishing claim that neither fluency in Arabic nor knowledge of the Middle East is necessary for leadership positions in the counterterrorism division. As Gary Bald, a former top FBI counterterrorism official, told Youssef's lawyer, Stephen Kohn, in a deposition, "You need leadership. You don't need subject-matter expertise. It is certainly not what I look for in selecting an official for a position."

Others in the intelligence community scoff at such claims. "Knowing about counterterrorism [7] (say, for example, that most Al Qaeda operatives have a logistics team that prepares the way for them) would help a supervisor ensure a proper investigation and avoid missing important aspects of the case," wrote former CIA analyst Dan Byman in support of Youssef's suit. Michael German, a counterterrorism agent who quit the bureau in 2004 after blowing the whistle on his superiors for illegal wiretapping, described the FBI's position as "indefensible" and "ridiculous." He told me, "You wouldn't

hire somebody to remodel your kitchen who didn't know anything about remodeling a kitchen."

Today, Youssef ostensibly heads up the Communications Analysis Unit, charged with processing bureau requests to private telecommunications firms for access to client records. It's a job in which "my language, my background, my operational experience, [and] my liaison experience...are not utilized at all," he says. "I'm at a point now where I'm not even utilized in the decision making within my own unit. Bosses will go right to my subordinates."

But if bureau executives thought that relegating Youssef to a desk job would keep him quiet, they were in for a disappointment. Shortly after Youssef took over as CAU unit chief in early 2005, he noticed widespread irregularities in the FBI's use of national security letters, a kind of administrative subpoena demanding customer information from private companies. After 9/11, the number of NSLs exploded, rising from 8,500 in 2000 to 143,000 between 2003 and 2005. Many were sent without any evidence linking them to ongoing counterterrorism investigations. The bureau also sent out hundreds of "exigent letters" demanding immediate access to telephone companies' client records without an official subpoena.

Youssef notified his supervisors of the scope of the problem. For months, they did nothing. Finally, in September 2005, the bureau's general counsel's office called a meeting. According to staffers for Sen. Chuck Grassley [8](R-Iowa), who has pressed for answers on why Youssef was sidelined so abruptly, FBI lawyers initially focused not on eliminating the abuse but on devising a legal work-around: the opening of a series of large, vaguely

defined investigative files that could be used to gain access to the private records of US citizens. Youssef used his position at the CAU to block the plan. The following year, after word of the abuses leaked, Department of Justice inspector general Glenn Fine opened an official inquiry. Youssef became a material witness in the case and gave several days' worth of testimony, which made him even more unpopular with his colleagues. Youssef says one agent Fine interviewed later boasted that he "threw Youssef under the bus." Another agent was overheard asking a colleague if he was "getting ready to throw Bassem Youssef off the roof."

Historically, in its dealings with whistleblowers like Youssef, the bureau's instinct has been to go on the attack. "The Youssef case captures the cultural problem at the FBI," says Sen. Grassley. "It's an example of higher-ups and the bureaucracy spending a lot of energy and resources to kill the messenger."

Youssef knows there's little chance of resurrecting his career. He stays on at the bureau in the hope of changing the culture by example—though that may be unlikely under Mueller, whom Obama has retained as director. The counterterrorism division, he says, is no better prepared today than it was before 9/11, and might even be worse off. He invoked a *M\*A\*S\*H* metaphor: "There's an episode where Colonel Potter's horse ran away. B.J. Hunnicutt and Hawkeye go looking for it. They don't know a thing about horses. Hawkeye's got this lasso, and he says, 'Anybody know anything about horses?' And his partner, B.J., says, 'I stepped into some horse manure once!' Hawkeye says, 'You're in charge.' That's the state of affairs in the counterterrorism division of the FBI."

**Source URL:** http://www.motherjones.com/politics/2009/05/fbis-least-wanted

**Links:**
[1] http://www.motherjones.com/politics/2004/01/anatomy-whistleblower
[2] http://www.motherjones.com/mojo/2007/03/fbi-violated-civil-liberties-repeatedly-issuance-national-security-letters
[3] http://www.motherjones.com/mojo/2006/07/military-purging-its-arabic-linguists
[4] http://www.motherjones.com/politics/2007/10/al-qaeda-iraq-self-fulfilling-prophecy
[5] http://www.motherjones.com/mojo/2007/06/who-needs-it-only-tiny-percentage-baghdad-embassy-employees-speak-arabic
[6] http://www.motherjones.com/politics/1998/05/court-inquisitor
[7] http://www.motherjones.com/mojo/2009/01/obama-counterterrorism-advisor-john-brennan-pushing-new-approach-iran
[8] http://www.motherjones.com/politics/2009/03/brodners-cartoon-du-jour-grasslier-thou

# EXHIBIT 14

<u>EXHIBIT 14</u>

"AFFIDAVIT OF BASSEM YOUSSEF"

**<u>TO BE FILED UNDER SEPARATE COVER</u>**

**<u>AFTER "CLEARED" FOR RELEASE BY FBI</u>**

# EXHIBIT 15



# LOCAL CAREER BOARD CHAIRPERSON TRAINING

PRESENTED BY THE MID-LEVEL LEADERSHIP SELECTION UNIT

# Job Posting Process
## Key Points When Drafting a Posting

▦ Interview Option

▷ If interviews may be conducted, must indicate "Interviews Possible" in the posting

• The LCB Chair may decide whether or not to interview candidates any time prior to the LCB if indicated in the posting

• If the posting indicates no interviews, the LCB Chair may not decide later to conduct interviews

9

FBI03400

# Verifications

- MLSU completes all verifications
- One competency verified by MLSU per job posting
  - Randomly selected by ASAPP
  - Both examples are verified
  - Same competency verified for all candidates
  - Verifications completed before SAMMS Board convenes

12

# Verifications

▣ Verifiers must have supervised the candidate and have knowledge of the competency example

▣ Verifiers must be able to verify the entire example

▣ Verifier is given the example and the only answers are "Yes," "No," or "I don't know"

➢ If the answer is "I don't know," the candidate is permitted to provide a second verifier

➢ If the answer is "No," the candidate is eliminated from all vacancies for which the example was used

13

FBI03404

# Voting Members' Initial Ratings

- Voting members rate all examples for all competencies for all candidates prior to the LCB
  - Voting members rate the examples and must **submit** via ASAPP

- ASAPP is designed to calculate the initial consensus

- ASAPP will generate email notifications to Voting Members in the event that competencies do not reach initial consensus

21

FBI03412

# Candidate Qualification Form (FD-954)

Application

- To apply for jobs, candidates must complete an FD-954 in ASAPP

- FD-954 is designed to document qualifications and identify specific, verifiable achievements

- For each competency listed in the posting, candidates must provide 2 examples which clearly describe:

  - A situation

  - The candidate's actions, and

  - The results of those actions

23

FBI03414

# Candidate Qualification Form (FD-954)
## Application

▣ Candidates should avoid:

   ⩒ Generalities

   ⩒ Vague Statements, and

   ⩒ Restatements of language in the anchors ("Parroting")

     • Example: "I express myself persuasively, concisely, and confidently in my communications and effectively communicate content to others"

▣ LCB members should ensure ratings are based on specific details rather than conclusory statements

▣ FD-954 may not contain classified information

FBI03415

# Conducting the LCB

Competency Example Ratings

▣ **Personal knowledge**

⋎ Chairperson or voting members may introduce personal knowledge into the LCB proceedings only when:

- The information is first-hand knowledge, and
- It is directly related to a specific competency example or work assignment cited by the candidate in the FD–954

⋎ If a personal observation is made during the LCB and an example consensus rating is influenced based on it, details must be documented in the LCB results document

- This can be documented in the comments section of the initial rating form

34

FBI03425

# Conducting the LCB

Totality of Experience

- Totality of Experience may also be used when the ratings of the top ranked candidates' are close, and a review of the candidates' FD-954 indicate a candidate with lower scores may be more suitable for the position
  - The further apart the candidates' ratings are will determine how much justification will be necessary to be approved by the SAMMS Board
  - These instances will be identified by MLSU as requiring further discussion by the SAMMS Board

49

FBI03440

# Conducting the LCB
Totality of Experience

- Any time totality of experience is used, it must be documented in the LCB results document

- Any justification used must be supported by information within the candidate's FD-954

50

FBI03441

# Conducting the LCB
## Determining Final Rankings

- Final rankings will be done by majority vote

- In the event of a tie, the LCB Chairperson will cast the deciding vote

57

FBI03448

# EXHIBIT 16

ASAPP TRAINING GUIDE

FEDERAL BUREAU OF INVESTIGATION
HUMAN RESOURCES DIVISION

# CHAPTER 7

# CONDUCTING A LOCAL CAREER BOARD (LCB)

## Overview

This chapter outlines the process for Local Career Board Points of Contact, Chairpersons, and Voting Members to successfully complete an LCB within the Automated Special Agent Promotion Program (ASAPP).

