UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BASSEM YOUSSEF, )<br>      Plaintiff, )<br>)<br>v. )<br>)<br>ERIC HOLDER )<br>U.S. Attorney General, )<br>      Defendant. )<br>) | Civil Action 1:11-CV-01362 (CKK) |

## NOTICE OF FILING

Plaintiff Bassem Youssef, by and through counsel, is hereby filing Exhibit 14 to "Plaintiff Youssef's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment," dated June 21, 2013 [Docket No: 1:11-CV-01362]. Exhibit 14, "Affidavit of Bassem Youssef," had been submitted to the FBI for clearance on June 21, 2013. The FBI has subsequently cleared this document for public release.

Respectfully submitted,

/s/ Stephen M. Kohn
Stephen M. Kohn, sk@kkc.com
DC Bar No: 411513
Kohn, Kohn & Colapinto, LLP
3233 P Street N.W.
Washington, D.C. 20007
Phone: (202) 342-6980
Fax: (202) 342-6984

Attorney for Plaintiff

July 11, 2013



# DEPARTMENT OF JUSTICE
# FEDERAL BUREAU OF INVESTIGAION

## BASSEM YOUSSEF V. FBI, ET AL.

### June Affidavit

**EXCISED COPY**

EXHIBIT 14

## AFFIDAVIT OF BASSEM YOUSSEF

I, Bassem Youssef, under the pains and penalties of perjury, hereby affirm that the following statements are true and correct to the best of my recollection:

1. My name is Bassem Youssef; I am the plaintiff in this case.

2. I have read the statement made by the FBI on page 14 of their brief in support of summary judgment. This statement does not accurately set forth the circumstances of my drafting the FD-954 submission for the position of Assistant Section Chief.

3. Prior to submitting my application for the position in question, the FBI had posted a notice seeking applications for the *same job*, i.e. an Assistant Section Chief within the CXS. I applied for this position.

4. However, the FBI cancelled this job application notice. I contacted the Executive Development office responsible for these notices ("EDSP"), and inquired about the reason for cancelling the job posting. I was informed that the posting was cancelled because the EC documenting the results of the LCB was delayed beyond the 30 day time frame allotted for submitting the EC, per FBI policy. It is well known that SACs and Section Chiefs deliberately delay the submission of the LCB results EC in order to repost the vacancy and provide their favored candidate to apply for that vacancy. Because I had applied for the position, I interpreted this action as an indication that the FBI did not want to promote me. I was also advised by EDSP that the other applicants had withdrawn their applicants and I was the only remaining candidate (which is not uncommon) and thus if the job posting was not cancelled, the FBI would have to offer me the position.

5. The "competencies" listed in the job posting for the cancelled Assistant Section Chief position and the Assistant Section Chief position for which I applied were the same. Consequently, I used my prior FD-954 as the basis for the new application.

6. I understand that Hipolito Castro denied knowing that I filed an EEO complaint based on discrimination at the time the Career Board met. This is completely not true. Mr. Castro and I discussed my EEO lawsuit on numerous occasions in the hallway between his office and mine. We had become friendly at work with one another, and during the course of our conversations the subject of the unfair treatment and the retaliation that I experienced as a result of filing an EEO suit were discussed. In fact, he expressed sympathy with my plight and told me that he believed there was discrimination and retaliation within the FBI. I clearly remember him on one occasion responding to my comments about EEO discrimination, stating either that there are "a—holes" or "sons of bitches" in every organization.

7. I understand that Erkan Chase has denied knowing that I filed an EEO complaint based on discrimination. This testimony is not truthful. I personally told Mr. Chase about my EEO action long before the meeting of the Career Board. I am not ashamed of having filed an EEO lawsuit, and believe that the lawsuit serves a higher purpose than simply seeking relief for the hardships I endured. Thus I have made no secret about the EEO matter, especially since my EEO suit received wide media attention and I was regularly asked about my lawsuit by friends and colleagues within the FBI. Mr. Chase worked with me in CXS, and served as a

Unit Chief in CXS as well as an Assistant Section Chief and we had numerous interactions.

