# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BASSEM YOUSSEF<br><br>    Plaintiff,<br><br>      v.<br><br>ERIC H. HOLDER, JR., United States<br>Attorney General,<br><br>    Defendant. | Civil Action No. 11-1362 (CKK) |

## MEMORANDUM OPINION
(January 28, 2014)

Bassem Youssef ("Youssef"), an employee of the Federal Bureau of Investigation (the "FBI"), brings this action against the United States Attorney General (the "Attorney General") under Title VII of the Civil Rights Act of 1964 ("Title VII").[1]  Youssef, an Egyptian-born American citizen, asserts two claims—one sounding in discrimination and the second sounding in retaliation—each challenging his non-selection for an Assistant Section Chief position in the FBI's Counterterrorism Division Communications Exploitation Section.  Presently before the Court is the Defendant's [41] Motion for Summary Judgment.  The Court finds that Youssef has failed to demonstrate that a genuine issue of material fact exists concerning his claim of national origin discrimination.  The Court finds that Youssef has, however, demonstrated the existence of genuine issues of material fact as to whether the FBI retaliated against him in response to his

---

[1]  Originally, Youssef also brought suit against three other federal actors, but he later voluntarily dismissed those defendants from the case.  *See* Stipulation, ECF No. [11].

statutorily-protected activities. Accordingly, upon careful consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court GRANTS IN PART and DENIES IN PART the Defendant's [41] Motion for Summary Judgment for the reasons that follow.

## I. BACKGROUND

### A. *The Scope of this Action*

On September 18, 2009, the FBI announced a vacancy for the Assistant Section Chief of the Counterterrorism Division's Communications Exploitation Section. Def.'s Stmt. ¶ 17.[3] Youssef applied for the position, but, at the end of November 2009, he was informed that he had not been selected. *Id.* ¶ 50. Youssef commenced this Title VII action on July 25, 2011, claiming that his non-selection was discriminatory based on his Egyptian-national origin and was retaliatory due to his participation in prior Equal Employment Opportunity ("EEO") activity. *See* Compl., ECF No. [3], ¶¶ 65-72. Youssef's prior EEO activity involved a separate lawsuit brought in this Court in 2003. *See generally Youssef v. F.B.I.*, 541 F. Supp. 2d 121 (D.D.C. 2008).

---

[2] While the Court bases its decision on the record as a whole, its consideration has focused on the following documents: Def.'s Mem. in Supp. of Summ. J. ("Def.'s Mot."), ECF No. [41]; Def.'s Stmt. of Material Facts Not in Genuine Dispute ("Def.'s Stmt."), ECF No. [41]; Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n."), ECF No. [47]; Pl.'s Opp'n. to Def.'s Stmt. Of Material Facts Not in Genuine Dispute and Pl.'s Stmt. Of Material Facts in Dispute ("Pl.'s Resp. Stmt."), ECF No. [47-1]; Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply"), ECF No. [51]; Def.'s Resp. to Pl.'s Stmt. Of Material Facts in Dispute, ("Def.'s Reply Stmt."), ECF No. [51-1]. The motion is fully briefed and ripe for adjudication. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f).

[3] The Court shall refer to Defendant's Statement of Material Facts not in Genuine Dispute ("Def.'s Stmt."), ECF No. [41], or directly to the record, unless a statement is contradicted by the opposing party, in which case the Court may cite to Plaintiff's Opposition to the Defendant's Statement of Material Facts ("Pl.'s Resp. Stmt."), ECF No. [47-1], or to the Defendant's Response to the Plaintiff's Statement of Material Facts ("Def.'s Resp. Stmt."), ECF No. [51-1], where appropriate.

**B.**  *FBI Method for Selecting Mid-Level Supervisors*

The FBI selects mid-level supervisors through a process involving a Local Career Board ("LCB"), which is composed of a non-voting chairperson and three voting members, all of whom are career supervisory special agents.  Def.'s Stmt. ¶ 1. The FBI component with the vacancy selects the preferred qualifications, known as competencies, for the position.  *Id.* ¶ 3.  The competencies are divided into primary and secondary competencies; four primary competencies are selected from a list of eight core management competencies developed by the Employee Development and Selection Program ("EDSP") and up to three secondary competencies are selected from a separate list of specialized skill competencies.  *Id.*  The primary competencies are accorded greater weight than the secondary competencies in rating the candidates for a position.  *Id.* ¶ 4.  Candidates interested in a job vacancy apply by submitting a Candidate Qualification Form, which contains the applicant's personal data, education level, and work history.  *Id.* ¶ 6.  As part of the form, the candidate also submits two examples of achievements demonstrating his or her experience and ability with regard to each required competency.  *Id.*  The competency examples are rated on a five-tier scale: Exemplary, Skilled, Competent, Marginal, and Ineffective.  *Id.* ¶ 7.  According to the LCB Chairperson Training presentation, "[i]f correctly applied, 'Competent' characterizes [the] majority of examples; 'Exemplary' and 'Ineffective' are rare."  Def.'s Ex. 4 (LCB Chairperson Training Presentation), at FBI 3417.  The FBI has published detailed criteria to be used by the LCB in rating candidates' examples.  Def.'s Stmt. ¶ 7.

After the job posting has closed, the EDSP determines which candidates meet the position's minimum qualifications and sends their application forms to the LCB chair, who distributes them to the voting members of the LCB at least three days before the LCB convenes

to rank the candidates. *Id.* ¶ 12. The voting members independently review and rate each candidate's competency examples on separate scoring forms prior to the LCB meeting. *Id.* The competency examples are rated based on their written content.[4] *Id.* ¶ 9. The LCB chair or voting members may introduce personal knowledge into the LCB proceedings only when the information is first-hand knowledge and it is directly related to a specific competency example or work assignment cited by the candidate. Def.'s Ex. 4 (LCB Chairperson Training Presentation), at FBI 3425. Voting members cannot take into account a candidate's performance appraisals or any factor not included under the qualifications in the job posting. Def.'s Ex. 5 (ASAPP Training Guide), at FBI 2748.

The LCB chair then convenes an LCB meeting, which is audio recorded. Def.'s Stmt. ¶ 13. The voting members bring their scoring forms and state their ratings. *Id.* The LCB chair documents the ratings and calculates the candidates' overall rating for each competency. *Id.* A majority vote determines the overall rating for a particular competency example; for example, if two voting members rate a particular competency as Competent and the third voting member rates it as Skilled, that example receives an overall rating of Competent. *Id.* For each competency, if a candidate receives an overall rating of Competent for Example 1 and an overall

---

[4] Youssef claims to dispute this fact in his Opposition to Defendant's Statement of Material Facts. *See* Pl.'s Resp. Stmt. ¶ 9. However, the Court finds that Youssef's opposition does not create a genuine dispute as to this fact. In his opposition, Youssef states that there is no method available to ensure that LCB members rely only on the written content provided in the application. *Id.* However, Youssef does not dispute that the LCB is instructed to rely on the written competency examples. Youssef further notes that the LCB guidelines allow LCB members to consider first hand personal knowledge directly related to competency examples and does not prohibit LCB members from using information obtained in informal conversations, formal interviews, or their own subjective knowledge of a candidate when determining their rankings. *Id.* The FBI also avers to this. *See* Def.'s Stmt. ¶ 9. The fact that an LCB member can rely on their personal knowledge related to the competency example does not contradict the FBI's statement that the LCB member is to rely on the content the applicant has provided in the example and not any outside research or contact with the candidate.

rating of Skilled for Example 2 of that same competency, the overall rating is determined by rounding down, meaning the candidate receives an overall rating of Competent for that particular competency. *Id.* The individual ratings are only discussed if two voting members deviate by two tiers in their ratings of a competency example. *Id.* ¶ 14. Once the overall competency ratings are determined, the LCB Chair ranks the applicants based on their overall competency ratings, taking into consideration the weight of the competencies. Def.'s Ex. 4 (LCB Chairperson Training Presentation), at FBI 3435. The selecting component then informs EDSP and the Special Agent Mid-Level Management Selection System (SAMMS) Board of the LCB competency example ratings and applicant rankings. Def.'s Stmt. ¶ 15. The SAMMS Board then selects the candidate for the position. *Id.*

**C. *Events Preceding Selection of Assistant Section Chief of the Communications Exploitation Section***

Youssef began working for the FBI in June 1988. *See* Def.'s Ex. 10 (Youssef's Candidate Qualification Form), at FBI 331-332. Over the next fifteen years, Youssef held numerous high-level counterterrorism and counterintelligence assignments throughout the United States and across the globe. *Id*. From January 2003 through December 2004, Youssef served as the Unit Chief for the Document Exploitation Unit within the Communications Exploitation Section ("CXS"). *Id.* at FBI 332. In December 2004, Youssef was transferred into his current position as the Unit Chief of the Communications Analysis Unit within CXS. *Id.* at FBI 331. While working as Unit Chief within CXS, Youssef would from time to time serve as the Acting Section Chief for CXS. *Id.*

On July 18, 2003, Youssef filed a lawsuit against the FBI alleging national origin discrimination and retaliation. *See generally Youssef v. F.B.I.*, 541 F. Supp. 2d 121 (D.D.C.

2008). Youssef alleged that the FBI discriminated against him following the September 11, 2001, terrorist attacks by excluding him from positions associated with counterterrorism and by retaliating against him after he filed an EEO complaint. None of the individuals who were involved in the alleged discriminatory and retaliatory action at issue in the present case— Youssef's non-selection as ASC of CXS—were identified as alleged discriminating officials in this prior 2003 action. However, the 2003 action was ongoing at the time of Youssef's 2009 application for the ASC position. Indeed, at the end of 2009, Youssef was preparing to go to trial for his retaliation claim, which was held before a jury in the fall of 2010. Youssef thus took leave throughout 2009 in order to participate in EEO-related proceedings. *See* Pl.'s Resp. Stmt. ¶ 91-93.

In October 2009, Youssef's first-line supervisor, Arthur Zarone, an ASC of CXS, completed Youssef's 2009 Performance Appraisal Report ("PAR"). Although Zarone gave Youssef an overall "Excellent" rating in 2008 and 2009, the two years Zarone supervised Youssef, in his 2009 PAR, Zarone rated Youssef one step lower in five "critical elements" than he had been rated the year prior. *See* Def.'s Ex. 15 (Youssef's 2008 and 2009 Performance Appraisal Reports). In Youssef's 2008 PAR, Zarone had rated Youssef "excellent" at "maintaining high professional standards" and "achieving results," but he rated Youssef "successful" in both categories in 2009. *Id.* In addition, Zarone rated Youssef as "Outstanding" in "Organizing, Planning, and Coordinating," "Acquiring, Applying, and Sharing Job Knowledge," and "Communicating Orally and in Writing" in 2008, but lowered his rating to "Excellent" in these three categories in 2009. *Id.* Included with Youssef's 2009 PAR were Zarone's notes of his impressions of Youssef's performance in 2009. *See* Def.'s Ex. 18 (Zarone Handwritten Notes). These notes stated:

<u>Issue</u>: drop of performance level from 08 → 09.
<u>Distractors</u>:

      Legal Matter
      OIG Report

*See id.* In their declarations and deposition testimony prepared for the present case, both Zarone and Fernandez attributed the decline in Youssef's 2009 performance to his "excessive absences from the office [due to his legal matter]." Zarone Decl. ¶ 2; *see also* Zarone Dep. 82-83; Fernandez Decl. ¶ 4; Fernandez Dep. 19-20, 22. As an example of the impact of Youssef's absences from the office, both Zarone and Fernandez specifically noted Youssef's supposed failure to timely renew a telecommunications contract, which they alleged nearly resulted in the loss of the contract. *See* Zarone Decl. ¶ 12-14; Fernandez Decl. ¶ 5; Fernandez Dep. 23-26.