## Objectives

By the end of this chapter, you will be able to:

- Assign an LCB Chairperson (LCB POC)
- Reassign an LCB Chairperson (LCB POC)
- Complete the Interview Decision, the Mandatory Qualifications Check, and the LCB Preparation Form (LCB Chair)
- Complete and Submit the Initial Ratings of Candidates (Voting Members)
- Complete Candidate Ratings and Rankings (LCB Chair)
- Complete and Submit the LCB Results Document (LCB Chair)
- Edit the LCB Results Document (LCB Chair)

ASAPP TRAINING GUIDE

FEDERAL BUREAU OF INVESTIGATION
HUMAN RESOURCES DIVISION

## A Brief Summary of SAMMS Policy

### Composition of Career Boards

- The LCB Chairperson must be a non-Voting Member and at least one grade higher than the position being heard.
- Boards must have three Voting Members. Additionally, Voting Members must be a grade equal to or greater than the advertised position.
- Field Offices must have at least one Voting Member at the grade equal to the advertised position. FBIHQ Voting Members have no such restriction.
- At least one Voting Member (or non-Voting Member observer of any grade) must be a member of a protected class and present during the LCB meeting.
- At least one Voting Member must be a Special Agent

### Rotation of LCB Chairperson and Members

- Field Office LCB Chairpersons and Voting Members are required to rotate on a semi-annual basis.
    - o  For Field Offices with more than one ASAC or where there are more than six SSAs, the Chairperson and Voting Members of the LCB must be selected on a six-month rotating basis.
    - o  For Field Offices with only one ASAC, the ASAC may serve as the permanent Chairperson.
- SACs will notify all employees via EC with a listing of the Primary and Alternate Chairpersons as well as the Primary and Alternate Voting Members for each six month period. The EC should be updated every six months.

### Convening the LCB

- The LCB must be convened within 90 days of the job posting close date.
- The LCB must be conducted with an audio recording of all proceedings.
- The Chairperson will recite into the audio recording the following minimum preamble:
    Today's date is ____; the current local time is ____.
    This meeting is being held in Room ____, of the ____ Building.
    The purpose of this meeting is to conduct the Local Career Board for Job Posting ____. This position is a grade ____, position for a ____ in the ____ Division of the FBI.
    My official Bureau name is ____ and I will serve as the Chairperson for this board. At this time, I will ask each of the Voting Members to record their official Bureau names, ____, ____, and ____.
    (If necessary) At this time, I will ask the non-voting protected class observer to record their official Bureau name, ____.
    This Board will now begin by reviewing the initial ratings submitted by the Voting Members.
- The Chairperson will ask each Voting Member how they rated each example for each competency for each candidate. For example, each Voting Member will state how they rated the candidate in Competency Example 1, then in Example 2 and so on. The Chair should ensure the competency being read is correctly displayed in the rating field.

**Note:** LCB documentation must be maintained for 10 years from the date of the SAMMS Board or the conclusion of any litigation, whichever is longer.

ASAPP TRAINING GUIDE

FEDERAL BUREAU OF INVESTIGATION
HUMAN RESOURCES DIVISION

### Interview Process

- Interviews are optional and are the choice of the advertising division.
- If an interview is conducted, it will be treated as if it were another competency example.
- Only questions based on the competencies listed in the posting can be used; all questions will be provided by MLSU; and all candidates must receive the same questions.
- The method of interview must be consistent for all candidates (e.g. all in person or by telephone).
- All interviews must be conducted by the entire LCB.

### Evaluation of the FD-954

- During the LCB process, Voting Members are required to apply the standardized ratings criteria for assessing a candidate's accomplishments with respect to each Core Competency and/or Specialized Competency.
- This standardized rating system is as follows:
  - E - Exemplary
  - S - Skilled
  - C - Competent
  - M - Marginal
  - I - Ineffective

### Individual Example Ratings

- Each voting member will give a rating to each of a candidate's individual examples.
- If all three ratings are within one level of one another (e.g. C, C, and S), the majority prevails (C in this case).
- If the ratings are more than one level apart (e.g. M, C, and S), a discussion will occur.
- The Voting Member with the highest rating should begin the discussion, providing justification for their rating. The Chair should ask the Voting Members if, based on their discussion, any of them are willing to change their votes. If consensus is not reached via discussion, the Chair will serve as the tie-breaker and cast the deciding vote.
- This process continues for each example for each competency for each candidate.

### Overall Competency Ratings

- Each candidate will have two example ratings for each competency (in the event that an interview was conducted, there will be a third example).
- If the two ratings are the same (e.g. C and C), that rating is the overall competency rating.
- If the two ratings are one level apart (e.g. C and S), the lower of the two is the overall competency rating (C).
- If the two ratings are more than one level apart, a discussion will occur by the LCB. Based on their discussion, the LCB will decide the overall competency rating. If necessary, the LCB Chair will serve as a tie-breaker. The overall competency rating must not be higher than one level below the

**The following actions are prohibited:**

- Applicants providing input to the LCB before or during the LCB.
- Discussion of protected characteristics (i.e., age, color, religion, disability, national origin, race or gender).
- Discussion of undocumented, informal communications between LCB members or between the LCB members and other individuals regarding the candidates.
- Evaluation of candidates on any factor not included under the qualifications in the job posting.
- Review of a candidate's personnel file.
- Use of performance appraisals.
- Contact with a candidate's rating or reviewing official.
- Use of any unsolicited comments in the evaluation process.
- Use of numerical calculations.
- Personal knowledge of candidates, unless the knowledge is directly related to a specific competency example provided by the candidate.

**If any of the following occurs during the LCB process, narrative documentation must be provided within the comment fields.**

- If a personal observation regarding a candidate's competency example was made and a consensus rating was influenced based upon these observations.
- Any use of totality of experience considerations
- If interviews were conducted, documentation must include:
  - The questions asked;
  - That all candidates were asked the same questions by the entire LCB;
  - That standard anchors were used in rating the candidates and results were recorded in the matrix.

# EXHIBIT 17



# DEPARTMENT OF JUSTICE

# FEDERAL BUREAU OF INVESTIGAION

## BASSEM YOUSSEF V. FBI, ET AL.

## 1:11-cv-01362-CKK

## LOCAL CAREER BOARD

## FREQUENTLY ASKED QUESTIONS

**EXCISED COPY**

**PLAINTIFF COPY**

FBI03382

> You have not checked out this page. Click 'Edit Page' to edit the page.

FBI > Human Resources Branch > Human Resources Division > Employee Development and Selection Program Section > Mid-Level Leadership Selection Unit

# Local Career Board (LCB) Frequently Asked Questions (FAQs)

## Overview

What activities are prohibited by LCBs?

What is the role of the LCB chairperson?

Who can be a LCB chairperson?

What is the composition of a LCB in the field?

What is the composition of a LCB at FBIHQ?

What is the role of the LCB voting members?

Can someone who is not voting be present for the LCB?

Who can be the protected class member?

How often do LCBs rotate in the field?

Do LCBs make selections for anything below the GS-14 level?

## Interviews

Is the LCB required to conduct interviews?

What interview questions can be asked by the LCB?

What method must be used for the interview?

## Training

What training is required for LCB chairpersons?

What training is required for LCB voting members?

FBI03383

When and where is the training available?

Who pays for the travel for the training?

How often is the training required?

Can anybody take the LCB training?

How do you get access in ASAPP to be a LCB chairperson?

Where can I find LCB training materials?

## Deadlines

What are the deadlines associated with conducting LCBs?

## ASAPP guidance

As a LCB voting member, how do I submit the initial ratings of candidates?

Where can I find guidance on how to conduct a LCB in ASAPP?

How should I rate a candidate who uses the same example twice?

## Overview

**What activities are prohibited by LCBs?**

The following actions are prohibited by LCBs: (1) discussion of **protected characteristics** (age, color, religion, disability, national origin, race, gender, sexual orientation, etc.); (2) discussion of undocumented informal communication among LCB members and other individuals regarding the candidates; (3) evaluating candidates on any factor not included in the job posting; (4) review of candidates' personnel files; (5) use of performance appraisals; (6) contact with a candidate's rating or reviewing official regarding the individual's candidacy for the vacancy; (7) use of presenters before or during the LCB deliberations; (8) use of any unsolicited comments in the evaluation process; (9) solicitation of any comments other than those outlined in the selection system; (10) use of numerical calculations; (11) use of plus or minus ratings; (12) review of FD-955s by LCB members prior to evaluating and ranking candidates; (13) review of FD-955s by LCB members for unranked candidates; (14) consideration of disciplinary issues; and (15) undocumented informal recommendations to members of the SAMMS Board. LCB

members are reminded to review MAOP, Part 1, 1-15.4 and the Ethics and Integrity PG as they relate to nepotism, favoritism, and the appearance of impropriety.