8. One such interaction occurred in the regular meeting of CXS Unit Chiefs that occurred on Tuesday, August 7, 2007 at approximately 10:25 a.m. During this meeting Acting Assistant Section Chief Erkam Chase made a reference to "whistleblowers." In response, Acting Unit Chief Ed Moschella commented, "Hang him," referring to the whistleblower referenced by Chase. When Moschella made this comment he was looking directly at me.

9. I filed a complaint on the same day with the Deputy Assistant Director, Chuck Frahm, in which I copied a number of officials, including the head of the FBI EEO office, Veronica Venture. In my complaint I directly referenced my EEO matter, in which I had raised a number of concerns related to the FBI's discriminatory practices.

10. That afternoon DAD Frahm called me into his office for an urgent meeting regarding my email. Frahm agreed that the comments were completely inappropriate, and that the Director of the FBI takes these issues seriously. Mr. Frahm assured me that he would meet with and counsel every person involved in the meeting, and discuss with them all of the concerns I raised in my email. Mr. Frahm appeared very sincere when he made this commitment.

11. Based on the contents of my email complaint, which directly referenced my pending EEO matter, it would not be conceivable that Mr. Frahm would not have discussed with Chase (and all the other participants) the fact that I had an EEO matter and that I was concerned that the hostility expressed at the meeting

concerned, in part, hostility regarding the strong allegations of discrimination I had raised.

12. I have reviewed Mr. Daniel Powers' FD-954, and based on this review conclude that the competencies identified in his document primarily reflect that he was simply doing his job. For example, the following activities identified by Mr. Powers as part of his work as a Legal Attaché are standard work assignments for any person holding that position: Identifying resources needed for an investigation, establishing a command post, working to ensure the return of the bodies of U.S. citizens who died abroad, and chairing large intergovernmental meetings on matters of interest for the FBI. In fact, if he is not performing these functions he would be negligent in his duties.

13. The Khobar Towers terrorist attack is a very well known event within the FBI and U.S. Intelligence Community. It would be inconceivable that trained FBI agents and other trained intelligence officials who work in counterterrorism would not be fully familiar with this attack, and would not know that at the time of the attack, it was the FBI's number one terrorism investigation. In fact, the Director of the FBI, Mr. Freeh, was nick-named, the "Khobar Towers Case Agent."

14. It is well known that the principle role of an FBI Legat is to establish effective liaison with foreign governments in furtherance of affecting a robust information and intelligence exchange between the two governments.

15. The contents of the FD-954 application form must be accurate and they are independently verified by an FBI official.

4

16. The world trade center bombing was the first successful terrorist attack perpetrated by a radical Islamic group, on U.S. soil, and as a result, received worldwide media coverage. One of the key points that received particular media and press attention was the fact that Sheikh Omar Abdel Rahman, the spiritual leader of the AGAI was suspected of playing a major role in that bombing. Congressional inquiries into the bombing investigation highlighted the fact that the Newark field office's repeated requests for FISA approval on the "Blind Sheikh" were denied until shortly before the attack.

17. The ability to successfully use such human assets constitutes one of the most important and difficult techniques in counterterrorism. In fact U.S. government officials asserted on a number of occasions that recruiting sources within groups such as AGAI is one of the most challenging endeavors within the intelligence community.

18. Canvassing "strategic assets" is a sophisticated investigative technique well known to, and is utilized by seasoned FBI agents.

19. Analyzing and compiling the intelligence necessary to request and obtain the necessary sophisticated investigative techniques referenced in my FD-954, which were redacted by the FBI, was in fact addressing my utilization of highly sophisticated investigative techniques. This is especially true during the time period prior to the 9/11 attacks, when the approval to utilize such sophisticated techniques was far more restrictive and difficult to obtain.

20. The Execution of an AG Search Warrant is a highly sophisticated investigative technique. These warrants are very difficult to obtain. The Attorney General or

his or her designate must personally approve this technique. The scope of a search such as the AG Search warrant is even more intrusive than a FISA.

21. Powers' statement that he obtained NSLs for this investigation does not demonstrate the utilization of any sophisticated technique. NSLs are very easy to obtain, and can be approved by an FBI official (including an FBI official in the local field office) and only need proof of the existence of a preliminary investigation. They are among the least sophisticated investigative techniques at available to an FBI agent.

22. A case agent receives information from his or her "assets."

23. A case agent compiles the relevant intelligence and submits a request for the type of search warrants or other investigative techniques that were improperly redacted in my FD-954.