Youssef's 2009 PAR was signed by Zarone on October 22, 2009, one day before the LCB—of which Zarone was a member—met to select the new ASC of CXS. Def.'s Reply Stmt. ¶ 86. In early November 2009, Youssef contacted the FBI's EEO Office requesting counseling. Def.'s Stmt. ¶ 51; Pl.'s Ex. 1 (Letter to EEO Office). Youssef also requested of the EEO Office and of the Assistant Director of the FBI's Counterterrorism Division, Michael Heimbach, that his evaluation be corrected on the basis that his "participation in a Title VII proceeding was a motivating factor in the downgrade." Pl.'s Ex. 1 (Letter to EEO Office); Pl.'s Ex. 2 (Letter to Michael Heimbach). On November 20, 2009, Assistant Director Heimbach responded by increasing Youssef's rating in "Organizing, Planning, and Coordinating," and "Acquiring, Applying, and Sharing Job Knowledge" from "Excellent" to "Outstanding." Pl.'s Ex. 5 (Heimbach Response to PAR Grievance). In adjusting these two ratings, Assistant Director Heimbach stated that he reviewed Zarone's comments and recommendations along with Youssef's appeal comments and "only considered [Youssef's] actual work performance when

making [his] decision." *Id.* Assistant Director Heimbach found that Youssef demonstrated outstanding skills in these two areas by his "efforts and dedication to the [redacted] initiative, [Youssef's] coordination with the telecommunication carriers, and participation in the [redacted]. *Id.* Assistant Director Heimbach, however, concluded that Youssef had not provided the Office enough detail regarding the remaining critical elements in which he had been downgraded to support a rating of "Outstanding" and that he had provided insufficient evidence "to make a decision other than to sustain [Youssef's] ratings on these Critical Elements." *Id.* Youssef does not presently challenge his 2009 PAR as discriminatory or retaliatory, but presents it as evidence that his non-selection as ASC violated Title VII.

### D. *Selection of Assistant Section Chief of the Communications Exploitation Section*

On September 18, 2009, CXS published a job posting for an ASC position. Def.'s Stmt. ¶ 17. CXS is responsible for leading and supporting law enforcement and intelligence efforts to target terrorist communications. *Id.* ¶ 16. CXS was hiring an ASC to replace Zarone who was taking an ASC position in the Critical Incident Response Group. Def.'s Stmt. ¶ 18; Zarone Decl. ¶ 55. The job posting listed four primary competencies which were weighted equally—Leadership, Problem solving/judgment, Interpersonal ability, and Initiative—and three secondary competencies, weighted in descending order—Liaison, Counterterrorism-complex CT, and Communication. Def.'s Stmt. ¶ 20. The minimum qualifications for the position were three years' FBI investigative experience, one year relief supervisory experience, and a current minimum performance appraisal of "Successful." *Id.* ¶ 19.

The Section Chief of CXS, Armando Fernandez, was designated as the LCB chair for the position. *Id.* ¶ 23. Fernandez, a Hispanic man of Mexican national origin, was Youssef's second-line supervisor at the time of the LCB. *Id.* ¶¶ 21, 26. Prior to Fernandez selecting the

LCB members and receiving the candidates' applications, three individuals, Richard Davidson, Matthew Desmond, and Daniel Powers, contacted Fernandez to let him know that they would be applying for the position. *Id.* The same day that Powers introduced himself to Fernandez, he also introduced himself to Zarone and indicated that he would be applying for the ASC position. *Id.* ¶ 29. Shortly prior to becoming aware of the applicants for the position, Fernandez asked Hipolito Castro, Jr., Erkan Chase, and Arthur Zarone to serve as LCB voting members. *Id.* ¶ 24. Castro, a Hispanic man of Puerto Rican national origin, was ASC of the Terrorist Financing Operations Section in the Counterterrorism Division at the time of the LCB. *Id.* ¶¶ 24, 26. Chase, an African American man of Turkish national origin, was an ASC, Technical, of CXS from 2008 through the time of the LCB, but did not supervise Youssef. *Id.*; Chase Decl., ¶ 1, 8. Zarone, a Caucasian man of European national origin, served as an ASC of CXS from April 2008 through October 2009, and, as noted before, was the direct supervisor and rating official for Youssef during that period. Def.'s Stmt. ¶ 18; Zarone Signed Sworn Stmt. at 2. Importantly, the LCB voting members deny knowing at the time of the LCB that Youssef was involved in an EEO-related lawsuit. Youssef, however, adamantly disputes their testimony and presents evidence, which he contends shows that, at the time of the LCB, each voting member was aware that he was engaged in EEO activity.

After designating the voting members, Fernandez received from EDSP the applications of four candidates: Youssef, Davidson, Desmond, and Powers, the eventual selectee. Def.'s Stmt. ¶ 27. Fernandez then distributed the applications to the LCB voting members and each voting member independently rated the competency examples for each candidate.[5] *Id.* ¶ 28. On

---

[5] Youssef claims to dispute the fact that each voting member independently rated the competency examples and did not discuss the examples amongst themselves or with Fernandez.

October 23, 2009, the LCB members convened to report their independent ratings of each candidate's competency examples. *Id.* ¶¶ 47-48. Chase rated Powers as Skilled in eight of his competency examples and as Competent in six examples. *Id.* ¶ 30. He rated Youssef as Skilled in one competency example and as Competent in thirteen examples. *Id.* Castro rated Powers as Skilled in eight of his competency examples and as Competent in six examples. *Id.* ¶ 39. He rated Youssef as Skilled in three competency examples and as Competent in eleven examples. *Id.* Finally, Zarone rated Powers as Skilled in six competency examples and as Competent in eight examples. *Id.* ¶ 42. He rated Youssef as Skilled in three competency examples and as Competent in eleven examples. *Id.* There was no other discussion of the candidates. *Id.* ¶ 48; *see also* Def.'s Ex. 11 (Oct. 23, 2009 LCB Transcript). Based on the individual ratings, Fernandez then determined the overall competency ratings for each of the applicants. *Id.* Overall, Powers was rated Skilled in one primary competency (Problem Solving/Judgment) and in one secondary competency (Counterterrorism), and Competent in the five remaining competencies placing him first amongst the four candidates. *Id.* Youssef was rated Competent in all seven competencies and thus ranked last among the candidates.[6] *Id.* The LCB voting members rated Davidson similarly, though slightly higher, than Youssef and Desmond similarly

---

*See* Pl.'s Resp. Stmt. ¶ 28. In disputing this fact, Youssef states only that "Zarone and Fernandez had numerous conversations about and discussed Mr. Youssef amongst themselves" and points to Fernandez and Zarone's testimony that they spoke to each other *prior* to the appointment of the LCB about Youssef's absences from his unit. *See id.* ¶¶ 28, 100, 101. This evidence does not contradict the FBI's contention that none of the LCB members discussed the *competency examples* or their *rankings* with each other prior to or during the LCB.

[6] Fernandez initially wrote on his Chairperson LCB Matrix that Youssef was the third-ranked candidate. However, Fernandez was subsequently informed by the EDSP that he had miscalculated the scores of the third and fourth ranked applicants, and that Youssef's ranking had been changed to fourth because he had lower individual scores than the next closest ranked candidate, Davidson. *See* Fernandez Decl. ¶ 16.

to Powers although slightly lower.  *See* Def.'s Ex. 8 (LCB Scoring Matrices).  Based on these overall competency ratings, the LCB declared Powers the top-ranked candidate and Youssef the last-ranked candidate.  *See* Def.'s Ex. 12 (LCB Memorandum to SAMMS Board), at 9. Fernandez then opened the envelope containing the Division Head Recommendations.  Def.'s Ex. 11 (Oct. 23, 2009 LCB Transcript), at 12-13.  The Division Heads recommended all candidates for the vacancy.  *Id.* at 13.

On November 19, 2009, the SAMMS Board, consistent with the competency ratings of the LCB voting members, selected Powers for the ASC position.  Def.'s Stmt. ¶ 50.  In the period between Zarone stepping down as ASC of CXS in November 2009 and Powers assuming the position in March 2010, Youssef was designated by Fernandez to serve as the acting ASC of CXS.  *Id.* ¶ 61.  Youssef had previously served as Acting Section Chief of CXS.  *See* Def.'s Ex. 10 (Youssef's Candidate Qualification Form), at FBI 331.

### E. *Procedural Background*

Shortly after learning of his non-selection for the ASC position, Youssef contacted an FBI EEO counselor and explained that he believed that his non-selection had been "in retaliation due to his prior EEO activity."  Def.'s Stmt. ¶ 51.  At the conclusion of EEO counseling, Youssef filed a formal EEO complaint, alleging that he had been discriminated against based on his national origin and retaliated against for his participation in prior EEO activity.  *See* Def.'s Ex. 16 (Feb. 16, 2010 EEO Compl.), at 1.  On May 19, 2010, the EEO Office informed Youssef's counsel that it would commence an investigation into Youssef's allegations.  Pl.'s Resp. Stmt., Ex. 1 (May 19, 2010 Ltr.), ECF No. [24-1], at BY 00038.  It is not clear whether the FBI ever conducted an investigation into Youssef's administrative complaint.  It is clear, however, that the FBI never issued a final decision resolving Youssef's complaint even though a year and a half

elapsed between the filing of Youssef's administrative complaint and the commencement of this action.

Youssef initiated this lawsuit on July 25, 2011, claiming that his non-selection was discriminatory based on his Egyptian-national origin and retaliatory due to his participation in EEO activity related to his 2003 lawsuit against the FBI. *See* Compl., ECF No. [3], ¶¶ 65-72. On December 23, 2011, the Defendant filed a Motion for Judgment on the Pleadings or, Alternatively Summary Judgment, contending that Youssef could not pursue his non-selection claims because he failed to exhaust his administrative remedies. The Court disagreed and by Order dated August 7, 2012, denied the Defendant's Motion. *See Youssef v. Holder*, 881 F. Supp. 2d 93 (D.D.C. 2012). The Defendant subsequently filed the present Motion for Summary Judgment. *See* Def.'s Mot., ECF No. [41]. In short, the Defendant now argues that Youssef's claims must fail because he cannot show that the FBI's legitimate, non-discriminatory reason for selecting Powers was pretextual or otherwise offer any evidence of discriminatory motive and because he cannot show a causal link between his protected activity and his non-selection.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [that he] . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to

the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in his favor. *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd,* 328 F.3d 647 (D.C. Cir. 2003); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). Accordingly, the Court reviews the Defendant's Motion for Summary Judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court shall grant a motion for summary judgment where the nonmoving party has failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of law.