**What is the role of the LCB chairperson?**

The LCB chairperson determines whether there will be interview questions, conducts the Mandatory Qualifications check, assigns the voting members, conducts the LCB, and completes the LCB Results Document. The LCB chairperson also serves as the tie breaker when the voting members cannot reach consensus.

**Who can be a LCB chairperson?**

The LCB Chairperson is a non-voting member (except when breaking a tie) who is at least one grade higher than the position being heard.

**What is the composition of a LCB in the field?**

The field Division LCB Chairperson is a non-voting member (except when breaking a tie) who is at least one grade higher than the position being heard. The LCB will consist of three voting members, at least one of whom must be an agent. Voting members must be at a grade equal to or higher than the advertised position. At least one voting member must be at a grade equal to the position being heard (i.e., for a GS-14 field Division SSA position, at least one LCB member must be a GS-14). At least one LCB member (LCB Chairperson, voting member, or non-voting observer of any grade) who is a member of a protected class must be present at the LCB meeting. Non-agent personnel of the appropriate grade may participate in the LCB as voting members.

**What is the composition of a LCB at FBIHQ?**

The LCB Chairperson is a non-voting member (except when breaking a tie) who is at least one grade higher than the position being heard. The LCB will consist of three voting members, at least one of whom must be an agent. For FBIHQ GS-14 and GS-15 positions, voting members must be at a grade equal to or higher than the advertised positions. At least one LCB member (LCB Chairperson, voting member, or non-voting observer of any grade) who is a member of a protected class must be present at the LCB meeting.

**What is the role of the LCB voting members?**

Voting members complete the initial ratings for each job posting candidate and participate in the LCB.

**Can someone who is not voting be present for the LCB?**

Yes.  Non-voting observers are permitted.  Any non-voting observers must be documented on the LCB Results Document.

**Who can be the protected class member?**

The protected class member can be the chairperson, a voting member, or a non-voting observer.

**How often do LCBs rotate in the field?**

The LCB Chairperson and voting members will rotate on a semi-annual basis. The division head will notify all employees via Electronic Communication (EC) who the primary and alternate Chairpersons are as well as identify the primary/alternate voting members for each six-month period.

**Do LCBs in the field make selections for anything below the GS-14 level?**

In addition to recommending candidates for GS-14 vacancies to the SAMMS Board, Field Office LCBs may also select SAs to become relief supervisors, secondary relief supervisors, primary relief supervisors, and SRAs. If feasible and efficient for field Division operations, the division head may utilize the Field Office LCB to assist him/her in other personnel matters such as determining intraoffice transfers, quality increases, new SA training matters, ancillary duty selections, and selection of SAs to attend specialized in-service trainings.

For LCB selections below the GS-14 level, there is no reporting requirement to FBIHQ. As with all other SA career boards, the entire proceedings of the LCB must be audio recorded and all LCB documentation and audio recordings must be maintained for a period of 10 years. Any documentation and recording of LCB action, which is the subject of litigation, will be retained for the purposes of litigation, regardless of the length of time since the LCB was held.

## Interviews

### Is the LCB required to conduct interviews?

Interviews during the LCB process for non-ASAC Special Agent Mid-Level Management System (SAMMS) selections are optional, and are the choice of the advertising division.  If an interview is conducted, it will be treated as if it were another competency example.

### What interview questions can be asked by the LCB?

Only questions based on the competencies listed in the posting can be used as interview questions.  The Mid-Level Leadership Selection Unit (MLSU) will provide applicable, approved interview questions to the LCB chairperson based on the competencies selected.  The LCB may ask any, but need not ask all, of the pre-approved interview questions provided by MLSU.  The LCB must, however, ask all candidates who are interviewed the same questions, and if interviews are conducted, all candidates must be interviewed.

### What method must be used for the interview?

Interviews may be conducted in person or telephonically, but all interviews must be conducted in the same manner.  All interviews must be conducted by the entire LCB and must be audio recorded.

## Training

### What training is required for LCB chairpersons?

The LCB Chairperson must be trained and certified by the Mid-Level Leadership Selection Unit (MLSU) on the LCB process prior to serving as the Chairperson.  Currently, this training is offered bi-annually at FBIHQ.  A Virtual Academy course is under development, and will eventually replace the classroom format.

### What training is required for LCB voting members?

Voting members must be trained by the LCB Chairperson prior to serving on an LCB. Chairpersons must affirm in Automated Selection and Promotion Program (ASAPP) that each voting member received training on the SAMMS Career Board process prior to serving as voting members.  A Virtual Academy course is currently under development for LCB voting members.

Once this training is available, voting members will be required to provide a copy of their Virtual Academy certificate to the LCB Chairperson.

**When and where is the training available?**

The LCB Chairperson training is available bi-annually at FBIHQ.  Please check the MLSU website for any training dates scheduled. Virtual Academy courses for LCB Chairperson training and voting member training are under development.

**Who pays for the travel for the training?**

Travel costs associated with LCB Chairperson training are covered by the division of the training participant.

**How often is the training required?**

LCB Chairpersons are required to receive LCB Chairperson training one time.  However, as policies do change, it is recommended that LCB Chairpersons refresh their training regularly by either reviewing the training materials on the MLSU website, or by attending the LCB Chairperson trainings scheduled at FBIHQ.

**Can anybody take the LCB training?**

The LCB Chairperson training held at FBIHQ is designed for LCB Chairpersons.  However, if space is available, extra seats will be provided to anybody who is interested on a first-come, first-serve basis. Once the LCB training is available on Virtual Academy, it will be available to anybody who wishes to register.

**How do you get access in ASAPP to be a LCB chairperson?**

Once you receive LCB chairperson training, you must submit a System Access Request (SAR) through EPAS to request LCB chairperson access in Automated Selection and Promotion Program (ASAPP).  To access the SAR application to make a request:

- **Launch the EPAS application (see the quick reference guide for EPAS User Interface).**
- **Click SAR Control Panel located in Launch Process section in the lower right hand corner**

of screen.
- Select the Request Additional Access button.
- Enter your approving supervisor and click verify
- Enter your name in the User Search.
- Click on your name in the User Search Results.
- Under Application/Access Search, select:
  - EPAS for System/Application
  - ASAPP Process under Category/Module
  - Click Search
  - Select  ASAPP_LCB_Chair_group  under Search Results
  - Enter a Justification in the box*
  - Click Add to Cart
  - Click the Green Arrow at the bottom

* For the justification, provide one sentence stating that you received LCB chairperson training, and include the training date.

**Where can I find LCB training materials?**

LCB training materials can be found on the MLSU website.  Please look under the Resources section to find the *Guidance and Resources for Local Career Boards.*

## Deadlines

**What are the deadlines associated with conducting LCBs?**

The LCB must convene within 90 days of the job posting deadline.  The LCB Chairperson must provide all materials to the members at least 3 days prior to the LCB.

## ASAPP Guidance

**As a LCB voting member, how do I submit the initial ratings of candidates?**

For guidance on completing and submitting the Initial Candidate Ratings in ASAPP, please refer to the ASAPP Chapter 7 - Introduction to Conducting Local Career Boards (LCBs) beginning on page 7-35.

**Where can I find guidance on how to conduct a LCB in ASAPP?**

For guidance on conducting a LCB in ASAPP, please refer to the ASAPP Training Manual (**ASAPP Chapter 7 - Introduction to Conducting Local Career Boards (LCBs)**) found on the Mid-Level Leadership Selection Unit (MLSU) website.

**How should I rate a candidate who uses the same example twice?**

According to the Special Agent Mid-Level Management System (SAMMS) Policy Implementation Guide, if a candidate provides only one example, and/or the candidate provides an identical write-up for both examples of the same competency, the overall competency rating for that competency can be no greater than two levels lower than the example consensus ratings for the only existing example. For example, if the candidate was rated "Skilled" in example 1A, and there was no example for 1B, or if the candidate used an identical example for 1A and 1B, the overall competency rating must be two levels below the only existing example and the candidate would receive an overall competency rating of "Marginal."

**For additional questions or assistance, call MLSU at (202) 324-5605.**

For questions or comments, contact BUDDAY, ROSEANN (HRD)(FBI)         Last modified on 8/7/2012 11:50:12 AM

FBI03390



# DEPARTMENT OF JUSTICE

# FEDERAL BUREAU OF INVESTIGAION

## BASSEM YOUSSEF V. FBI, ET AL.

## 1:11-cv-01362-CKK

## LOCAL CAREER BOARD

## FREQUENTLY ASKED QUESTIONS

### EXCISED COPY

**PLAINTIFF COPY**

> ❗ You have not checked out this page. Click 'Edit Page' to edit the page.

FBI > Human Resources Branch > Human Resources Division > Employee Development and Selection Program Section > Mid-Level Leadership Selection Unit

# Local Career Board (LCB) Frequently Asked Questions (FAQs)

## Overview

What activities are prohibited by LCBs?