24. A case agent manages the techniques on "targets" referenced in my FD-954.

25. The DCI award was one of the most prestigious awards given in the U.S. intelligence community. A candidate had to be nominated by the head of his agency (in my case, the Director of the FBI made the nomination), and was awarded by the Director of Central Intelligence. Officers and Special Agents from all twelve U.S. intelligence agencies competed for the award. The award was and is very well known within the U.S. intelligence community and within the FBI. If a seasoned or veteran FBI agent claims they do not know what this award means, I would challenge their credibility. This is especially true for any agent who is or was assigned to the National Security Branch, the Counterterrorism or Counterintelligence Divisions.

26. The rating system in a Career Board is designed to require Board members to accurately rate applicants. If an applicant demonstrates exemplary qualifications in a competency, they must be rated accordingly.

27. The FBI improperly redacted information from my FD-954 which is not classified, and in some cases is widely known to the general public. These redactions were prejudicial and harmed my ability to fully set forth and explain my competencies in a public proceeding, or even to my own attorney. I repeatedly asked the FBI to clear the entire FD-954 for release to my counsel as part of this case. The FBI has not yet complied with that request. The facts improperly redacted by the FBI, if released to my counsel, would greatly enhance my ability to demonstrate the validity of my case.

28. The Blind Sheikh was Osama bin Laden's spiritual advisor.

29. In 2009 I worked on obtaining a renewal of contracts with telecommunication companies to provide services for the Communications Analysis Unit/CXS Section.

30. I had no performance problems related to this assignment. I successfully negotiated the renewal for the contracts.

31. The delay in finalizing the contracts was not a CAU issue, but was caused by a delay in approval process within the FBI Office of General Counsel. The contracts that I had successfully negotiated needed to be approved by FBI OGC, and there was a delay in that approval process.

32. Because of this delay, I negotiated a separate agreement with the telecommunications companies to ensure the service to the FBI is continued

without any disruption while the contracts were under review by the Office of General Counsel.

33. The agreement we reached authorized the telecommunications companies to invoice the FBI for services provided. This was agreeable to all parties, and as a result of this "fix," the CAU and the FBI continued to obtain all of the services we needed from these providers without any lapse in coverage.

34. The FBI OGC eventually completed its review and the contracts were signed and approved.

35. At no time was my performance in these matters the subject of any form of performance attack by my managers. In fact, ASC Zarone acknowledged in my PAR that I continued efforts to enhance the coordination between the FBI and the telecommunications carriers. He added that I negotiated with the carriers to continue service while aiming to substantially reduce costs (in the millions of dollars).

36. My participation in EEO proceedings had absolutely no impact whatsoever on my ability to negotiate these contracts with the telecommunications companies and/or to insure that the FBI continued to obtain all of the services we needed from these companies. In fact I successfully negotiated a substantial reduction in the cost of the contract while greatly enhancing the services provided.

37. The rating of "Successful" for a veteran and seasoned agent is considered a very low rating within the FBI. A "Successful" rating is traditionally given to a brand new agent with the hopes of that agent improving his/her rating as they gain more

experience. A seasoned and experienced agent receiving a rating of "Successful" is viewed as a very unfavorable rating.

38. During my mid-year evaluation in 2009 Mr. Zarone raised the issue of my absences from work. I explained the reasons I had taken leave, and explicitly informed him that leave had been taken for my EEO matter. I also informed him that participation in such EEO matters was protected. He acknowledged this fact, and did not take any formal action against me at that time, nor did he instruct me not to take any additional leave. When I contested my PAR rating later in 2009, I set forth the facts related to this mid-year evaluation meeting in a letter to the Assistant Director for Counterterrorism.

39. According to FBI rules, employees have the right to participate in EEO related proceedings, and are permitted to take official paid administrative leave in order to have the time to so participate. My Assistant Section Chief during 2009, Mr. Zarone, would have had to approve my official leave, and would have been made aware of the purpose of leave during the normal course of business. In fact, if Mr. Zarone approved my Administrative leave without knowing the reason or purpose for which I'm requesting leave, he would be negligent in his duties.

40. FBI employees are required to report discriminatory actions. The failure to make such a report constitutes official misconduct.

Signed:

Bassem Youssef