## III.    DISCUSSION

### A. *National Origin Discrimination Claim*

Pursuant to Title VII, all personnel actions affecting employees of the federal government "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). To prove a violation of Title VII, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the employer were "more likely than not based on the consideration of impermissible factors" such as race, ethnicity, or national origin. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981)

(internal quotation marks and citation omitted). Furthermore, "the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Brady v. Livingood,* 456 F. Supp. 2d 1, 6 (D.D.C. 2006) (quoting *Kalekiristos v. CTF Hotel Mgmt. Corp.,* 958 F. Supp. 641, 665 (D.D.C. 1997)). Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala,* 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973)).

Under the *McDonnell Douglas* paradigm, Youssef has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas,* 411 U.S. at 802. If he succeeds, the burden shifts to the FBI to articulate some legitimate, nondiscriminatory reason as to why Youssef was not selected for the ASC position, and to produce credible evidence supporting its claim. *Id.* The FBI's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254; *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.,* 328 F.3d 647, 651 (D.C. Cir. 2003) (internal quotations and citation omitted), *cert. denied,* 540 U.S. 881 (2003); *see also Burdine,* 450 U.S. at 253. If the FBI is successful, the burden then shifts back to Youssef to prove that the FBI's proffered motive was

"not its true reason, but was a pretext for discrimination." *Barnette v. Chertoff,* 453 F.3d 513, 516 (D.C. Cir. 2006) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000)).

At the summary judgment stage, however, the D.C. Circuit has instructed that, once an employer provides a legitimate, non-discriminatory basis for its decision, "the district court need not—*and should not*—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, the central question for the Court to resolve is whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." *Id.* Effectively, "[t]his boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory motives?" *Murray v. Gilmore,* 406 F.3d 708, 713 (D.C. Cir. 2005).

Still, the Supreme Court has taken care to instruct trial courts that "the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves,* 530 U.S. at 143 (quoting *Burdine,* 450 U.S. at 255 n. 10). "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. The Court of Appeals for the District of Columbia Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack

16

the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc). However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [the plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 27–28 (D.C. Cir. 1997). "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-finder] could conclude that he has suffered discrimination." *Aka,* 156 F.3d at 1290.

### 1. *The FBI's Proffered Legitimate, Non-Discriminatory Reasons*

The Court must first assess whether the FBI has produced evidence that Youssef was not selected for the ASC position for one or more legitimate, nondiscriminatory reasons. *Reeves*, 530 U.S. at 142. The FBI asserts that Youssef was not selected as ASC because he was not the top-rated candidate based on the strength of his competency examples. To support this explanation, the FBI has produced the independent score sheets of each LCB voting member which show that each member independently ranked Powers first based on his competency examples, as well as the LCB Chairperson's Scoring Matrix, the transcript of the LCB meeting, and the LCB's memorandum to the SAMMS Board, which all show that Powers was ranked first overall and Youssef fourth overall based on the LCB voting members ratings of the candidates' competency examples. As these documents only show the rating each LCB voting member gave

to each candidate's competency examples but not the rationale for the rating, the FBI has also

provided declarations and deposition testimony from each LCB voting member explaining the

reasoning behind their ratings.[7]  As an initial matter, each LCB voting member declared that he

based his ratings on the candidates' competency examples relying solely on the narrative

provided by the candidate in the application form and did not conduct any independent research

or consult with anyone concerning the candidates' examples.  *See* Castro Decl. ¶ 19; Chase Decl.

¶ 6; Zarone Decl. ¶ 28; *see also* Def.'s Ex. 13 (LCB Memorandum to SAMMS Board) ("There

were no undocumented, informal communications between [L]CB members and other

individuals regarding the candidates for this position.").  The LCB voting members all also

declared that the geographic location of an example or the terrorist target involved was less

important to the voting member in evaluating the candidates' examples than the actual work the

---

[7] At times in his Opposition to the Defendant's Statement of Material Facts Not in Genuine Dispute, Youssef dismisses the LCB voting members' declarations as "self-serving," "after-the-fact" statements.  *See, e.g.,* Pl.'s Resp. Stmt. ¶¶ 22, 28, 46.  The Court notes that the LCB voting members' declarations are not improper post-hoc rationalizations of Youssef's non-selection.  This is not a case where the employer had an opportunity or obligation to provide a contemporaneous explanation of its adverse employment action, but failed to do so or lost the documentation regarding that explanation and, only once litigation is well under way, has provided an explanation or a fuller explanation of its employment decision.  Here, it is undisputed that the LCB members followed the selection and reporting process as they were required to do by the LCB rules.  Each LCB voting member came to the LCB meeting with his scoring matrix already independently completed. The LCB meeting at which the LCB voting members shared their independent rankings and at which the overall rankings were calculated was recorded from start to finish.  By providing the Court with the LCB voting members' individual ranking matrices, the overall group ranking matrix, and the LCB meeting transcript, the FBI has provided the contemporaneous record in its entirety of its employment decision. Now, the LCB voting members are offering more detailed explanations of their contemporaneously recorded ranking decisions, explanations which remain consistent between their declarations and the excerpts of their depositions provided by the parties. Youssef offers no evidence to impeach the LCB voting members' declarations other than his own assessment of his application, which, not surprisingly, conflicts with the LCB voting members' evaluation of his application.  Accordingly, the Court shall consider the LCB voting members' declarations for their value as further explanation of the contemporaneous records showing why Youssef was not selected.

candidate illustrated in the example. *See* Castro Decl. ¶ 21; Zarone Decl. ¶ 49; Chase Decl. ¶ 14.

Specifically, Castro explained in his declaration that Youssef could have drafted his examples more effectively. Castro Decl. ¶ 15. Castro also found that "[i]n several instances, [Youssef] did not describe his role in the depicted investigation or scenario that he used as an example, and failed to provide significant, necessary information." *Id.* As an example, Castro explains that in the candidates' Counterterrorism examples he was "looking for whether the candidate had served as a case agent on a counterterrorism investigation, as case agents are the frontline personnel doing the hands-on work in any investigation." *Id.* ¶ 16. Castro notes that one of Youssef's example indicated that he was the AGAI coordinator, but Castro asserts that he was not aware of AGAI or of an AGAI "coordinator" and Youssef did not explain the significance of his coordinator position, nor indicate that he was a case agent. *Id.* Castro found that Youssef's example "illustrat[ed] that he was doing his job effectively, but did not differentiate his role from what agents throughout the FBI were doing and thus Castro rated it "Competent." *Id.* Castro rated one of Powers' Counterterrorism examples as "Skilled" because it "demonstrated that he had effectively headed a Joint Terrorism Task Force ("JTTF"), responsible for all counterterrorism investigations in his field office, and utilized techniques and achieved results that demonstrated skilled performance of complex counterterrorism work." *Id.* ¶ 20.

Similarly, Chase believed that Youssef's examples were weaker in terms of specificity and underlying work. Chase Decl. ¶ 11. As an example of his reasoning, Chase explains that he found Powers' example of leadership in the FBI's investigation of the 2008 Mumbai attacks demonstrated that Powers "led teams of investigators and intelligence officers in difficult and urgent missions, provided direction and effectively delegated work to them, and directed his

teams in meeting the mission objectives." *Id.* ¶ 12. On the other hand, Chase found Youssef's example describing his service as the first legal attaché to Saudi Arabia "did not indicate that he was responsible for leading any subordinates or how he had done so." *Id.* ¶ 13. As for Youssef's Leadership example describing his efforts as the first Unit Chief of the Document Exploitation Unit, Chase found that "it was expected that he would establish the unit's goals, objectives and mission" as "every unit chief, not just the first one, does this." *Id.* Furthermore, Chase felt the fact that the Document Exploitation Unit increased in size during Youssef's leadership—a fact emphasized by Youssef in his application—was "true of all units in [the Counterterrorism Division], as counterterrorism became a top priority for the FBI" during that period. *Id.* Chase also found that Youssef's emphasis on the weekly and sometimes daily briefings he led within his unit was "exactly what a Unit Chief is expected to do." *Id.*

In the area of counterterrorism, Chase was interested "in examples in which the applicant had a lead role as a case agent in a counterterrorism investigation, and the sophistication of the techniques employed during the investigation." *Id.* ¶ 14. Chase rated Powers' first Counterterrorism example as "Skilled" because it established that he had supervised a JTTF and been responsible for international investigations that involved "several significant and sophisticated investigative techniques" and for the "initiation of an approach that involved multi-jurisdictional, interagency, and transnational components." *Id.* ¶ 15. He rated Powers' second Counterterrorism example as "Skilled" because it demonstrated leadership in investigations, specifically, that Powers had "instituted weekly JTTF meetings" and that he had "been able to develop a team approach to complicated international and domestic terrorism investigations" and thus had "developed a skillful approach to the difficult problem of law enforcement coordination" in addition to "being substantially responsible for engaging the JTTF." *Id.* ¶ 16.

Chase rated Youssef's first Counterterrorism example as "Competent" because "although it showed him doing his job well, it did not articulate case agent investigation responsibilities or use of sophisticated techniques." *Id.* ¶ 17. Specifically, although Youssef's example indicated that he obtained important information from an asset, Youssef "did not indicate that he had authored any FISA warrants or used other sophisticated techniques" and also "did not indicate that he was leading a particular investigation." *Id.* As for Youssef's second example explaining Youssef's role as the "AGAI coordinator," Chase rated it as "Competent" because "in [his] mind" there is "a significant difference between being supervisor of an investigation and the coordinator for a particular group" with the latter "simply administratively coordinat[ing] the investigations focusing on a particular group" as opposed to "supervis[ing] the investigation" and being "involved in the daily decisions of investigating the terrorist cell." *Id.* ¶ 18. Moreover, Chase states he "was not very familiar with AGAI, and was not aware of its role in the 1993 World Trade Center bombing or of any affiliation with Osama bin Laden" and that it was Youssef's "responsibility, as the applicant, to provide the contextual information if he believed it significant to his example." *Id.* ¶ 19.

Finally, Zarone found that Youssef's examples "were not as current and did not involve field terrorism work when compared to Powers' experience." Zarone Decl. ¶ 37. Zarone rated Youssef's Leadership example describing his work as the first legal attaché in Saudi Arabia as "Competent" because it described work that was "part of every [legal attaché's] job." *Id.* ¶ 38. Moreover, Zarone was aware that "when the FBI opens a [legal attaché] office overseas, numerous FBI headquarters divisions are involved in the effort, which includes funding, coordination, security and human resources. No FBI [legal attaché] office is opened by the singular efforts of any one person." *Id.* However, Zarone found this example to be a "Skilled"

demonstration of the Liaison competency and rated it as such.  *Id.* ¶ 39.  Zarone also rated as "Competent" Youssef's Problem Solving/Judgment example in which Youssef describes his efforts to coordinate a Persian Gulf states visit by the FBI Director on the "Director's very tight schedule."  *Id.* ¶ 40.  Based on Zarone's experience in the same role, he found that the length of the Director's visit described by Youssef presented less of a security concern and that the advance team, not the legal attaché for the region, handled the logistics and security component of the Director's travel.  *Id.*  Finally, Zarone rated as "Competent" Youssef's Counterterrorism example describing the information he obtained from an asset because it "was the type of work an agent is expected to perform," and because "the information provided by Mr. Youssef's source was but one piece in a tapestry of information . . . that allowed the FBI to make the necessary legal showing to obtain authority to perform certain intelligence gathering activities."  *Id.* ¶ 42.