What is the role of the LCB chairperson?

Who can be a LCB chairperson?

What is the composition of a LCB in the field?

What is the composition of a LCB at FBIHQ?

What is the role of the LCB voting members?

Can someone who is not voting be present for the LCB?

Who can be the protected class member?

How often do LCBs rotate in the field?

Do LCBs make selections for anything below the GS-14 level?

## Interviews

Is the LCB required to conduct interviews?

What interview questions can be asked by the LCB?

What method must be used for the interview?

## Training

What training is required for LCB chairpersons?

What training is required for LCB voting members?

FBI03383

When and where is the training available?

Who pays for the travel for the training?

How often is the training required?

Can anybody take the LCB training?

How do you get access in ASAPP to be a LCB chairperson?

Where can I find LCB training materials?

### Deadlines

What are the deadlines associated with conducting LCBs?

### ASAPP guidance

As a LCB voting member, how do I submit the initial ratings of candidates?

Where can I find guidance on how to conduct a LCB in ASAPP?

How should I rate a candidate who uses the same example twice?

### Overview

**What activities are prohibited by LCBs?**

The following actions are prohibited by LCBs: (1) discussion of protected characteristics (age, color, religion, disability, national origin, race, gender, sexual orientation, etc.); (2) discussion of undocumented informal communication among LCB members and other individuals regarding the candidates; (3) evaluating candidates on any factor not included in the job posting; (4) review of candidates' personnel files; (5) use of performance appraisals; (6) contact with a candidate's rating or reviewing official regarding the individual's candidacy for the vacancy; (7) use of presenters before or during the LCB deliberations; (8) use of any unsolicited comments in the evaluation process; (9) solicitation of any comments other than those outlined in the selection system; (10) use of numerical calculations; (11) use of plus or minus ratings; (12) review of FD-955s by LCB members prior to evaluating and ranking candidates; (13) review of FD-955s by LCB members for unranked candidates; (14) consideration of disciplinary issues; and (15) undocumented informal recommendations to members of the SAMMS Board. LCB

members are reminded to review MAOP, Part 1, 1-15.4 and the Ethics and Integrity PG as they relate to nepotism, favoritism, and the appearance of impropriety.

**What is the role of the LCB chairperson?**

The LCB chairperson determines whether there will be interview questions, conducts the Mandatory Qualifications check, assigns the voting members, conducts the LCB, and completes the LCB Results Document. The LCB chairperson also serves as the tie breaker when the voting members cannot reach consensus.

**Who can be a LCB chairperson?**

The LCB Chairperson is a non-voting member (except when breaking a tie) who is at least one grade higher than the position being heard.

**What is the composition of a LCB in the field?**

The field Division LCB Chairperson is a non-voting member (except when breaking a tie) who is at least one grade higher than the position being heard. The LCB will consist of three voting members, at least one of whom must be an agent. Voting members must be at a grade equal to or higher than the advertised position. At least one voting member must be at a grade equal to the position being heard (i.e., for a GS-14 field Division SSA position, at least one LCB member must be a GS-14). At least one LCB member (LCB Chairperson, voting member, or non-voting observer of any grade) who is a member of a protected class must be present at the LCB meeting. Non-agent personnel of the appropriate grade may participate in the LCB as voting members.

**What is the composition of a LCB at FBIHQ?**

The LCB Chairperson is a non-voting member (except when breaking a tie) who is at least one grade higher than the position being heard. The LCB will consist of three voting members, at least one of whom must be an agent. For FBIHQ GS-14 and GS-15 positions, voting members must be at a grade equal to or higher than the advertised positions. At least one LCB member (LCB Chairperson, voting member, or non-voting observer of any grade) who is a member of a protected class must be present at the LCB meeting.

**What is the role of the LCB voting members?**

Voting members complete the initial ratings for each job posting candidate and participate in the LCB.

**Can someone who is not voting be present for the LCB?**

Yes.  Non-voting observers are permitted.  Any non-voting observers must be documented on the LCB Results Document.

**Who can be the protected class member?**

The protected class member can be the chairperson, a voting member, or a non-voting observer.

**How often do LCBs rotate in the field?**

The LCB Chairperson and voting members will rotate on a semi-annual basis. The division head will notify all employees via Electronic Communication (EC) who the primary and alternate Chairpersons are as well as identify the primary/alternate voting members for each six-month period.

**Do LCBs in the field make selections for anything below the GS-14 level?**

In addition to recommending candidates for GS-14 vacancies to the SAMMS Board, Field Office LCBs may also select SAs to become relief supervisors, secondary relief supervisors, primary relief supervisors, and SRAs. If feasible and efficient for field Division operations, the division head may utilize the Field Office LCB to assist him/her in other personnel matters such as determining intraoffice transfers, quality increases, new SA training matters, ancillary duty selections, and selection of SAs to attend specialized in-service trainings.

For LCB selections below the GS-14 level, there is no reporting requirement to FBIHQ. As with all other SA career boards, the entire proceedings of the LCB must be audio recorded and all LCB documentation and audio recordings must be maintained for a period of 10 years. Any documentation and recording of LCB action, which is the subject of litigation, will be retained for the purposes of litigation, regardless of the length of time since the LCB was held.

## Interviews

**Is the LCB required to conduct interviews?**

Interviews during the LCB process for non-ASAC Special Agent Mid-Level Management System (SAMMS) selections are optional, and are the choice of the advertising division. If an interview is conducted, it will be treated as if it were another competency example.

**What interview questions can be asked by the LCB?**

Only questions based on the competencies listed in the posting can be used as interview questions. The Mid-Level Leadership Selection Unit (MLSU) will provide applicable, approved interview questions to the LCB chairperson based on the competencies selected. The LCB may ask any, but need not ask all, of the pre-approved interview questions provided by MLSU. The LCB must, however, ask all candidates who are interviewed the same questions, and if interviews are conducted, all candidates must be interviewed.

**What method must be used for the interview?**

Interviews may be conducted in person or telephonically, but all interviews must be conducted in the same manner. All interviews must be conducted by the entire LCB and must be audio recorded.

## Training

**What training is required for LCB chairpersons?**

The LCB Chairperson must be trained and certified by the Mid-Level Leadership Selection Unit (MLSU) on the LCB process prior to serving as the Chairperson. Currently, this training is offered bi-annually at FBIHQ. A Virtual Academy course is under development, and will eventually replace the classroom format.

**What training is required for LCB voting members?**

Voting members must be trained by the LCB Chairperson prior to serving on an LCB. Chairpersons must affirm in Automated Selection and Promotion Program (ASAPP) that each voting member received training on the SAMMS Career Board process prior to serving as voting members. A Virtual Academy course is currently under development for LCB voting members.

Once this training is available, voting members will be required to provide a copy of their Virtual Academy certificate to the LCB Chairperson.

**When and where is the training available?**

The LCB Chairperson training is available bi-annually at FBIHQ. Please check the MLSU website for any training dates scheduled. Virtual Academy courses for LCB Chairperson training and voting member training are under development.

**Who pays for the travel for the training?**

Travel costs associated with LCB Chairperson training are covered by the division of the training participant.

**How often is the training required?**

LCB Chairpersons are required to receive LCB Chairperson training one time. However, as policies do change, it is recommended that LCB Chairpersons refresh their training regularly by either reviewing the training materials on the MLSU website, or by attending the LCB Chairperson trainings scheduled at FBIHQ.

**Can anybody take the LCB training?**

The LCB Chairperson training held at FBIHQ is designed for LCB Chairpersons. However, if space is available, extra seats will be provided to anybody who is interested on a first-come, first-serve basis. Once the LCB training is available on Virtual Academy, it will be available to anybody who wishes to register.

**How do you get access in ASAPP to be a LCB chairperson?**

Once you receive LCB chairperson training, you must submit a System Access Request (SAR) through EPAS to request LCB chairperson access in Automated Selection and Promotion Program (ASAPP). To access the SAR application to make a request:

- **Launch the EPAS application (see the quick reference guide for EPAS User Interface).**
- Click SAR Control Panel located in Launch Process section in the lower right hand corner

of screen.
- Select the Request Additional Access button.
- Enter your approving supervisor and click verify
- Enter your name in the User Search.
- Click on your name in the User Search Results.
- Under Application/Access Search, select:
    o EPAS for System/Application
    o ASAPP Process under Category/Module
    o Click Search
    o Select   ASAPP_LCB_Chair_group  under Search Results
    o Enter a Justification in the box*
    o Click Add to Cart
    o Click the Green Arrow at the bottom

* For the justification, provide one sentence stating that you received LCB chairperson training, and include the training date.