On the other hand, Zarone rated Powers' example of Leadership after the 2008 Mumbai terrorist attacks as "Skilled" because it demonstrated "skilled leadership during a time of crisis" that was commended by the FBI Director for "furthering the legacy of the FBI throughout the region."  *Id.* ¶ 45.  Zarone also rated Powers' Initiative example describing a national investigative strategy that Powers implemented concerning a major domestic terrorism case as "Skilled" because it demonstrated that Powers "was able to establish priorities, overcome adversity, persevere through obstacles, and that his efforts resulted in 70 spin-off domestic terrorism investigations."  *Id.* ¶ 46.  Similarly, Zarone rated Powers' first Counterterrorism example as "Skilled" because "it established that, as the head of a JTTF, Mr. Powers led all aspects of an international terrorism investigation out of the FBI's Indianapolis Division that involved several intelligence community partner agencies, a foreign government, and several

FBI headquarters units." *Id.* ¶ 48. Zarone found this example important because JTTFs are a "foundational component of the FBI's counterterrorism efforts," and several of the investigators under Powers' supervision were nominated for the FBI Director's award and received pay increases. *Id.* Finally, Zarone rated Powers' first Liaison example as "Skilled" because it indicated that Powers "successfully obtained information from a previously uncooperative subject," "briefed a three-star general and his command staff" about the information, and as a result of the information, "received authority to plan a mission to identify and locate a terrorist training camp" with a U.S. Special Forces team. *Id.* ¶ 47.

As the LCB voting members' sworn affidavits, their deposition testimony under oath, and the documentary evidence from the LCB meeting are all admissible evidence, the Court finds that the FBI has met its burden of production and established a legitimate, non-discriminatory reason for Youssef's non-selection. *Burdine*, 450 U.S. at 255 (to establish a legitimate, non-discriminatory reason, "the defendant must simply set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.").

## 2. *Evidence of Discrimination, Vel Non*

Since the FBI has presented legitimate, non-discriminatory reasons justifying Youssef's non-selection, the Court therefore proceeds directly to considering the ultimate question of "discrimination *vel non*"—whether Youssef has adduced sufficient evidence for a reasonable jury to conclude that the FBI's proffered reason for its decision is pretextual, and that its real motivation was discrimination based on Youssef's national origin. *Reeves*, 530 U.S. at 142–43. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256; *see also Reeves,* 530 U.S. at 143. "Proof

23

that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves,* 530 U.S. at 147 (citing *St. Mary's Honor Ctr.,* 509 U.S. at 517) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka,* 156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight."). Youssef can also attempt to "avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination," such as "discriminatory statements by the employer," "other attitudes suggesting the decision maker harbors discriminatory animus," and/or other "data" concerning his protected class(es). *Holcomb v. Powell,* 433 F.3d 889, 899 (D.C. Cir. 2006) (internal citations omitted).

As always, Youssef retains the "ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256. At this point,

> a court reviewing summary judgment looks to whether a reasonable [fact-finder] could infer intentional discrimination or retaliation from all the evidence, including (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).

*Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted). Accordingly, the Court shall first evaluate the strength of Youssef's *prima facie* case and then address the additional evidence Youssef presents of pretext and discriminatory motive.

### i. *Youssef's Prima Facie Case*

Youssef argues that the LCB's failure to select him as ASC constituted discrimination on

the basis of his national origin. *See* Pl.'s Opp'n. at 15-23. Youssef may establish a *prima facie* case of national origin discrimination by showing that: (1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications, he was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants. *Holcomb,* 433 F.3d at 895 (citing *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C. Cir. 2003)). Youssef easily establishes a *prima facie* case and the FBI concedes as much. Youssef is of Egyptian national origin; he was on the list of qualified candidates for the ASC position but was not selected; and another individual, Powers, was selected to fill the position.

## ii. *Evidence of Pretext*

In addition to his *prima facie* case, Youssef essentially makes two overarching arguments in an attempt to show that the FBI's proffered legitimate, non-discriminatory reasons for his non-selection are pretextual and that this pretext shielded discriminatory motives: (1) events surrounding Youssef's 2009 Performance Appraisal Report ("PAR") and the ASC selection suggest that the LCB members harbored discriminatory bias, and (2) a reasonable jury could infer discrimination from the fact that the LCB misstated or overstated the qualifications of the respective candidates and Youssef was the objectively superior candidate. Having examined the parties' arguments, including Youssef's voluminous Statement of Material Facts and Response to the FBI's Statement of Material Facts, in addition to the record, the Court finds that Youssef has not adduced evidence from which a reasonable trier of fact could infer that the FBI's proffered justification for his non-selection was pretext for national origin discrimination. The Court addresses each of Youssef's arguments in turn.

### a. Evidence of Discriminatory Bias

Youssef's first argument is that a trier of fact could reasonably infer that the FBI "is dissembling to cover up a discriminatory purpose" from the following evidence: (1) Zarone's (and other Career Board members') attempt to deny any knowledge that the legal matters in which Youssef was engaged were EEO related; (2) Zarone and Fernandez's "creation" of a "contrived issue" to justify their "illegal" downgrade of Youssef's PAR; (3) the Assistant Director of the FBI's Counterterrorism Division overturning two performance ratings in Youssef's PAR, which Zarone lowered the day before the LCB met; (4) Fernandez and Zarone's meeting with Powers prior to the LCB meeting; and (5) Fernandez's appointment of Youssef as Acting ASC prior to Powers assuming the position, despite Zarone and Fernandez lowering Youssef's performance ratings in five categories. Pl.'s Opp'n. at 17. Youssef argues that each of these pieces of evidence suggest discriminatory bias on the part of the FBI and, accordingly, that the FBI's reason for not selecting Youssef as ASC is pretextual.

Individually and collectively, none of these five pieces of evidence rise to the level of creating a genuine dispute as to whether the explanation provided by the FBI for Youssef's non-selection was pretext for a discriminatory motive. Youssef first argues that the LCB voting members' "denial of knowledge that Mr. Youssef's [prior] legal matter concerned EEO issues, taken in the light most favorable to Mr. Youssef, creates a jury question on issues related to credibility, pretext and discriminatory bias." Pl.'s Opp'n. at 18. First, Youssef "must do more than merely express an intent to challenge the credibility of the defendant's witnesses on cross examination. [Youssef] must produce specific facts that raise an inference of discriminatory motive." *Mulrain v. Donovan*, 900 F.Supp.2d 62, 73 (D.D.C. 2012) (quoting *Howell v. Sullivan*, 1992 WL 675147, at *5 (D.D.C. 1992)). Even assuming Youssef has established a genuine

dispute as to whether the LCB voting members knew Youssef was engaged in an EEO-related legal matter against the FBI and thus lied in denying their knowledge of the nature of this legal matter in their depositions and declarations, this evidence suggests that the LCB voting members are seeking to cover up the fact that the LCB did not select Youssef because he was engaged in an EEO lawsuit against the FBI, not because he was of Egyptian national origin. In other words, these facts would at best allow a reasonable trier of fact to infer retaliatory intent in not selecting Youssef for the ASC position; these facts are insufficient to "raise an inference of discriminatory motive" based on Youssef's national origin. *Mulrain,* 900 F.Supp.2d at 73. In other words, as it has been presented by Youssef, this. *See Warner v. Vance-Cooks*, --- F. Supp. 2d ---, 2013 WL 3835116, * 21 (D.D.C. 2013) (supervisor's alleged remark that he was going to "let the dogs out" on plaintiff, which plaintiff argued reflected discriminatory intent, was insufficient to defeat summary judgment on plaintiff's sex discrimination claim because "nothing in the statement suggests that the plaintiff was being targeted based upon her gender.").

Youssef's next two arguments also fail to raise an inference of *discriminatory* motive. Youssef argues that once Zarone and Fernandez "illegally downgraded [Youssef's PAR] in response to Youssef's protected right to take time off for his EEO claim," Zarone and Fernandez falsely alleged that Youssef was "responsible for mishandling contract negotiations concerning the renewal of services provided by telecommunications companies to the FBI" in order to justify their downgrade of Youssef's PAR. Pl.'s Opp'n. at 18. Youssef posits that "if the jury were to credit Mr. Youssef's version of events, this incident would constitute further evidence of motive, pretext and intentional discrimination." *Id.* at 19. Similarly, Youssef's third argument is that the Assistant Director of Counterterrorism's decision to upgrade two of the five competencies in which Zarone had downgraded Youssef's PAR "is strong evidence that Mr.

Zarone and Mr. Fernandez had negative views of Mr. Youssef which could not be objectively sustained." *Id.* at 20. Youssef contends that "Zarone's admission that these views were premised on Mr. Youssef's 'legal matter,' in which Mr. Youssef was attempting to resolve a discrimination concern, undermines the FBI's argument on this matter." *Id.* In other words, the Assistant Director's upgrade of two competencies in Youssef's 2009 PAR is further evidence that Zarone improperly downgraded Youssef's PAR based on his involvement in an EEO lawsuit. In both of these arguments, Youssef's own presentation of the facts—as evidence that Zarone and Fernandez were biased against Youssef because of his involvement in protected activity—at most allows an inference of retaliatory motive, not discriminatory bias against Youssef's national origin. Consequently, these arguments are insufficient to raise an issue of material fact as to whether Youssef's non-selection was motivated by discriminatory bias.

Youssef's fourth argument is that the fact that he "was the only applicant [with] whom Fernandez did not interview or speak [] prior to the Career Board meeting," and Powers was the only candidate to have a face-to-face meeting with Zarone, is "clearly suspicious, and demonstrate[s] evidence of bias and disparate treatment between Youssef and Powers." *Id.* at 20-21. Youssef contends that there are factual disputes as to what was discussed during the meeting between Fernandez and Powers and why Zarone arranged for that meeting. *Id.* The FBI responds that the fact that every candidate except for Youssef contacted Fernandez prior to the LCB in no way suggests discriminatory bias because Fernandez was listed in the job posting as the point of contact for questions regarding the ASC position and each candidate took it upon himself to contact Fernandez and Youssef could have done the same. Def.'s Reply at 18. The FBI also points to Fernandez's declaration stating that the candidates' discussions with Fernandez lasted no more than a minute and "the extent of the discussion was Fernandez wishing

28

the applicants good luck." Def.'s Reply at 19; Fernandez Decl. ¶ 12. The Court agrees with the FBI that these brief introductory encounters initiated by the candidates are far from sufficient to raise any suspicion in the mind of a trier of fact, much less an inference of discriminatory bias. In his deposition testimony, Fernandez explains that he received an introductory call from Davidson and Desmond, but that Powers stopped by his office to introduce himself because he was at FBI Headquarters for a Legal Attaché conference. Fernandez Dep. at 52. Fernandez explains that Powers "just wanted to stop by, introduce [himself] and tell [Fernandez] that [he] was applying for the Assistant Section Chief job" to which Fernandez responded, "Oh, okay. Thank you very much," and walked away. *Id.* Fernandez further explains that all of these encounters happened before the LCB was selected and before Fernandez knew the identity of the candidates. *Id.* at 52, 57. Likewise, Zarone states in his declaration that he "briefly met Mr. Powers shortly before the LCB, when [Powers] had introduced himself and indicated that he was applying for the ASC position." Zarone Decl. ¶ 43. Zarone further states that he and Powers did not discuss Powers' application. *Id.* Although Youssef alleges in his pleadings that there are factual disputes about what was discussed in these meetings and why they occurred, Youssef cites to no evidence and the Court, in its own review of the record, has found none to dispute the FBI's explanation of these meetings as nothing more than brief introductory encounters initiated by the candidates. The Court finds these meetings to be particularly innocuous given that both Zarone and Fernandez already knew Youssef, but had not previously met Powers. The Court also finds the fact that Powers met with Zarone does not raise suspicion as Powers was seeking the position Zarone was vacating and the encounter happened before the LCB members were selected. Accordingly, the Court finds that Youssef fails to create a genuine issue of material fact as to whether a reasonable trier of fact could infer national origin discriminatory bias from

these encounters.