**Where can I find LCB training materials?**

LCB training materials can be found on the MLSU website.  Please look under the Resources section to find the *Guidance and Resources for Local Career Boards.*

## Deadlines

**What are the deadlines associated with conducting LCBs?**

The LCB must convene within 90 days of the job posting deadline.  The LCB Chairperson must provide all materials to the members at least 3 days prior to the LCB.

## ASAPP Guidance

**As a LCB voting member, how do I submit the initial ratings of candidates?**

For guidance on completing and submitting the Initial Candidate Ratings in ASAPP, please refer to the ASAPP Chapter 7 - Introduction to Conducting Local Career Boards (LCBs) beginning on page 7-35.

**Where can I find guidance on how to conduct a LCB in ASAPP?**

For guidance on conducting a LCB in ASAPP, please refer to the ASAPP Training Manual (**ASAPP Chapter 7 - Introduction to Conducting Local Career Boards (LCBs)**) found on the **Mid-Level Leadership Selection Unit (MLSU) website.**

**How should I rate a candidate who uses the same example twice?**

According to the Special Agent Mid-Level Management System (SAMMS) Policy Implementation Guide, if a candidate provides only one example, **and/or the candidate** provides an identical write-up for both examples of the same competency, the overall competency rating for that competency can be no greater than two levels lower than the example consensus ratings for the only existing example. For example, if the candidate was rated "Skilled" in example 1A, and there was no example for 1B, or if the candidate used an identical example for 1A and 1B, the overall competency rating must be two levels below the only existing example and the candidate would receive an overall competency rating of "Marginal."

**For additional questions or assistance, call MLSU at (202) 324-5605.**

For questions or comments, contact BUDDAY, ROSEANN (HRD)(FBI)        Last modified on 8/7/2012 11:50:12 AM

# EXHIBIT 18

LCB Matrix  *(To be utilized by Chairperson & Final Matrix)*

| CKS Assistant Section Chief EFAP 2008-1008 | | Leadership | | Problem Solving/ Judgement | | Management Ability | | Initiative | | Liaison | | Counterterrorism - Complex CT | | Communications | | Div. Head Rec. | LCB Rank ** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Candidate Name | | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | | |
| Davidson, Richard A. | A | S | C | C s | C | S s | C | C s | C | S s | C | C s | C | S s | C | | 4 |
| | B | C | | C s | | C s | | C s | | C s | | C s | | C s | | | |
| | tot | | | | | | | | | | | | | | | | |
| Desmond, Matthew P. | A | C | C | C s | C | C s | C | S s | C | S s | C | C s | S | S s | C | | 2 |
| | B | C | | C s | | C s | | C s | | C s | | S s | | C s | | | |
| | tot | | | | | | | | | | | | | | | | |
| Powers, Daniel P. | A | S | C | S s | S | C s | C | S s | C | S s | C | C s | S | S s | C | | 1 |
| | B | C | | 3 s | | C s | | C s | | S s | | 3 s | | C s | | | |
| | tot | | | | | | | | | | | | | | | | |
| Yousuf, Rizwan | A | C s | C | C s | C | S s | C | C s | C | S s | C | C s | C s | C s | C | | 3 |
| | B | C s | | S s | | C s | | C s | | C s | | C s | | C s | | | |
| | tot | | | | | | | | | | | | | | | | |

* Overall Rating raised based on "Totality of Experience"
** Change in Rank based on Division Head Comments

B - Exemplary    C - Competent    I - Ineffective
S - Skilled    M - Marginal    Circle around Rating = Not Verified

SUBJECT TO PROTECTIVE ORDER

FBI 310

# EXHIBIT 19

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    ------------------------------X

4    BASSEM YOUSSEF,                    :

5               Plaintiff,     : Civil Action No.

6          v.                    : 1:11-CV-01362-CKK

7    ERIC HOLDER, ATTORNEY GENERAL    :

8               Defendant.      :

9    ------------------------------X

10

11            Telephonic Deposition of

12             ARMONDO FERNANDEZ

13              WASHINGTON, DC

14          Tuesday, December 11, 2012

15               10:40 a.m.

16

17

18

19

20   Job No.:  29900

21   Pages 1 - 90

22   Reported by:  STEPHANY L. JEROME, RPR

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

11

1      Q    Was the NSL review still ongoing then?

2      A    Well, I was actually involved in the

3  classifying the DOJ OIG report as soon as I reported

4  to Headquarters.

5      Q    So when you knew Mr. Rogers, were you

6  co-workers or was he your supervisor or were you his

7  supervisor?

8      A    He was my Unit Chief.

9      Q    And so when's the next time you heard of

10  Mr. Youssef?

11      A    When I reported to FBI Headquarters.

12      Q    And what did you hear about Youssef when you

13  reported to Headquarters?

14      A    The Section Chief that was outgoing out of

15  CXS, who reported and then was immediately switched to

16  a different section, mentioned Bassem's name and said,

17  "I believe he has an EEO complaint against the FBI."

18  I said okay.

19      Q    What else did this Section Chief mention to

20  you about Mr. Youssef?

21      A    That's it.

22      Q    He only mentioned he had an EEO complaint;

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

18

1       A    No, sir.

2       Q    And have you ever filed an EEO complaint

3    while an employee at the FBI?

4       A    No, sir.

5       Q    Did you think it was important to know that

6    Mr. Youssef had filed an EEO complaint at the time you

7    became the Section Chief?

8            MR. GUZMAN:  Objection to the extent that's

9    been asked and answered, but Mr. Fernandez can answer.

10           THE WITNESS:  You know, I think I was

11   indifferent.

12   BY MR. KOHN:

13      Q    Why were you indifferent?

14      A    As long as he was doing his job, I was good

15   with it.

16      Q    Now, were you aware that once you became the

17   Section Chief Mr. Youssef had to leave the unit to

18   perform tasks or attend proceedings related to his EEO

19   complaint?

20      A    Approximately two to three months after I

21   reported, I was aware.

22      Q    And how did you become aware of that?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

19

1      A    He was never at the meetings that I required

2   him to be, and he was never there to brief anything

3   from his units.

4      Q    And who did you discuss these absences with?

5      A    His Section Chief.

6      Q    That would be Assistant Section Chief?

7      A    Right.

8      Q    And who was that?

9      A    Art Zarone -- Arthur Zarone.

10     Q    And did you raise concerns with Mr. Zarone

11  that Mr. Youssef, because of his EEO case, was absent

12  from these meetings and briefings?

13          MR. GUZMAN:  Objection to the form of the

14  question.

15          THE WITNESS:  I did not raise concern.  I

16  wanted to know why he wasn't around.

17  BY MR. KOHN:

18     Q    And what did Mr. Zarone tell you?

19     A    I believe he is -- I forget how he stated

20  it, but he was gone during -- for his case.

21     Q    And did you ask Mr. Zarone what case that

22  was?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

20

1       A    At that time I knew what the case was.

2       Q    Did Mr. Zarone provide you with any concerns

3    about Mr. Youssef being absent from the unit because

4    of his case?

5       A    Could you repeat the question?

6       Q    Sure.  Did Mr. Zarone raise any concerns

7    with you about Mr. Youssef being absent from the unit

8    because of his case?

9       A    Yes.

10      Q    What concerns did Mr. Zarone raise?

11      A    That he was gone quite a bit, and he was not

12   paying attention to his unit.

13      Q    And what advice did you give Mr. Zarone?

14      A    I asked Mr. Zarone if Mr. Bassem Youssef was

15   giving him any documentation or letting them know that

16   he had to leave for a certain amount of days or not.

17      Q    And what did Mr. Zarone say to you?

18      A    Art Zarone said, "No, Bassem doesn't let me

19   know when he leaves; doesn't send me an e-mail;

20   doesn't provide me any documentation; he just leaves."

21      Q    And what was your response to that?

22      A    I said we need to get some kind of

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

21

1    documentation.  He needs to let us know when he leaves

2    so that we know when he's not in the unit.

3        Q    And what did Mr. Zarone say in response to

4    that?

5        A    I don't exactly recall.  He said I got it,

6    okay.

7        Q    And did Mr. Zarone ever again come back to

8    you and discuss Mr. Youssef's being absent from the

9    unit because of his case.

10       A    I believe there were several times.  At that

11   point I believe Bassem Youssef was either letting them

12   know verbally or by e-mail that he was going to be

13   absent.

14       Q    And what did Mr. Zarone report back to you

15   about that?

16       A    That he was going to be absent for his case.

17       Q    And were there any discussions about the

18   impact these absences had on Mr. Youssef's ability to

19   function effectively as a Unit Chief?

20       A    Would you repeat the question, please?

21       Q    Was there any discussion with Mr. Zarone

22   about the impact of these absences on Mr. Youssef's

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

22

1    ability to function effectively as a Unit Chief?

2        A    Yes.

3        Q    What was said in those discussions?

4        A    We had about three projects -- two to three

5    projects that needed to be done during his absences,

6    and I would just tell Art make sure these projects are

7    completed.