Finally, Youssef argues that discriminatory bias can be inferred from the fact that Fernandez "suspiciously" appointed Youssef Acting ASC for the period between Zarone leaving the position and Powers assuming it even though Fernandez believed "Youssef was so incompetent as to his job." Pl.'s Opp'n. at 21. Youssef contends that the "PAR downgrade, combined with Mr. Fernandez's deposition testimony that was highly critical of Mr. Youssef's performance immediately before the [LCB] meeting, simply cannot be squared with Fernandez's decision to appoint Mr. Youssef as the acting Assistant Section Chief." *Id.* Youssef posits that "[b]ased on this conflict[,] a strong inference can be made that Zarone and Fernandez lied about these so-called performance issues [(including the telecommunications contract)] in order to justify Youssef's non-selection and the performance downgrade." *Id.* at 22. The FBI responds that Fernandez's decision to have Youssef act as ASC "is perfectly consistent with the fact that Youssef's overall work performance had been rated Excellent" and "cuts against an inference of retaliatory or discriminatory animus." Def.'s Reply at 19 n. 7. The Court agrees that this evidence is insufficient to raise an inference of discriminatory motive. Although Zarone and Fernandez raised some concerns about Youssef's performance in their depositions and declarations and in Zarone's notes attached to Youssef's PAR, the FBI has presented evidence that Youssef's supervisors still considered him to be doing his job very well, as directly demonstrated by Youssef's overall performance rating of "Excellent" in 2009—the same overall rating he received in 2008. *See* Def.'s Ex. 15 (Youssef's 2008 and 2009 PAR). Indeed, Youssef was recommended for the ASC position by the head of the Counterterrorism Division. *See* Def.'s Ex. 11 (Oct. 23, 2009 LCB Transcript), at 13. Furthermore, Youssef's appointment as Acting ASC was also consistent with his tenure in the section and the fact that he had served

several times as Acting Section Chief of CXS in the past.[8]  *See* Def.'s Ex. 10 (Youssef's

Candidate Qualification Form), at FBI 331.  Accordingly, Youssef has failed to establish a

genuine inconsistency between Zarone and Fernandez's performance reviews and his

appointment as Acting ASC that would allow a reasonable trier of fact to find his appointment as

Acting ASC suspicious and revelatory of Zarone and Fernandez's discriminatory bias.

### b. Failure to Properly Evaluate Youssef and Powers' Overall Qualifications and Competency Examples

Youssef's second overarching argument is that the FBI's legitimate non-discriminatory

reason is called into question by the fact that Youssef was not selected for the ASC position

despite having starkly superior qualifications and by the fact that the LCB did not stick to the

---

[8] The Court notes that as part of an additional argument in opposition to the Attorney General's Motion for Summary Judgment, Youssef briefly discusses submitting an application for the position of ASC of CXS in response to an FBI job posting at a time prior to the ASC selection currently at issue.  *See* Pl.'s Opp'n. at 31.  Youssef alleges in his Opposition that after he submitted his application for the prior ASC posting, the FBI pulled the listing, supposedly to "increase the candidate pool."  *Id.*  Youssef states that "had Mr. Youssef been the only applicant for the position, the FBI would have been compelled to grant him that promotion . . . [i]nstead the FBI pulled the listing."  *Id.*  Likewise, in his Opposition to Defendant's Statement of Material Facts Not in Genuine Dispute, Youssef states that "the pulling of the job posting after Mr. Youssef applied for it indicates that the FBI had no intention of promoting him because this means there were no other applicants" and Youssef would have had to be offered the position. Pl.'s Resp. Stmt. at ¶ 151.  However, Youssef never actually argues in his pleadings that the FBI's cancellation of the prior ASC position is evidence of discriminatory motive.  Instead, Youssef simply alleges these facts as part of his argument refuting the Government's characterization of his application for the ASC position currently at issue as "simply resubmit[ting] a prior unsuccessful FD-954, which [Youssef] 'may have tweaked here and there' for present purposes."  Def.'s Mot. at 14.  Youssef argues that since the prior ASC position was for the same job as the ASC position currently at issue his old application already "contained most of the information he need[ed] to fully set forth his competencies" and the Government's accusation that he was "being lazy" is without merit.  Pl.'s Opp'n. at 31.  In any event, Youssef's characterization of the cancelled position is incorrect.  In 2007, the FBI posted an ASC position for the CXS which listed different required competencies.  Def.'s Reply Ex. 5 (Job Posting), at 1-4.  More importantly, Youssef was actually one of three candidates for the position.  *Id.* at 6.  Thus, even if the Court were to generously read Youssef's passing mention of the cancellation of this prior position as an actual argument that this evidence demonstrates discriminatory motive, the inference Youssef seeks to draw cannot factually be drawn.

"four corners" approach in rating the competency examples of the candidates. Specifically, Youssef argues that the LCB voting members considered outside information regarding Powers' examples and "presumed or aggrandized [Powers'] statements in a manner that made his application appear stronger than written," while "cavalierly brush[ing] off" Youssef's accomplishments, "which are well known throughout the FBI and which are matters of public record." Pl.'s Opp'n. at 22-23.

Although the D.C. Circuit has stated that a court must not "serve as a 'super-personnel department that reexamines an entity's business decisions,'" *Holcomb,* 433 F.3d at 897 (quoting *Barbour v. Browner,* 181 F.3d 1342, 1346 (D.C. Cir. 1999)), a factfinder may infer discrimination if the evidence shows a reasonable employer would have found the plaintiff "significantly" better qualified for the job but nevertheless failed to offer the job to the plaintiff. *Aka,* 156 F.3d at 1294. In order to justify an inference of discrimination, the plaintiff must demonstrate a "qualifications gap . . . great enough to be inherently indicative of discrimination." *Holcomb,* 433 F.3d at 897; *see also Stewart v. Ashcroft,* 352 F.3d 422, 429–30 (D.C. Cir. 2003) (examining record for evidence of a "stark superiority of credentials" and concluding that "fine distinctions" were insufficient to raise a jury question).

Youssef offers the following as "objective evidence" that his qualifications for the ASC position were starkly superior to Powers': (1) At the time Youssef was a "highly experienced FBI case agent, with responsibility as the coordinator for the investigation into the Blind Sheik's organization, Mr. Powers was still working as a highway patrolman in Juniper, Florida"; (2) Youssef served as a Legal Attaché in the Middle East ("an area of particular import for combating Middle Eastern terrorism") for 41 months, while Powers only served as an Attaché for 15 months in India, "a country not as directly involved in international terrorism as Saudi

Arabia and the other Gulf nations served by Youssef"; (3) Youssef served "on numerous occasions" as the Acting Section Chief of CXS—a position higher than Assistant Section Chief—while Powers never served in that capacity; and (4) Youssef served in two Unit Chief positions in CXS while Powers never held a position in CXS. Pl.'s Opp'n. at 30. Essentially, Youssef claims that a reasonable trier of fact could infer discrimination from the FBI "ignor[ing]" this "radical difference[] in experience and seniority between [him] and Powers." *Id.*

It is well established that courts "must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily." *Barnette,* 453 F.3d at 517. However, in making the argument above, Youssef asks the Court to do precisely the contrary—to discount the LCB voting members' views in favor of his own beliefs as to what qualifications are most important to the ASC position. In concluding that he is substantially more qualified for the ASC position than Powers, Youssef emphasizes factors, notably length of tenure and experience within CXS, that were not listed as qualifications, competencies, or even preferences for the ASC position. *See* Def.'s Ex. 7 (Job Posting). Indeed, Douglas Price, Section Chief of the EDSP, explained in his declaration that the voting members of an LCB are not to take into account a candidate's length of tenure.[9] Price Decl. ¶ 11. Moreover, the LCB process and

---

[9] Youssef does not directly contest this fact in his Opposition to Defendant's Statement of Material Facts Not in Genuine Dispute, but does generally point to the LCB Chairperson Training presentation which states that "Totality of Experience may also be used when the ratings of the top ranked candidates' are close, and a review of the candidates' [application forms] indicate a candidate with lower scores may be more suitable for the position." Pl.'s Ex. 15 (LCB Chairperson Training Presentation), at FBI 3440. In other words, the LCB need not rely only on the LCB members' ratings of the specific experiences detailed in the candidates' competency examples, but may consider the totality of a candidate's experience in certain circumstances. The LCB must provide justification if it takes a "totality of experience" approach. *See id.* The fact that an LCB *may* employ a "totality of experience" approach does

accompanying application form are structured to identify individuals "with demonstrated leadership and management abilities, and not necessarily subject matter experts." *Id.* ¶ 2. This was especially true in the LCB at issue as the job posting listed only one specialized competency—Counterterrorism experience—for which a candidate's specific investigate and subject matter experience would be relevant. This competency was weighted second to last amongst the seven required competencies. Thus, Youssef's experience within CXS is by no means dispositive. Furthermore, Youssef now emphasizes his service as Acting Section Chief for CXS, yet he provided no example from his experience as Acting Section Chief for any of his competency examples. As the LCB process is structured to rate candidates first and foremost on their competency examples, the LCB voting members cannot now be faulted for giving little weight to Youssef's Acting Section Chief experience. Finally, Youssef emphasizes his service in the Middle East as compared to Powers' service in India, a country Youssef characterizes as less directly involved in international terrorism. However, in their depositions and declarations, the LCB voting members made clear that what they considered most heavily in evaluating the candidates was the work and results illustrated in the example, not the geographic location of the example or the terrorist target involved. *See* Castro Decl. ¶ 21; Zarone Decl. ¶ 49; Chase Decl. ¶ 14; Pl.'s Ex. 21 (Chase Dep.), at 77. Youssef points to no evidence that would call into question the propriety of this evaluative approach or the veracity of the LCB voting members' claim to

---

not contradict Price's statement that the length of a candidate's duty is not to be taken into account. Although the "totality of experience" approach allows the LCB to consider the total package of experiences a candidate would bring to a position, instead of just the rankings given to the experiences the candidates used to illustrate the competency examples, it does not necessarily permit the LCB to consider the length of duty of an applicant. Moreover, it would appear that a "totality of experience" approach would not have applied to Youssef in the instant case since he was rated last of the four candidates and thus was not a "top ranked candidate" eligible to benefit from such an approach.

have taken such an approach. Ultimately, although Youssef had served at the FBI longer than Powers and had served in CXS, the Court finds that both candidates were able to point to comparable experiences from their respective tenures at the FBI that effectively demonstrated their abilities within each required competency. Consequently, the Court finds that the evidence Youssef offers of his "objectively" superior qualifications fails to undermine the legitimacy of the LCB voting members' reasons for his non-selection.