8        Q    And what would Art say to you?

9        A    Okay.

10       Q    And my question, then, is, do you think

11   these absences impacted his ability to function

12   effectively as a Unit Chief?

13       A    Yes.

14       Q    How so?

15       A    He didn't instruct his people under him to

16   follow through on the projects; he would just leave.

17       Q    And how did you learn that?

18       A    We would call the Acting Unit Chief, and I

19   would ask where is this project at, the status, and

20   many times over and over they would say Bassem never

21   told us to do anything.

22       Q    And did you discuss these issues with

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

23

1    Mr. Youssef?

2         A    Art Zarone -- I instructed Art Zarone to do

3    it.

4         Q    And did Art Zarone report back to you about

5    what those discussions were with Mr. Youssef?

6         A    Not the discussions, other than it's been

7    taken care of.

8         Q    And then did he report back and say it was

9    not taken care of?

10        A    I found out about one project that had not

11   been taken care of.

12        Q    And what was that project?

13        A    It was the contract with a "telecommuni"

14   carrier.

15        Q    And tell us how that project was not taken

16   care of?

17        A    Once a week we would ask Bassem -- I would

18   ask Bassem how are the contracts going?  He would

19   state they were going fine.  And that was at a

20   six-month period out when the contract was going to

21   end.  The closer we got to the end of the contract, he

22   would tell me it was fine, it was fine, and it turned

24

1   out that he had done extremely minimal work on the

2   contract and we were about to lose the contract with a

3   "telecommuni" carrier.

4        Q    And how did you learn that information.

5        A    I spoke to his folks, specifically an IA who

6   came and said, "There's been no work on this contract.

7   I want to let you guys know because we're about to

8   lose this contract."

9        Q    And who's that IA?

10       A    I believe her first name is Alexi.  I can't

11  recall her last name.

12       Q    And it's your testimony that Mr. Youssef was

13  somehow responsible for almost losing this contract?

14       A    Yes.

15       Q    And do you know how this matter was

16  resolved?

17       A    Yes.

18       Q    How was it resolved?

19       A    When this came to my -- I called the section

20  chiefs of several sections to come forth that were in

21  the process of this contract.  And Mr. Youssef was in

22  training somewhere up north.  I asked him to come

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

25

1    back.  He flew back.  So we had a meeting in my

2    office.  I told the contracting attorney, along with

3    some other attorneys and everybody in the room, that

4    we, CXS, had dropped the ball; how do we get these

5    contracts moving forward as soon as possible?

6         Q    And who were the people in the room at that

7    time?

8         A    For the contract the attorney was -- I

9    believe her name is Christine Costello.  I don't know

10   if she's still there yet.  And the other attorney was

11   Parsons.  And there was a few other people in there.

12   Bassem Youssef was in there.  Art Zarone was in there.

13   The IA, Alexi, was in there.  And there were a couple

14   other people in there that I do not recall.

15        Q    So Art Zarone was in the room when you said

16   that CAX had dropped the ball?

17        A    CXS.

18        Q    CXS had dropped the ball?

19        A    Yes.

20        Q    And when you said CSX had dropped the ball,

21   who in CSX had dropped the ball?

22        A    Sir, that is CXS.

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

26

1       Q    CXS?

2       A    Yes, sir.

3       Q    Thanks.  So who in CXS had dropped the ball?

4       A    Could you repeat the question, please?

5       Q    Okay.  When you referenced in that meeting

6    that CXS had dropped the ball, who did you understand

7    had dropped the ball at CXS?

8       A    I did not reference a name to anybody in

9    that room, but my belief -- if you're asking my

10   opinion, my belief is that Bassem Youssef had not

11   worked on this contract as he had stated on previous

12   occasions that he had.

13      Q    So do you believe that it was Mr. Youssef

14   who had dropped the ball?

15           MR. GUZMAN:  Asked and answered.  You can

16   answer.

17           THE WITNESS:  Yes.

18   BY MR. KOHN:

19      Q    And did you ever discuss with Art Zarone

20   whether or not Mr. Youssef had dropped the ball on

21   this contract?

22      A    Yes, sir.

27

1       Q     And what was Mr. Zarone's opinion?

2       A     After the meeting I had -- after that

3   meeting that I previously discussed, I talked to Art

4   Zarone, I said, "Bassem, on numerous times told us

5   this was taken care of.  Why was it not?"

6             And he said, "Bassem told me that it had

7   been taken care of."

8       Q     Did he say anything else about Mr. Youssef

9   in that conversation?

10      A     That was the gist of the conversation.

11      Q     Did you ever have any other conversations or

12  any conversations with Mr. Zarone in which Mr. Zarone

13  expressed disappointment or dissatisfaction about any

14  aspect of Mr. Youssef's performance?

15      A     Other than we've already discussed, no.

16      Q     Did you write up Mr. Youssef for this

17  contract issue, in other words, put something on paper

18  memorializing that Mr. Youssef had not done his job?

19      A     That is not my job responsibility.  The

20  answer to your question is no.

21      Q     Did you ask Mr. Zarone to write up this

22  issue?

28

1        A     I did.

2        Q     And did he?

3        A     Yes, he did.

4        Q     And did he provide you with a copy of that

5    document?

6        A     Just before he left, he had some notes on

7    it.  Yes, sir.

8        Q     So he had notes on it.  Did he ever -- so

9    your testimony is he had notes about the contract

10   issue, correct?

11       A     Correct.

12       Q     Did he have anything else other than those

13   notes?

14       A     You know, in the notes, I believe I gave a

15   copy of it to Bassem Youssef, and it was part of his

16   PAR.

17       Q     But in terms of any type of write-up on that

18   issue, it would be your testimony that it was in

19   Mr. Zarone's notes that he gave to you at the time

20   Zarone was leaving as Assistant Section Chief?

21       A     Actually, what he did was, he gave them to

22   the Acting Assistant Section Chief so that he could

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

29

1    present it to Bassem Youssef.

2         Q    Okay.  Now, did you review Mr. Zarone's

3    notes about Mr. Youssef's performance before you

4    signed Mr. Youssef's 2009 PAR?

5         A    Yes.

6         Q    And do you remember in those notes there was

7    a reference to Mr. Youssef being absent from the unit?

8         A    Vaguely.

9         Q    And what do you remember about the notes

10   regarding Mr. Youssef being absent from the unit?

11        A    That's all I remember, is that he was absent

12   from the unit.

13        Q    Do you remember the notes making reference

14   to him being absent because of a court case or a legal

15   matter?

16        A    I do not.

17        Q    But at the time you read -- you read those

18   notes before you signed the PAR; that was your

19   testimony?

20        A    Right.

21        Q    If you can just hold on for one second.

22        A    Okay.

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

30

1          (Discussion off the record.)

2     BY MR. KOHN:

3          Q     Okay.  I believe we sent down some exhibits

4     for you to look at or have available to you for this

5     deposition.  I want to call your attention to a

6     document that has been marked for deposition as Felder

7     Exhibit 4.  Can your Counsel provide you with a copy

8     of that?

9          A     Yes.  I have it in front of me now.

10         Q     Did you review this document before this

11    deposition today?

12         A     No.

13         Q     I want you -- we're just going to move

14    backwards a little.  Go to the third page of the

15    exhibit.  This is the PAR, which looks like you signed

16    it on 10/27/09?

17         A     Correct.

18         Q     And you did sign it on that day?

19         A     Correct.

20         Q     And now I want to call your attention -- did

21    you ask Mr. Zarone why he lowered some of the ratings

22    from 2008 to 2009?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

31

1       A     No.

2       Q     I would now like to call your attention to a

3    document that was marked as Felder Exhibit 5.

4       A     Okay.  I have it in front of me.

5       Q     Now, have you looked at this document prior

6    to your deposition?

7       A     I have not.

8       Q     Prior to today, have you ever seen this

9    document?

10      A     I have not.

11      Q     Okay.  I'd like you to go to what I

12   believe -- well, there's two pages -- the first two

13   pages you can ignore.  The last three pages are what I

14   believe to be the notes of Mr. Zarone that you

15   referenced that you looked at.  Can you look at those

16   three pages and see if those are the notes?  And on

17   the bottom right-hand corner of the document in small

18   print you'll see a page number FBI 660661 and 662.

19      A     Right.  I see them.

20      Q     Were these the notes you looked at from

21   Mr. Zarone before you signed the performance review?

22      A     To the best of my recollection, yes.

32

1      Q    And just to help me out here, can you show

2   me on these notes where the reference to that contract

3   issue is?

4      A    I believe it's on the page that says FBI

5   660.

6      Q    And can you kind of help me out, show me

7   where that is on that page?

8      A    It would be on the top.  There's a bullet,

9   and it says contracts right next to it.