In the same vein, Youssef argues that his competency examples were also objectively superior to Powers' and that the LCB improperly interpreted and weighed the candidates' examples in coming to the opposite conclusion. As an example, Youssef points to Chase and Zarone's declarations explaining that Powers' Leadership example describing his service as Legal Attaché in Mumbai during the 2008 terrorist attack showed "skilled leadership," while Youssef's two leadership examples "simply showed Youssef performing tasks that would be expected of any Unit Chief or Legal Attaché." Pl.'s Opp'n. at 32. Youssef argues that the FBI's explanation is defective because *Powers'* example "merely sets forth performance items that would be expected from any Legal Attaché." *Id.* Youssef contends that he, on the other hand, listed "numerous items that are unique and demonstrate strong leadership;" for example, Youssef was named the *first* Chief of a CXS Unit and was thus "responsible for building the unit from the bottom up." *Id.* at 33. Youssef argues that "this is not simply the work of any Unit Chief, as most Unit Chiefs do not have to build out the unit they are to manage, and do not show the type of skilled leadership to create a successful program working with foreign intelligence agencies." *Id.* Moreover, Youssef notes, the leadership demonstrated in this example related directly to the

work being performed within the CXS.[10]  *Id.*

Youssef also uses the Counterterrorism competency examples as an illustration of his clearly superior skills and competency examples.  Youssef states that he "is without question an international star" in the area of counterterrorism and that "the FBI's attempt to demonstrate that Mr. Powers' had stronger counterterrorism competencies than Mr. Youssef flunks any reasonable or non-biased analysis."  Pl.'s Opp'n. at 37.  Youssef contends that Chase's assertion that Youssef failed to demonstrate his use of "sophisticated techniques" in his counterterrorism examples is entirely fallacious because all of the techniques Youssef used were among the most sophisticated counterterrorism and counterintelligence techniques and Powers, in his examples, did not state that he used most of these techniques and instead primarily listed techniques that were easier to execute.  *Id.* at 39-40.  Youssef further contends that Chase's claim that Youssef

---

[10] Likewise, Youssef argues that his example describing his experience as the *first* Legal Attaché in Saudi Arabia demonstrated more skilled leadership than Powers' example of his Legal Attaché work because Powers did not establish the Legal Attaché office in Mumbai.  Pl.'s Opp'n. at 34.  Moreover, Youssef asserts that his example was stronger because "he did not simply chair a meeting, he built a strong network in order to enable the FBI to liaise with intelligence agencies throughout a region of the world that plays a fundamental role in the number one priority of the FBI: combating Middle Eastern terrorism that directly threatens Americans." *Id.*  Youssef further argues that "[i]t is well known that the principle role of an FBI [Legal Attaché] is to effectively liaise with foreign governments," and Youssef's example shows how he "provided the leadership necessary to help solve the strained relations between the United States/FBI and a key partner in the War on Terror." *Id.* at 35.  By contrast, Powers' Leadership example did not indicate any strained relations in India that Powers had to go "beyond his expected performance levels" to overcome. *Id.*  As with Youssef's evaluation of his other competency examples, the Court finds this argument insufficient to establish that Youssef's examples or experiences were clearly superior to Powers'.  Moreover, Youssef argues that this Leadership example was starkly superior to Powers' Leadership examples in large part because of Youssef's demonstrated success in liaising under difficult conditions.  The Court notes that Youssef used the same experience for his Liaison competency example and that every LCB voting member rated this experience as an example of "Skilled" liaison abilities. The Court thus has great difficulty accepting Youssef's argument that the LCB ignored his superior qualifications in evaluating this competency example.

"failed to articulate any case agent investigation responsibilities" is also completely fallacious. *Id.* at 41. Youssef explains that his examples outlined tasks that a case agent would undertake and used the possessive pronoun in discussing "[his] investigation" and "[his] targets" something only a case agent would do when referring to targets and investigations. *Id.*

Finally, Youssef notes that his first Counterterrorism example concerned "the most important counterterrorism operation conducted by the FBI in the 1990s—the investigation into the First World Trade Center bombing—while Powers' examples "concerned [an investigation of] a person who was not even arrested by any law enforcement agency, and was permitted to voluntarily leave the country." *Id.* Youssef also notes that his second counterterrorism example demonstrated that the intelligence he obtained "was singular in nature, highly valuable, not just to the FBI, but to other members of the Intelligence Community," "used against the most dangerous Middle Eastern terrorist organization operating in the United States," resulted in "several operations and cell members [being] disrupted," and led to Youssef being awarded the highly prestigious Director of Intelligence Award. *Id.* at 44. By contrast, Powers only stated that his intelligence was "significant" and helped the FBI's "collection efforts" and "domain awareness." *Id.* at 43. Youssef concludes that a jury could "reasonably find that [his] competency in this area far and away exceeded that of Mr. Powers" and that the LCB demonstrated significant bias against Youssef in finding otherwise. *Id.*

Although Youssef may believe the Board should have been more impressed with his credentials, the Board was entitled to form its own opinions concerning the relative value of his experiences. *See Fischbach v. District of Columbia Dep't of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible, he must show that the explanation given is a phony reason.")

(quoting *Pignato v. American Trans Air, Inc.,* 14 F.3d 342, 349 (7th Cir. 1994)). Much of Youssef's analysis of his credentials as compared to Powers' is based on his personal assessment of the relative value of their experiences and unsubstantiated opinions about what constitutes a sophisticated investigation technique or what performance items are "merely" "expected" from a position. But Youssef's subjective opinion concerning his credentials does not weigh heavily in this calculus. *See Perry v. Shinseki*, 783 F.Supp.2d 125, 137 (D.D.C. 2011), *aff'd* 466 Fed. Appx. 11 (D.C. Cir. 2012) ("Perry's 'own self-perception of her credentials' are 'irrelevant for purposes of establishing discriminatory . . . conduct.'" (quoting *Talavera v. Fore,* 648 F.Supp.2d 118, 136 (D.D.C. 2009), *rev'd in part on other grounds by Talavera v. Shah,* 638 F.3d 303, 312–13)); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 7 (D.D.C. 2000) ("[P]laintiff's perception of herself, and of her work performance, is not relevant. It is the perception of the decisionmaker which is relevant.") (internal citation and quotation marks omitted), *aff'd,* 298 F.3d 989 (D.C. Cir. 2002). Although a reasonable trier of fact might at times disagree with an LCB voting members' evaluation of a specific example, Youssef has not—and cannot—point to a competency example that demonstrates such starkly superior skill or experience or an evaluation that is so unreasonable as to allow a reasonable trier of fact to infer discrimination. *See Aka*, 156 F.3d at 1294 ("we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone. In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.").

Moreover, in re-evaluating the relative strength of their examples, Youssef again

emphasizes aspects of his competency examples to which the LCB by its structure or the voting members by their choice did not give great weight. Specifically, Youssef emphasizes his work within CXS and the location and target of his counterterrorism work which were given less weight in the LCB process. In addition, in emphasizing the significance of his counterterrorism work and the results he obtained, Youssef now provides substantially more context to his examples than he provided in his application. While Youssef may want to elaborate on his experiences in this proceeding, the Court is neither required nor permitted to reevaluate his credentials with this additional information. *See Fischbach*, 86 F.3d at 1183 (a court must "beware of using 20/20 hindsight [and] must respect the employer's unfettered discretion to choose among qualified candidates"). This is especially true given that Youssef does not dispute that it was his responsibility to provide sufficient context at the time he submitted his application, especially when submitting examples of experiences from well over a decade earlier. *See Kundra v. Abraham*, 2007 WL 1821264, at *1 (D.D.C. Jun. 25, 2007) ("When an excellent statistician relies on his supervisor's supposed knowledge of his career, but does not fully describe his credentials in his application package for promotion, can he complain of discrimination when the supervisor relies on the written word and selects another excellent, but junior, statistician for the job? The answer to this question is no.").

In any event, counterterrorism was second-to-last in overall weight. Thus, even if Youssef had received a unanimous Skilled rating on both Counterterrorism examples, he still would not have outranked Powers. *See* Def.'s Ex. 8 (LCB Matrix), at FBI 736. In sum, as it is not "clear 'on its face' that [Powers'] responses were inferior to [Youssef's] . . . 'it is not the Court's place to second-guess [the LCB voting members'] preference for one response over the other." *Perry*, 783 F. Supp. 2d at 143 (quoting *Chavers v. Shinseki,* 667 F. Supp. 2d 116, 131

39

n.10 (D.D.C. 2009)). Accordingly, Youssef has failed to come close to showing the sort of "wide and inexplicable gulf" in qualifications required for the Court to infer discrimination. *See Lathram v. Snow,* 336 F.3d 1085, 1091 (D.C. Cir. 2003).

Youssef's next argument is that the falsity of the FBI's legitimate, non-discriminatory reason for his non-selection can be inferred from the fact that the LCB voting members' did not evaluate the candidates purely on the written content of their competency examples as they averred they did in their declarations and as was required by FBI LCB rules for selecting mid-level management.[11] Youssef's primary argument in this regard is that the LCB voting members were willing to make inferences and conduct outside research about Powers' competency examples in order to aggrandize his qualifications, but made no effort to understand or draw

---

[11] Youssef also argues that since the FBI's promotional process was focused on "highly subjective criteria," such as "leadership," "judgment," and "interpersonal ability," "the ability of the FBI to rely on the Board members' subjective opinions of Youssef and Powers is compromised." Pl.'s Opp'n. at 23-24. In other words, Youssef contends that the FBI's heavy use of subjective criteria should be interpreted as masking bias, discrimination, and retaliation. Pl.'s Opp'n. at 24. However, Youssef misunderstands this Circuit's case law concerning an employer's use of subjective criteria. In cases where courts have found an employer's use of subjective criteria to raise an inference of discrimination, the employer has simply cited an employee's "temperament" or "presentation of self" or "enthusiasm" as its legitimate, non-discriminatory reason for taking an adverse employment action against the employee. *See, e.g., Hamilton v. Geithner,* 666 F.3d 1344,1356-1357 (D.C. Cir. 2012); *Aka,* 156 F.3d at 1298. Here, by contrast, although the FBI is evaluating subjective qualities like "leadership" and "interpersonal ability," it is doing so through the objective process of comparing candidate *experiences* under each competency. *See Perry*, 783 F. Supp. 2d at 137 ("Here, in addition to subjective justifications such as "management style" and "temperament," Lenox presented more objective reasons for selecting Murphy, such as the high ranking he received from the subject matter expert, *his unique experience*, and his history of military service.") (emphasis added). Thus, the FBI did not select a candidate based on subjective feelings about the candidates, but based on an objective comparison of the candidates' experiences demonstrating certain required skills. Indeed, Youssef himself appears to admit that the FBI's ASC selection process was based on objective criteria when he states that his and Powers' competency examples can be compared based on objective criteria because "[b]oth Powers and Youssef responded to questions concerning their experience in counterterrorism" and both "relied upon their experiences as Legal Attaches in responding to questions concerning 'leadership.'" Pl.'s Opp'n. at 24. Accordingly, the Court finds Youssef's argument unavailing.

inferences for Youssef's competency examples. Pl.'s Opp'n. at 22-23; Pl.'s Resp. Stmt. ¶ 31. This disparate treatment, Youssef argues, "demonstrates bias against Mr. Youssef." *Id.* As an initial matter, several of the inferences Youssef claims the voting members improperly drew in favor of Powers are actually taken from the FBI's Statement of Material Facts Not in Genuine Dispute in which the FBI summarizes the LCB voting members' declarations, and, in so doing, at times slightly overstates the LCB voting members' conclusions. However, the Court has restricted its evaluation of the FBI's legitimate, non-discriminatory reasons for Youssef's non-selection to the reasons set forth in the sworn declarations and deposition testimony provided by each LCB voting member. As such, many of Youssef's improper inference arguments which are based only on the FBI's Statement of Facts in Genuine Dispute carry no weight.