10     Q    And can you read that?

11     A    Yes.  His handwriting is horrible.  It's a

12   bullet.  It says contracts.  And then there's a check

13   mark.  It says, "No response to e-mails."  And there

14   is a June right before that.  Next line says. "July,

15   check mark, not the driver of events."  And then the

16   next one says, "August 9th, paper copy" -- I believe

17   that's "of OGC."  I can't read the next word.  And

18   then the next line says, "September something too soft

19   for several days."  I think that's soft.  It may not

20   be.  Oh, off.  "17 something off for several days."

21     Q    Do you know what was occurring in September

22   of 2009 in terms of his EEO case?

33

1      A    I don't recall.

2      Q    And what's the next line?

3      A    The next line is a check mark.  It says,

4  "Problem solving, question mark, initiative, question

5  mark."

6      Q    Do you know if those related to the

7  contracts issue or is that beginning another subject

8  issue?

9      A    No.  I can't -- I wouldn't be able to tell

10 you.

11     Q    And did you discuss these notes with

12 Mr. Zarone?

13     A    I don't recall.

14     Q    Do you know what the result was of

15 Mr. Youseff's work on that contract issue?

16     A    I don't understand your question.

17     Q    Well, what was the outcome of Mr. Youssef's

18 efforts regarding that contract issue?

19     A    Well, the result of the IA's efforts and my

20 involvement is that we got the contract complete.

21 Mr. Youssef was pretty much not involved in it at the

22 very end.

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

34

1      Q      And were you aware that the Bureau saved

2    money on the resolution of that contracts issue?

3      A      Because of the IA, yes.

4      Q      So you're saying Mr. Youssef had no role in

5    that?

6      A      Yes, sir.  That's exactly what I'm saying.

7      Q      And what's your basis for believing he had

8    no role in that?

9      A      Because he wasn't paying attention to the

10   contracts.  He wasn't as involved as the IA was.  The

11   IA was doing the work.

12     Q      And who was the IA?

13     A      I believe I've mentioned her name.  I don't

14   know her last name.  Alexi?  Alexis?

15     Q      And is she in the unit?

16     A      I don't know if she's there now.

17     Q      But was she at the time?

18     A      Yes, sir.

19     Q      And who is her supervisor?

20     A      I don't know, sir.

21     Q      Do you know if she reported to Mr. Youssef?

22     A      I do not think she reported to him directly,

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

35

1    no.

2         Q     And who else in the unit was involved in it?

3         A     There should have been a Supervisory Special

4    Agent assigned to it also.

5         Q     And do you remember who that was?

6         A     No, sir.

7         Q     And do you remember whether Mr. Youssef was

8    ever congratulated for his outstanding work on this?

9         A     No, sir, I don't remember.

10        Q     And after that meeting you attended, what

11   was your further involvement on the issue?

12        A     I had to personally walk and make sure that

13   the contracts were going through the FBI process,

14   whatever that may have been.

15        Q     And who was it that was responsible within

16   the FBI for the delay in those contracts being

17   approved?

18        A     I don't understand your question.

19        Q     Who was responsible at the FBI for the delay

20   in the contracts being approved?

21        A     As far as being approved, there was nobody

22   responsible.  The contracts weren't written up at all

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

36

1   because of Mr. Youssef.

2       Q    And who did you discuss this contracts

3   problem with Mr. Youssef -- did you have other

4   discussions about his performance on this with

5   Mr. Zarone?

6           MR. GUZMAN:   That's been asked and answered,

7   but you can answer again.

8   BY MR. KOHN:

9       Q    Any others while you're walking all the

10  contracts through?

11      A    I'm sorry.   Could you repeat the question?

12      Q    Did you have any other discussions with

13  Mr. Zarone about the problems with Mr. Youssef's

14  performance on this contract issue?  And I'm asking

15  this again because you're talking about your further

16  involvement and the fact that you had to sit and carry

17  these contracts around.

18          MR. GUZMAN:   I'm going to object, asked and

19  answered, to the extent it misstates his testimony,

20  but you can answer.

21          THE WITNESS:   I'm sorry.   After all that

22  could you please repeat --

37

1

2  BY MR. KOHN:

3      Q    Based upon the discussions we're having now,

4  do you remember any other discussions with Mr. Zarone

5  about performance problems with Mr. Youssef on these

6  contracts.

7      A    Just the one conversation I had with him

8  after the meeting.

9      Q    Then why didn't you have other conversations

10 with him about this to get Youssef to do his job?

11         MR. GUZMAN:  Objection to form.  You can

12 answer.

13         THE WITNESS:  I'm sorry, could you repeat --

14 BY MR. KOHN:

15     Q    Why didn't you have any further discussions

16 with Mr. Zarone about this issue to make sure Youssef

17 was doing his job?

18     A    Well, that's an easy answer, sir.  That was

19 the very last contract that we needed for that year.

20     Q    So after that meeting you had, the contract

21 issue was resolved?

22         MR. GUZMAN:  Hold on, Steve.  Let --

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

38

1     Mr. Fernandez was finishing his answer so the court

2     reporter can take it down.

3              MR. KOHN:  Oh, I'm sorry.

4              THE WITNESS:  The question, I believe, was

5     why didn't I have any more issues and/or discussions

6     with Art Zarone on the performance of Bassem Youssef

7     when it came to these contracts.  That was the very

8     last contract that needed to be approved, signed, gone

9     through.  There were no more issues with contracts

10    that year.

11    BY MR. KOHN:

12         Q    So prior to that meeting that you've

13    testified to, did you have any discussions with

14    Mr. Zarone about problems with Mr. Youssef's

15    performance on the contracts?

16         A    Right before I had the meeting, every week

17    we'd ask Bassem Youssef how are the contracts going?

18    He would say they're going fine.  When the IA -- I

19    will repeat.  When the IA approached me and said,

20    "These are not being worked on; what do you want to

21    do?" that's when I approached Art Zarone and said,

22    "Where is Bassem?  We need to work on these

39

1    immediately?"

2    BY MR. KOHN:

3        Q    And what did Zarone say to you?

4        A    As I stated before, sir, Bassem Youssef is

5    in training somewhere up north.  I said, "Get him down

6    here, and we need to have a meeting with everybody

7    involved so we can get these contracts expedited."

8        Q    Thank you very much for that.  So, as I

9    understand it now, from your perspective this incident

10   between your conversation with the IA, your

11   conversation with Zarone, and then that meeting, all

12   occurred in a relatively short period of time?

13       A    Well, depending on what you mean by a short

14   period of time.  Within a week's time, yes.

15       Q    Within a week's time.  And how many

16   contracts were at issue?

17       A    I don't recall, but I believe it was just

18   one.

19       Q    Who fixed the issues with the contracts?

20       A    Are you talking after the meeting, sir?

21       Q    Yeah.  At the end of the day, who was

22   responsible for fixing the issues with the contracts?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

40

1        MR. GUZMAN:  Who did or who was responsible?

2        MR. KOHN:  Well, we'll break it up into two

3   questions.

4   BY MR. KOHN:

5        Q    Who was responsible for fixing the issues

6   with the contracts?

7        A    As the Section Chief, I was responsible for

8   the section which included the contracts.  Me.  I was

9   responsible.

10       Q    So who did fix the issues with the

11  contracts?

12       A    I would say it was a committee, which

13  included myself and the section chiefs of the other

14  sections that needed to get this contract through,

15  where we all agreed that we would work on this and

16  expedite it to get through.

17       Q    And were any of the other sections

18  responsible for the delay in getting the contract

19  through?

20       A    No.

21       Q    So you would say the entire delay was based

22  upon your section?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

41

1      A    Yes.

2      Q    Based upon this issue and your

3   responsibility, how were you rated as a supervisor in

4   2009 for your work on these contracts?

5      A    I was not rated specifically on the work on

6   these contracts.  They was rated over the overall

7   section, which included seven units.

8      Q    So is it your testimony that these contracts

9   were not mentioned in your PAR?

10     A    I believe so.  I do not have my PAR in front

11  of me.

12     Q    And would you agree that as the supervisor

13  responsible for these contracts, you had a performance

14  deficiency in managing your section?

15     A    I do not believe so.

16     Q    Okay.  Next is, in going through these notes

17  I want to call your attention to the third page, which

18  is 662.

19     A    Okay.

20     Q    Do you see where Mr. Zarone wrote,

21  "Distracters, legal matter, OIG report."  Do you see

22  that?  It's on the top of page 662.

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

46

1    of your recollection, in your last three performance

2    reviews?

3              MR. GUZMAN:  That's been asked and answered,

4    but Mr. Fernandez can answer again.

5              THE WITNESS:  There is no rating, sir; it's

6    a yes or no.  And the check mark was checked yes for

7    did you provide EEO training?

8    BY MR. KOHN:

9        Q    So now the next question.  Based upon your

10   knowledge of EEO matters within the FBI, can an

11   employee take off official time to work on an EEO

12   matter, yes or no?