Youssef does provide several examples of allegedly improper evaluations of the candidates' applications drawn directly from the voting members' declarations. However, the Court finds none of these examples are so egregious as to cause a reasonable trier of fact to discredit the FBI's reason for Youssef's non-selection. *Grosdidier v. Broadcasting Board of Governors*, 709 F.3d 19, 26 (D.C. Cir. 2013) ("[E]vidence of pretext might include 'an error too obvious to be unintentional.'" (quoting *Fishbach*, 86 F.3d at 1183)). For example, Youssef points to Chase's statement that Powers' Leadership example regarding his role as Legal Attaché in Mumbai during the 2008 terrorist attacks "showed that [Powers] had led teams of investigators and intelligence officers in difficult and urgent missions, provided direction and effectively delegated work to them, and directed his teams in meeting the mission's objective." Chase Decl. ¶ 12. Youssef argues that Chase could not have adopted this belief based only on the written content of Powers' application because "Powers does not explicitly demonstrate his role as the leader of investigators and intelligence officers, nor does he describe his missions as either

urgent or difficult" or ever "explicitly state[] any mission objectives rendering it impossible for Chase to conclude that such objectives were met." Pl.'s Resp. Stmt. ¶ 31. Youssef concludes that Chase drew unfounded inferences or conducted outside research in order to evaluate Powers' application as he did.[12] *Id.*

The Court finds Chase's evaluation of Powers' Leadership example to be anchored in the written content of Powers' example. In his example, Powers writes about ten terrorists attacking in "multiple locations in Mumbai" resulting in the death of "over 170 people." *See* Def.'s Ex. 9 (Powers' Candidate Application Form). Powers himself references the situation as a "time of crisis." *Id.* From this alone, the LCB voting members could reasonably conclude that the mission was "difficult" and "urgent." There is also no indication that Chase conducted outside research or drew an unfounded inference in order to conclude that Powers had led investigators and intelligence officers during this mission. In his example, Powers clearly states that he "successfully tasked investigators and intelligence officers . . . to motivate and lead in a time of crisis" and explains that he was commended for his leadership. Finally, although Powers does not explicitly state the mission objectives, it was not "impossible" or unfounded for Chase to conclude that the mission objectives were met.[13] In the example, Powers describes the many actions he took in response to the terrorist attack and, for many of the actions, specifically states

---

[12] Similarly, Youssef also argues that Zarone's assertion in his declaration that he rated Powers' Mumbai Legal Attaché Leadership example as "Skilled" in part because it showed that Powers "immediately identified the resources necessary [and] obtained them from FBI headquarters" shows that Zarone "either infer[ed] that Powers obtained the resources from FBI headquarters or conduct[ed] an independent investigation into Powers' involvement in order to gain such insight." Pl.'s Resp. Stmt. ¶ 43. As with Chase's evaluation of Powers' Leadership example, the Court finds Zarone's evaluation does not suggest that he conducted outside research or drew improper inferences.

[13] In fact, Chase only states that Powers "*directed* his teams *in meeting* mission objectives." Chase Decl. ¶ 12 (emphasis added).

that they were done "successfully." *Id.* He also references his nomination for an FBI Directors Award based on this work and his commendation by many high level FBI officials. *Id.* In other words, any inferences Chase drew to come to his evaluation of Powers' Leadership example were exceedingly slight and well-supported by the text of the example. Accordingly, the Court finds Chase's evaluation in no way suggests that Chase inappropriately conducted outside research or was biased towards Powers and against Youssef, much less biased against Youssef due to his national origin.

Youssef also points to inferences that the LCB voting members *refused* to draw in favor of *his application*. For example, Youssef highlights Chase's statement that, in evaluating the candidates' counterterrorism examples, he was "particularly interested in instances where the applicant had taken a lead role as a case agent in a counterterrorist investigation." Chase Decl. ¶14. Youssef argues, however, that neither Powers nor Youssef ever explicitly describe themselves as case agents in their counterterrorism examples, yet Chase made that inference for Powers but found that Youssef had "not articulate[d] case agent investigation responsibilities" even though Youssef wrote of "*his* investigation" and "*his* targets." Pl.'s Resp. Stmt. ¶ 33, 37; Pl.'s Opp'n. at 41. Second, Youssef points to Chase's statement that he did not see any indication in Youssef's Leadership example about his Legal Attaché work in Saudi Arabia "that Youssef had been responsible for actually leading a group of subordinates or how he had done so." Chase Decl. ¶ 13. Youssef argues that, since he noted in his example that he was the *first* Legal Attaché in Saudi Arabia and "opened and established the operational/administrative framework of the [Legal Attaché] Office," "it is logical [for Chase] to infer that Mr. Youssef certainly led subordinates in order to open the office." Pl.'s Resp. Stmt. ¶ 32. Youssef argues that Chase's failure to make this inference suggests he was influenced by discriminatory bias.

43

*Id.*

The Court again finds Youssef has not presented evidence that Chase drew—or refused to draw—any inferences revelatory of discriminatory bias against Youssef. The inferences Youssef claims Chase improperly refused to draw would have required Chase to make far greater assumptions about Youssef's experiences than were required for any of the inferences Youssef alleges Chase or other LCB voting members improperly drew in Powers' favor. For example, Powers clearly states that he was "responsible for all aspects of an international terrorism investigation" in one Counterterrorism example and in another that he was "responsible for one of several complex IT investigations involving a homegrown terrorist," while Youssef's first counterterrorism example does not indicate his position in the investigation. *See* Def.'s Ex. 9 (Powers' Candidate Qualification Form); Def.'s Ex. 10 (Youssef's Candidate Qualification Form). Instead, Youssef argues that the voting members should have inferred his case agent role because he spoke of "[his] investigation" and "[his] targets" in the example. Moreover, Chase indicated that he was ultimately interested in a candidate who had served in a "*lead* role" as a case agent and Youssef's Counterterrorism examples offer no indication that he served in a leadership role. As for Youssef's Legal Attaché Leadership example, it would be logical for Chase to infer that Youssef worked and collaborated with many people, but not that he led anyone, much less subordinates without more context. For all of the competency examples, it was Youssef's responsibility to provide sufficient context and detail. Youssef's examples of the LCB voting members' biased unwillingness to draw inferences in Youssef's favor are actually more properly viewed as instances in which Youssef failed to provide sufficient context and detail in his examples, especially as compared to Powers' application. *See Stewart*, 352 F.3d at 429 (affirming summary judgment on non-selection claim where plaintiff put less effort and

thought into application than selectee who presented the more thoughtful and detailed application).

As a final example of the LCB's improper evaluation of the candidates, Youssef points to his second Counterterrorism example explaining his role as AGAI coordinator and Chase's "inference" that a "coordinator of a particular [terrorist] group administratively coordinates the investigations focusing on a particular group." Chase Decl. ¶ 18. Youssef argues that his Counterterrorism example does not state that he administratively coordinated investigations and, moreover, his example states that he was awarded the Director of Intelligence Award for his "recruitment efforts and intelligence obtained" as AGAI coordinator. Pl.'s Resp. Stmt. ¶ 38. Youssef reasons that it was unreasonable for Chase to assume that the Director of Intelligence Award could be awarded "without Mr. Youssef having played a key role in the overall investigative effort." *Id.*

The Court finds that this example also does not raise an inference of discriminatory treatment or even an inference that the LCB improperly evaluated the candidates' applications. Even though Youssef did not state in his example that he administratively coordinated investigations, Chase based his conclusion that a "group coordinator" is an administrative coordinator based on "his experience," i.e. his personal knowledge, which the LCB rules permit him to do. *See* Def.'s Ex. 4 (LCB Chairperson Training Presentation), at FBI 3425 (LCB voting members "may introduce personal knowledge into the LCB proceedings only when the information is first-hand knowledge and it is directly related to a specific competency example or work assignment cited by the candidate"). The fact that Chase might have been mistaken about the nature of a group coordinator's responsibilities is irrelevant as there is no evidence to suggest that this is not what Chase actually believed. *See Herbert v. Architect of the Capitol*, 766

F.Supp.2d 59, 81 (D.D.C. 2011) (courts will not find pretext where supervisor's reason for action turns out in retrospect to have been mistaken, so long as the supervisor "honestly and reasonably believed" the action took place). Furthermore, Youssef's argument that his receipt of the Director of Intelligence Award makes Chase's inference that Youssef played less than a key role illogical is unavailing. First, Chase (along with Castro)[14] stated in his deposition testimony that he was not familiar with the Director of Intelligence Award. Pl.'s Ex. 21 (Chase Dep.), at 69-70. Second, without more context, the receipt of an award still does not indicate that Youssef was leading or supervising the investigation, especially when the competency example otherwise speaks primarily of review and analysis of intelligence. In sum, the Court finds that the alleged inferences that the LCB voting members drew or failed to draw do not rise to the level of showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005).

Finally, Youssef contends that the LCB voting members failed to properly follow the LCB evaluation process because they did not have sufficient knowledge relevant to Youssef's competency examples and failed to seek out knowledge to be able to properly evaluate Youssef's examples. Pl.'s Resp. Stmt. ¶¶ 37, 40. Specifically, Youssef argues that several of the voting members were inexplicably un- or under-informed about the AGAI terrorist group and the Blind Sheik and their connection to the 1993 World Trade Center Bombing and Osama Bin Laden and that Castro was not familiar with the significance of Youssef's AGAI coordinator role. *Id.* ¶142. In addition, Youssef notes that several members "did not understand" what the Director of

---

[14] *See* Pl.'s Ex. 22 (Castro Dep.), at 27, 63.