13       A    With proper documentation, yes, sir.

14       Q    And can the FBI downgrade an employee's PAR

15   because they took official time to work on an EEO

16   matter, yes or no?

17       A    To take official time on an EEO matter, no,

18   sir.

19       Q    So that means if you take official time to

20   work on an EEO matter, regardless of how long you are

21   out of the unit, the FBI cannot downgrade your PAR,

22   correct?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

47

1        A     I believe that I answered that, sir; and the

2    answer is no, they cannot downgrade your PAR.

3        Q     Thank you.  So when you read these notes

4    about distracters, legal matter, what inquiry did you

5    do with Mr. Zarone to ensure that the EEO policies of

6    the FBI were fully adhered to?

7        A     Sir, I believe I answered that question as I

8    do not recall.

9        Q     Thank you.

10       A     You're welcome, sir.

11       Q     Now, you've given -- based upon the

12   testimony that you've just given in its entirety, and

13   especially your testimony about Mr. Youssef's

14   performance on the contracts issue, do you believe

15   that Mr. Youssef should have become the Assistant

16   Section Chief of your section in October of 2009, yes

17   or no?

18       A     I'm sorry, sir, you were extremely loud and

19   I couldn't --

20       Q     I'm yelling at this phone here.  I don't

21   know how loud I come across, and now I'm very happy I

22   can talk softer.  I don't know what I'm saying.  Thank

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

50

```
 1        A     No, sir.  I was quite surprised to see his

 2   name in there.

 3        Q     Why?

 4        A     Usually when I have a posting and I am the

 5   point of contact, Mr. Bassem has been the one and only

 6   person that has not approached me.  Usually my

 7   employees approach me and show me that they're

 8   interested in the job and why they're interested in

 9   the job.  Again, he has been, in the 17, almost 18

10   years I've been in the Bureau, the only person that

11   has not approached me and told me he's putting in for

12   one of my jobs.

13        Q     Okay.  But was he required to approach you

14   and tell you he was putting in for the job?

15        A     No, sir.  But usually when a person is

16   interested in a job, you let people know hey, I want

17   this job, I'm interested, and this is why I'm

18   interested.  And, again, I found that extremely odd

19   that he would not approach me and even let me know

20   that he applied for the job.  I was quite surprised

21   when I saw his name on it.

22        Q     Now, again, I just want to go back.
```

52

1      Q    Who was that?

2      A    Actually, I had a call from all the other

3    candidates.  I'm sorry, I got a call from -- I believe

4    there was four candidates so I got a call from two

5    candidates and a face-to-face from one of the

6    candidates.

7      Q    Who was the face-to-face with?

8      A    Daniel Powers.

9      Q    And tell me about what occurred in that

10   face-to-face meeting?

11     A    Well, it was a short meeting.  It couldn't

12   have been more than 60 seconds.  He came in with Art

13   Zarone, and Art Zarone introduced him to me.  He goes,

14   "Well, my name is Dan Powers.  I was in for a Legat

15   Conference.  I just wanted to stop by, introduce

16   myself and tell you that I was applying for the

17   Assistant Section Chief job."

18     Q    And what did you say to him?

19     A    I said, "Oh, okay.  Thank you very much."

20   And I do remember that I was busy with something; I

21   couldn't sit there and talk to him, and I remember

22   walking out of the office.

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

57

1    assistant section chiefs.  I wanted a minimum of three

2    voting members, and I went out to the section next to

3    us and asked the Assistant Section Chief there, "Hey,

4    I've got a Board coming up soon, will you be my" -- to

5    answer your question, the short answer is yes.  And

6    the reason I have to do that is because when they send

7    the candidate packages out, I have to report who the

8    members are.

9        Q    So at the time Art Zarone introduced you to

10   Mr. Powers, was Art Zarone on the Career Board that

11   was going to make the selection?

12       A    Well, at the time did I know that?  No.

13       Q    So Art Zarone introduced you to Powers, and

14   after that you named Zarone to the Career Board?

15       A    After the introduction, sir?

16       Q    Yes.

17       A    Yes.

18       Q    And are there any notes concerning this

19   interaction that you had with Mr. Powers?

20       A    When he was introduced to me, sir?

21       Q    Yes.

22       A    No.

60

1        Q    Yes.

2        A    Just that he was involved.  I don't know

3   what his role was, sir.

4        Q    And do you know his relationship or did you

5   know his relationship at the time of the Career Board

6   to Osama Bin Laden?

7        A    No, sir.

8        Q    And have you ever heard of a terrorist cell

9   known as al-Gama'a al-Islamlyah better known as the

10  Islamic Group or AGAI?  And I can spell that.  I'll

11  spell it for the record since my pronunciations are

12  often not very good.  A-L dash G-A-M-A apostrophe A,

13  AL, A-L hyphen I-S-L-A-M-L-Y-A-H.  Do you know what

14  that terrorist cell was involved in?

15       A    You know, all I know is that they were

16  involved, you know, somehow with The Blind Sheikh.

17       Q    Do you know what that terrorist cell's role

18  was in the World Trade Center bombing from 1993?

19       A    No, sir.

20       Q    Do you know anything about the need to get a

21  FISA or search warrant on that cell in or around the

22  1993 time frame?

63

1    have never heard of that before.

2        Q    Were aware that Mr. Youssef was awarded the

3    DCI Award?

4        A    I want to say I recall that.  I don't know

5    what for though.

6        Q    And are you aware that the Director of the

7    FBI would nominate the FBI agents to the Director of

8    Central Intelligence for that award?

9        A    I don't know if that's a fact or not, sir.

10       Q    Do you know how prestigious the Director of

11   Central Intelligence Award was within the intelligence

12   communities in or about 1995?

13       A    No, sir.  I was working drugs at that time.

14       Q    And how about thereafter, did you ever learn

15   how prestigious a Director of Central Intelligence

16   Award was?

17       A    No, sir.  Since my time working up at

18   Headquarters, the second time up there, we really

19   didn't even hear about that award.

20       Q    In terms of working counterterrorism, is it

21   important for agents or is it a good skill to have to

22   undergo recruitments to obtain intelligence; is that

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

65

1      Q     Mr. Youssef worked in the Los Angeles

2   Division.

3      A     Okay.  I'm sorry.

4      Q     But, again, are you aware that he received

5   the Director of Central Intelligence Award for his

6   recruitment of sources and the intelligence obtained

7   from those sources from the Middle Eastern terrorist

8   organization cell al-Gama'a al-Islamlyah or the

9   Islamic Group?

10          MR. GUZMAN:  That's been asked and answered,

11   but you can answer again Mr. Fernandez.

12          THE WITNESS:  No, sir, I was not aware of

13   that.

14   BY MR. KOHN:

15      Q     And are you aware that that group was, in

16   fact, the group that The Blind Sheikh was the leader

17   of?

18      A     No, sir, I was not aware of that.

19      Q     And are you aware that The Blind Sheikh was

20   Osama bin Laden's spiritual leader?

21      A     No, sir, I was not aware of that.

22      Q     Have you ever served as a legal attache?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

66

1          A     No, sir, I have not.

2                MR. KOHN:  Hold on for a moment.  Okay?  If

3     we can go off the record, I'm going to look at my

4     notes.

5                MR. GUZMAN:  Sure.

6                (A brief recess was taken.)

7                MR. KOHN:  Mr. Fernandez -- hello?

8                THE WITNESS:  Yes, sir.

9     BY MR. KOHN:

10         Q     I think we're getting close to being done.

11    I just want to talk to you a little bit about the

12    Career Board process.

13         A     Okay.

14         Q     So, as I understand it, a Career Board is

15    named, and the specific Career Board, you were on the

16    Career Board for the Assistant Section Chief for your

17    Section back in 2009, correct?

18         A     Yes, sir.

19         Q     And you were the chair of that Career Board?

20         A     Yes, sir.

21         Q     And you were the one who appointed all the

22    members of the Career Board?

TELEPHONIC DEPOSITION OF ARMONDO FERNANDEZ
CONDUCTED ON TUESDAY, DECEMBER 11, 2012

71

1    HRD.

2        Q    So what you would have sent to HRD were the

3    ranking sheets of the three members, your overall

4    matrix sheet and the tape, correct?

5        A    Correct.  HRD, just for everyone here, is

6    the Human Resources Division.

7        Q    Thank you very much.  That's an excellent

8    clarification.  And I understand the rankings.  Would

9    you ever indicate to anybody whether you agreed or

10   disagreed with the rankings?

11       A    No, sir.  I am there just as a chairperson

12   to break any ties, but since we had three voting

13   members, there was not going to be a tie, and make --

14   obviously as chairperson make sure that it was done

15   fairly.

16       Q    And the person being selected here would

17   ultimately report to you?

18       A    Yes, sir.

19       Q    And did you discuss these rankings at all

20   with your supervisor at the time?

21       A    Are you talking my immediate supervisor,

22   sir?