Intelligence Award was. *Id.* Youssef contends that if any voting member was genuinely uninformed about any of these matters, he should have asked for clarification or to interview the candidates. *Id.* ¶¶ 35, 37, 40. Youssef contends that the members' failure to do so is proof of discriminatory animus. *Id.*

First and foremost, the LCB rules make clear that conducting an interview of the candidates is entirely optional. See Def.'s Ex. 5 (ASAPP Training Guide), at FBI 2748. The LCB guidelines do not impose any requirement or even suggest that an interview be conducted under any specific circumstances. Thus, Youssef's argument that the LCB voting members failed to properly follow the LCB process is unavailing. Moreover, the LCB voting members' unfamiliarity with the terrorist organizations and events discussed in Youssef's Counterterrorism examples is far from "inexplicable." For his application, Youssef drew on examples involving terrorist activities that took place between 1993 and 1996 prior to the time any of the LCB voting members had begun working in counterterrorism. *See* Pl.'s Ex. 20 (Zarone Dep.), at 19; Pl.'s Ex. 21 (Chase Dep.), at 9; Pl.'s Ex. 22 (Castro Dep.), at 8. In his pleadings, Youssef now elucidates the connection between the Blind Sheik, AGAI, and the first World Trade Center bombing, but it was Youssef's responsibility to provide sufficient context and detail in his application to make the import of his examples evident, especially given their age. *See Kundra*, 2007 WL 1821264, at *1 (finding that an employee cannot complain of discrimination when he "relies on his supervisor's supposed knowledge of his career, but does not fully describe his credentials in his application package for promotion," and the supervisor relies on the applicants' "written word" in selecting another applicant). In any event, the information that Youssef finds the LCB voting members were improperly lacking was not fundamental to the evaluation of Youssef's application. As was explained above, the LCB voting members focused on the candidates'

47

leadership in counterterrorism investigations, or the type of counterterrorism techniques used, not the significance of the specific terrorist operation to the FBI or the world. As for the Director of Intelligence Award, the award's main relevance—that Youssef was awarded for his counterterrorism work—was clearly communicated to the LCB by the title of the award. *See* Pl.'s Ex. 21 (Chase Dep.), at 70.

### c. Conclusion

In sum, Youssef has failed to proffer evidence supporting an inference that the FBI's reasons for his non-selection were pretext for national origin discrimination. Youssef's evidence that the LCB members were motivated by discriminatory bias fails to raise an inference of discriminatory bias based on national origin and, for some of the evidence, an inference of any bias against Youssef. Youssef's arguments that his starkly superior qualifications and the LCB's improper evaluation of the candidates reveal the FBI's reason for his non-selection as pretext are equally unavailing. Youssef's qualification argument "may show, at best, that the rating and ranking panel could have given [Youssef] a score somewhat higher than the score [he] received . . . [but] [t]hat is not enough to show that the [FBI's] proffered non-discriminatory reason was pretext, particularly with no further evidence of bias such as discriminatory statements or attitudes by agency officials." *Fields v. Geithner,* 840 F.Supp.2d 128, 137 (D.D.C. 2012), *aff'd,* 2012 WL 3059585 (Jul. 11, 2012). Moreover, none of the supposed "irregularities" Youssef points to in the LCB's evaluation of the candidates—the inferences drawn or not drawn, the lack of an interview—could rise to the level of even a colorable claim of irregularity.

Youssef would effectively have this Court conclude that his non-selection was discriminatory based on his *prima facie* case, without a proffer of additional evidence supporting an inference that the FBI's reasons for his non-selection were pretext for national origin

discrimination. As a result, and based on the totality of the admissible evidence before the Court, a jury could not reasonably conclude that Youssef's non-selection constituted impermissible national origin discrimination. Accordingly, the Court shall grant the FBI's Motion for Summary Judgment on this claim.

### B. *Retaliation Claim*

"Like claims of discrimination, claims of retaliation are governed by the *McDonnell Douglas* burden-shifting scheme." *Carney v. Am. Univ.,* 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C. Cir. 1984)). As Youssef proffers no direct evidence that the FBI retaliated against him for filing an EEO complaint, the *McDonnell Douglas* framework applies here. Under the *McDonnell Douglas* paradigm, Youssef has the initial burden of proving by a preponderance of the evidence a *prima facie* case of retaliation. *McDonnell Douglas*, 411 U.S. at 802. To prove unlawful retaliation, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) his employer took an adverse personnel action against him; and (3) a causal connection exists between the two. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). If Youssef succeeds in establishing a *prima facie* case, the burden then shifts to the FBI to articulate some legitimate, non-retaliatory reason for its actions, and to produce credible evidence supporting its claim. *McDonnell Douglas*, 411 U.S. at 802 (quoting *Burdine*, 450 U.S. at 253). If the FBI is successful, then "'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence,' which includes not only the *prima facie* case but also the evidence the plaintiff offers to 'attack the employer's proffered explanation for its action' and other evidence of retaliation." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (quoting *Carter*, 387 F.3d at 878) (internal quotation marks omitted).

As with discrimination claims, if the employer produces a legitimate non-discriminatory reason for its actions at the summary judgment stage, "the district court need not—*and should not*—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*," "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation." *Jones,* 557 F.3d at 678 (quoting *Brady*, 520 F.3d at 494) (internal quotation marks omitted). As the FBI has asserted a legitimate, non-retaliatory explanation for Youssef's non-selection as ASC—that he was not the top-rated candidate based on the strength of his competency examples—the only question for the Court to address is "whether the employee's evidence creates a material dispute on the ultimate issue of retaliation." *Id.* Thus, the Court must review "each of the three relevant categories of evidence—*prima facie*, pretext, and any other—to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation." *Id.* at 679 (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)).

Youssef easily meets the first two prongs of a *prima facie* case of retaliation and the FBI concedes as much. "An activity is 'protected' for the purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'" *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006). Youssef's filing of an EEO complaint, initiating a lawsuit claiming that he had suffered national origin-based employment discrimination in violation of Title VII, and participating in legal efforts related to that lawsuit constitutes "protected" activity under Title VII. *See* 42 U.S.C. § 2000e–3(a) (prohibiting discrimination against an employee because he "opposed any practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

50

or hearing under this title").  An action is "adverse" if the employer's actions are likely to have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Thus, Youssef also meets the second prong of his *prima facie* case by showing that he suffered an adverse action when the FBI did not select him for the ASC position.  *See Cones*, 199 F.3d at 521 (explaining that denial of a promotion may constitute a materially adverse action).

The FBI argues, however, that Youssef's case "runs aground" at the third element—causation.  Def.'s Mot. at 22.  Youssef seeks to establish an inference that his protected activity was the reason for his non-selection as ASC by presenting evidence that each member of the LCB knew that he was involved in a Title VII lawsuit against the FBI and that preparations for his lawsuit were still ongoing at the time the LCB convened, thus leaving no gap in time between his protected activity and the adverse employment action.  Youssef contends that causation is further established by the timing of Zarone's demonstration of animus towards Youssef's protected activity in Youssef's PAR, which Zarone signed one day before participating in the adverse employment action.  The FBI contends that the LCB voting members[15] were only aware

---

[15] The FBI concedes that the LCB Chair, Fernandez, was aware that Youssef had a pending EEO matter.  However, Fernandez did not rate the candidates himself and played no other role in the LCB and its deliberations other than to tally and calculate the voting members overall ratings of the candidates.  *See Butler v. Ashcroft*, 293 F. Supp. 2d 74, 79 (D.D.C. 2003) ("[Plaintiff's] allegations that . . . a supervisor 'whom plaintiff has heard and known to engage in racial, sexist and otherwise inappropriate comments, was a member of each of the career boards in this case,' is unavailing because [the supervisor] was a nonvoting member of the board and even encouraged [Plaintiff] to apply for the second position.").  Moreover, Youssef does not allege that Fernandez in any way influenced the LCB's rankings of the candidates. The only impact Youssef alleges Fernandez had on the LCB deliberations is through Fernandez's selection of Zarone to serve as a voting member of the LCB despite the fact that Zarone and Fernandez had had numerous conversations about Youssef's performance prior to the LCB convening.  *See*

that Youssef had a pending legal matter, not that the legal matter involved allegations of discrimination or retaliation by the FBI, and thus Youssef has failed to show that the LCB members had knowledge of his protected activity. The FBI further argues that even if the Court were to accept Youssef's contention that all members of the LCB were aware that Youssef was engaged in protected EEO activity, each LCB member learned about Youssef's protected activity many months or even years before Youssef's non-selection as ASC and thus the temporal distance between when the LCB members learned of the lawsuit and when the adverse personnel action was taken is too great to allow an inference of causation.

Youssef has provided uncontroverted evidence that he was participating in depositions and other protected legal activities related to his EEO lawsuit against the FBI at the end of 2009, a very short temporal distance from his non-selection as ASC. *See* Pl.'s Resp. Stmt. ¶ 91-93. At the *prima facie* stage this evidence is sufficient to raise an inference of causation. Courts in the D.C. Circuit have repeatedly held that "an adverse action following closely on the heels of protected activity may in appropriate cases support an inference of retaliation even when occurring years after the initial filing of charges." *Jones*, 557 F.3d at 680. Moreover, a plaintiff need only offer evidence that "the *employer* had knowledge of the employee's protected activity, and the adverse personnel action took place shortly after that activity." *Id.* at 679 (emphasis added); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (finding the fact

---

Pl.'s Resp. Stmt. ¶ 28. However, there is uncontroverted evidence that Fernandez selected the LCB voting members prior to learning who the applicants for the position were. *See* Fernandez Decl. ¶ 11. Consequently, a reasonable trier of fact would not infer from this evidence that Fernandez sought to taint the LCB by selecting an LCB voting member whom he knew had concerns about Youssef's performance. Moreover, such an inference is further undermined by the fact that Zarone held the position for which the LCB had been convened to fill and thus was an obvious and useful choice for the LCB. *See id.* ¶ 9. In addition, Fernandez's conversations with Zarone about Youssef's performance all occurred before Fernandez selected the LCB voting members. *See id.* ¶ 13.

that plaintiff submitted an EEO complaint to the agency under three months from the adverse employment action sufficient to establish causation at the *prima facie* stage, even if plaintiff does not directly show individuals who took the adverse employment action knew of the protected activity).

Of course, our Circuit has explained that "positive evidence beyond mere proximity is required to defeat the presumption that [an employer's] explanations are genuine." *Woodruff v. Peters,* 482 F.3d 521, 530 (D.C. Cir. 2007). The Court finds, however, that Youssef has adduced sufficient evidence to establish a genuine issue of material fact as to whether the LCB voting members knew that Youssef was engaged in protected EEO activity close to the time of the LCB meeting, whether they lied in denying any knowledge of Youssef's protected activity at the time the LCB convened, and whether this knowledge affected their selection of the new ASC. Accordingly, judgment as a matter of law cannot be entered against Youssef on his retaliation claim. In coming to this conclusion, the Court's decision is informed by the D.C. Circuit's opinions in *Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012) and *Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009).

## IV.    CONCLUSION

For the reasons set forth above, the Court shall GRANT IN PART and DENY IN PART the Defendant's [41] Motion for Summary Judgment. An appropriate Order accompanies this memorandum opinion.

**SO ORDERED.**

_____*/s/*_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE