**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
BASSEM YOUSSEF,                     )
                                    )
            Plaintiff,              )          Civil Action No. 11-1362 (CKK)
                                    )
    v.                              )          ECF
                                    )
ERIC H. HOLDER, JR., United States  )
Attorney General,                   )
                                    )
            Defendant.              )
_____)

## DEFENDANT'S SUPPLEMENTAL PRETRIAL MEMORANDUM

Defendant hereby responds to the Court's July 2, 2015 Order requesting the parties to provide supplemental pretrial briefing on certain topics addressed at the first pretrial conference. *See* Dkt. No. 86.

### I.    Fernandez

Defendant attaches the declarations of Valerie Parlave and Marilouse Felder describing the selection process as it existed in 2009 and as was employed by the Local Career Board ("LCB") at issue in this case.  Parlave is currently employed as the Executive Assistant Director in charge of the FBI's Human Resources Branch.  Parlave Decl. ¶ 1.  In 2009, Parlave was the Section Chief of the FBI's Employee Development and Selection Program ("EDSP") Section in the Human Resources Division.  *Id.*  Felder is the Section Chief of the Resource Management Section of the FBI's Counterterrorism Division, and has held the position since 2007.  Felder Decl. ¶ 1.

Under the process that existed in 2009, applications for vacancies were submitted by candidates to EDSP.  Parlave Decl. ¶ 6.  After the job posting had closed, EDSP would verify

1

that the candidates met the minimum qualifications listed on the job posting.  *Id*. ¶ 7.  EDSP would then forward the applications to the advertising division's Administrative Section ("AMSU") along with a list of the applicants and instructions for conducting the LCB.  *Id*. ¶ 13.

AMSU acted as the conduit between EDSP and the advertising division.  Felder Decl. ¶¶ 4-12.  Prior to providing the applications to the LCB Chairperson, AMSU would contact the Chairperson to find out the identity of the LCB voting members.  *Id*. ¶¶ 7-8.

The LCB Chairperson was selected by the division with the vacancy.  Parlave Decl. ¶ 8.  The LCB Chairperson would select the LCB voting members at least three days prior to the time the LCB was convened.  *Id*. ¶ 10.

Accordingly, under the procedure outlined above, the LCB Chairperson would select the LCB voting members before learning the identities of the applicants.[1]  This is confirmed by the declaration of Armando Fernandez, submitted in connection with Plaintiff's summary judgment motion.  *See* Dkt. 42-2 at 27.  Fernandez attested: "At the time that I appointed the LCB voting members, I was not aware of who the applicants were.  I learned their identity afterwards, when I received the applications of the four agents who had applied for the position[.]"  *Id*. at 31 ¶ 11.  Therefore, it is confirmed by both the procedures in place at the time and by his own sworn statement that Fernandez could not have known, and did not know, the identity of the applicants when he selected the LCB voting members.

## II.    LCB Interview Process

The Parlave Declaration reflects that the 2004 changes to the selection process at the FBI

---

[1] Based on her review of the LCB selection materials, Parlave found no departure from LCB rules and procedures in the manner in which the October 23, 2009 ASC/CXS LCB was convened or conducted.  Parlave Decl. ¶ 32.

included several significant changes with respect to interviews conducted by the LCB.[2]  Prior to the 2004 changes, applicants submitted a short, one-page application that simply listed the applicant's qualifications.   Parlave Decl. ¶ 21.   The FD-954 in use after 2004 provides substantially more information to the LCB; in particular, the FD-954 requires applicants to provide two specific examples for each of the designated competencies for the position.   *Id*. With more information included in the written applications after the 2004 changes, interviews would become less important.

Other changes likewise reduced the likelihood that the LCB would conduct interviews. Under the new system, if an interview is to be conducted, a formal process is required to determine questions asked during the interviews.   Specifically, the advertising division will indicate to EDSP which competencies the candidates will address during the interview.  Parlave Decl. ¶ 22.   EDSP then provides the applicable, approved interview questions to the LCB Chairperson.   *Id*.   The LCB may only ask the pre-approved interview questions provided by EDSP, and the LCB must ask all candidates the same questions.   *Id*.   In contrast, under the old system, there were no rules or policies concerning the types of questions asked during the interviews and the questions were formulated by the LCB Chairperson or the other LCB members without oversight from EDSP.  *Id*. ¶ 24.

Also, under the new system, interviews must be conducted by the entire LCB, the interviews must be recorded, and all of the candidates must be interviewed.   *Id*. ¶ 23.   All interviews must be conducted in the same manner (*i.e.*, in person or by telephone).   *Id*.   Under

---

[2] Defendant need not prove Curran's lack of knowledge on this point.   Rather, it is Plaintiff's burden to demonstrate that his proffered "expert" witness possess knowledge relevant to the subject matter of his testimony, *i.e.*, LCB procedures and practices in use in 2009.  Plaintiff has failed to do so.

the old system, interviews could be conducted by either the LCB Chairperson alone or by the entire LCB. *Id.* ¶ 24.

In short, the 2004 overhaul to the selection process expanded the amount of written information submitted to the LCB, thus reducing the need for interviews. The overhaul also included several changes to the rules regarding interviews. These changes transformed interviews from an informal process to a formal, structured, and more time-consuming undertaking.

### III.   Reputation Evidence

#### A.  Baseline Reputation Evidence

Plaintiff has not shown that his reputation in the 1990s is relevant to a determination of his baseline reputation in this case. Reputation evidence must be based on an observation of the reputation that is close in time to the events at issue, and may not be based on observations made in the distant past. *See United States v. Whitmore*, 359 F.3d 609, 617 (D.C. Cir. 2004) (testimony as to reputation should be limited to a period reasonably close to the relevant time period); *United States v. Watson*, 669 F.2d 1374, 1381-82 (11th Cir. 1982) (reputation testimony was excluded as too remote in time where based on observations from two years before relevant time); *cf. United States v. Lewis*, 482 F.2d 632, 640 (D.C. Cir. 1973) ("[O]ne's reputation for testimonial honesty . . . is to be established by evidence of his community reputation at the time of trial and during a prior period not remote thereto."). The reason for this is obvious – evidence of a witness's reputation in the distant past is not necessarily probative of the witness's reputation at the relevant time because a person's reputation may change.

Indeed, in this case, that is exactly what occurred. Plaintiff's own testimony in his prior trial establishes that his reputation in the 1990s does ***not*** reflect his reputation in 2008/2009. For

example, Plaintiff testified that his reputation was harmed in 2005 when he was denied permission to attend inspections.  *See* Tr. of Jury Trial, Day 3, AM Session, 98:6-21, 125:1-5. Plaintiff testified that he "was grieving [his] reputation" – "the reputation [he] had throughout [his] Bureau career[.]"  *Id.* at 125:17-18.  Accordingly, evidence of Plaintiff's reputation in the 1990s is not probative of his reputation in 2008/2009, the relevant baseline in this case.

### B.  Post-Retirement "Reputational Damage"

Plaintiff seeks to call Edward Curran to testify about "Youssef's post-retirement reputational damage" due to his "diminished post-retirement employment prospects."  Order at 5. This is not reputation testimony.  "Reputation evidence is not . . . the personal opinion of a witness about another individual. Rather, it is a witness's perception, based on a proper foundation, of what others in the community feel about an individual."  *Zamorano v. Wayne State Univ.*, 2008 U.S. Dist. LEXIS 58472, at *12 (E.D. Mich. Aug. 1, 2008); *see also Kelley v. Sec'y, Dep't of Corr.*, 2006 U.S. Dist. LEXIS 8166, at *36 (M.D. Fla. Feb. 13, 2006) ("Reputation evidence is what others in the community thought about the [person at issue.]"). Here, Plaintiff has made no proffer that Curran can testify about what others in the community thought about Plaintiff following Plaintiff's retirement.  *See Sykes v. Napolitano*, 634 F. Supp. 2d 1, 7 (D.D.C. 2009) (determining that expert opinion on a plaintiff's reputation lacked foundation because the expert did "not provide any basis for knowing [plaintiff's] reputation before, or after," the relevant event).  It will not help the jury for Curran to provide a general opinion that the denial of the ASC position could have theoretically impacted Plaintiff's reputation to some unquantifiable extent.  *Id.* at 8 ("[Expert witness's] common sense conclusion that [the plaintiff] might be perceived as 'damaged goods' would be of no assistance to a jury, all of whom have their own common sense to guide their conclusions.").

Curran's proffered testimony, instead, essentially relates to the qualifications that would be desirable to Plaintiff's potential employers.  Such testimony should be excluded for three reasons.  First, the testimony would be relevant only to the extent that (1) Plaintiff applied for another job after leaving the FBI; (2) the job paid more than Plaintiff's Unit Chief position which he voluntarily resigned; and (3) Plaintiff was denied the job because he had not held the ASC position.  Plaintiff has made no such proffer and, moreover, has not claimed that Curran possesses any knowledge regarding Plaintiff's post-FBI job search.

Second, Plaintiff offers no basis for Curran's opinion about how potential employers would value various experiences at the FBI.  The court in *Sykes* dealt with a very similar issue. 634 F. Supp. 2d at 7-8.  There, the plaintiff was an employee of the Secret Service who alleged he was involuntarily reassigned to a less advantageous position due to his race.  *Id*. at 2.  The plaintiff sought to introduce the expert testimony of a former Secret Service employee who had transitioned to the private sector.  *Id*. at 3-4.  The "expert" would have testified, *inter alia*, that the reassignment would have a negative effect on the plaintiff's post-retirement earnings potential because employers value former division leaders (the position to which plaintiff had been assigned) moreso than former supervisors (the position to which plaintiff was re-assigned). The court rejected the proposed testimony, holding that there was no "experiential basis for th[e] opinion from [the witness's] own job search" and to the extent the witness knew of the experiences of other former Secret Service employees moving into the private sector, "his knowledge is pure hearsay and well beyond his asserted expertise."  *Id*. at 8.

Here, too, Curran has provided nothing to show that he has relevant experience as an applicant or hiring official that would provide him the expertise to opine on this subject.  Indeed, Plaintiff's expert report makes no mention of any involvement by Curran in the hiring functions

at his post-FBI employment.  *See id.* at 7-8 (witness could not testify as expert regarding the impact of reassignment on the plaintiff's advancement and future employment where witness "does not indicate that he ever selected agents for the [position at issue]").

Third, it is entirely speculative for Curran to conclude that the denial of the ASC position in 2009 would have caused Plaintiff to lose job opportunities following his retirement years later in October 2014.  Plaintiff had a long career at the FBI, during which he rose to the ranks of management, and occupied an important GS-15 Unit Chief position at the end of his tenure.  It would be utter speculation for Curran to testify that any marginal value added by an ASC title would have qualified Plaintiff for jobs that were otherwise out-of-reach for him.  *See Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) ("[D]amages cannot be awarded on the basis of 'mere speculation or guesswork'").

Finally, any testimony concerning lost future job opportunities would relate to equitable remedies, not compensatory damages, and would be heard only in a second, equitable phase of the trial.  As noted in the parties' Joint Pretrial Statement, "[t]he parties have agreed to stipulate to bifurcation of the liability/compensatory damages and equitable relief phases of the litigation, as the Court ordered in *Youssef I*."  Dkt. No. 77 at 7.  In *Youssef I*, the Court ordered as follows:

> Prior to trial, the Court ordered that the trial be bifurcated so that legal issues such as liability and compensatory damages would be decided first by the jury before the Court heard evidence relating to Youssef's request for equitable relief, which the Court would decide in its sole discretion during a remedy phase. See [185] Order on Bifurcation (Jan. 21, 2010). The Court bifurcated the trial to avoid the unnecessary presentation to the jury of complicated expert testimony relevant solely to Youssef's request for equitable relief such as back pay and front pay, which was based on theories of possible promotions that Youssef did not apply for but might have received in the future had he become inspection certified in January or February 2005.

*Youssef v. FBI*, 762 F. Supp. 2d 76, 79-80 (D.D.C. 2011).

Plaintiff noted in the Joint Pretrial Statement that his requested equitable relief included "all economic damages that resulted from the denial to promote Mr. Youssef." Dkt. No. 77 at 32. He similarly noted in his interrogatory responses that his alleged "lost employment promotional opportunities . . . resulted in economic damage" and that "the court will conduct a second hearing on economic damages and instatement into a new position" following the liability portion of the trial.

Accordingly, even if Curran's testimony on this issue were admissible (it is not), it would be introduced only during any equitable phase of the trial, but would not be heard by the jury.

IV.     **Inspector General ("IG") Investigation**

The Court's July 2 Order requires that Defendant identify in its supplemental pretrial brief "the specific evidence it is seeking to introduce about the IG investigation and its purpose in introducing this evidence." *See* ECF 86 at 5-6. As the Court implicitly recognizes, the "OIG Report" (and not the longstanding IG investigation itself) is relevant to Plaintiff's retaliation claim only because then-Assistant Section Chief Arthur J. Zarone listed the report as a distractor in the handwritten notes he attached to Youssef's 2009 PAR, which was issued at about the same time that Zarone served on the LCB that did not select Plaintiff for the Assistant Section Chief position. *See id.* at 6 ("Defendant shall specifically indicate what testimony Zarone would offer about the IG report and its influence on Youssef's 2009 PAR and what he meant when he listed "OIG Report" as a "distractor" on Youssef's PAR").

Defendant does not intend to introduce evidence about the OIG investigation because Zarone's notes, which Plaintiff seeks to introduce as a trial exhibit, do not refer to Plaintiff's "participation in an IG investigation," as has been alleged by Plaintiff, *see* Pl.'s Opp'n to Def.'s Mot. in Limine (ECF 82) at 17, but rather to any distraction that the impending release of the

OIG Report itself may have caused Plaintiff during the 2009 review period.  It cannot be disputed that Plaintiff and Zarone were both aware in 2009 that the final report's release was imminent, even though the OIG Report entitled "A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records," was not issued until January 2010 by the Department of Justice's Oversight and Review Division, Office of Inspector General, several months after the PAR was issued.[3]  It also cannot be disputed that both Plaintiff and Zarone understood that the report would almost certainly discuss Plaintiff because he was Unit Chief of the section that handled "exigent" or "national security" letters.[4]

Consequently, Defendant seeks to introduce the testimony of Zarone that he honestly believed that the uncertainty as to the report's treatment of Plaintiff weighed upon Plaintiff and served to distract him from performance of his duties in 2009.  Zarone's anticipated testimony was set forth in the declaration that Defendant attached to its motion for summary judgment (Zarone Decl., ECF 42-2 at 40-53 of 99).  Specifically, Zarone will testify, consistent with his declaration, as follows:

> 9.   Although I believe that Mr. Youssef's overall performance in 2009 was excellent, I observed a decline in his performance in comparison to the 2008 rating year. Accordingly, I rated him "Outstanding" in fewer critical elements in 2009 than in 2008. I attributed the decline to a lack of physical engagement, in the form of excessive absences from the office as well as a lack of mental engagement when he was present, with CAU's operations.

> 10.   Mr. Youssef's lack of engagement had a cascading impact on CAU. During this time period, there were a number of time-sensitive initiatives

---

3   *See* http://www.justice.gov/oig/special/s1001r.pdf.

4   The report contained a section on Plaintiff (at 224-230) because he was Unit Chief of the section that handled "exigent" or "national security" letters during part of the time period reviewed by the OIG.

and cases in CAU that had to move forward in his absence. However, the ability to act on them in a timely manner was affected as decisions became elusive or were slowed by the bottleneck resulting from Mr. Youssef. This in turn affected operations in the field and budgeting for the unit. Mr. Youssef's lack of engagement also manifested itself in his written work product, which, on at least one occasion, required significant revisions from me before it was sent up the chain of command.

15.    To assist me in preparing Mr. Youssef's 2009 PAR, I handwrote notes of my impressions of Mr. Yousef's performance over the course of the rating year. In those notes, I noted issues with Mr. Youssef's lack of engagement, including a lack of responsiveness to emails, an inability to locate him when needed, and a dip in his level of initiative and follow through. I also noted my concerns with how he handled the contract renewal.

16.    I also recorded in my notes that two distractors seemed to be contributing to Mr. Youssef's dip in performance, involving an investigation by the Department of Justice Office of Inspector General (OIG) and a pending legal matter.

17.    Mr. Youssef, as well as other unit members, were involved in an investigation by OIG into the FBI's use of Exigent Letters and other informal requests to obtain telephone records. I was aware of the investigation through my role as ASC, in which I served as a conduit for information from CSX to OIG.

22.    Mr. Youssef's participation in the OIG investigation and in a discrimination complaint against the FBI played no role in the ratings that I gave him in 2008 and 2009. As I explained above, I do not recall even being aware that Mr. Youssef had filed a discrimination complaint against the FBI at the time I prepared his PARS.

23.    The reasons for his absences during the 2009 rating year also were not a factor in my ratings. I never denied Mr. Youssef's leave requests because, in my view, it was his responsibility to ensure proper coverage of his unit, and to ensure that his work was being completed in a timely manner. If Mr. Youssef needed to work evenings and weekends to carry out his responsibilities as a unit chief due to absences during the workday for whatever reasons, I expected that he would do so.

Zarone Decl., "Mr. Youssef's 2008 and 2009 Performance Ratings," at 2-6.

Consequently, Defendant's proffered trial testimony does not include testimony about the IG investigation or even Plaintiff's participation therein. Rather, Zarone's notes – the exhibit in question – make clear that the "distractor" was the almost completed "IG Report" itself and the uncertainly as to how the report would treat Plaintiff.  Zarone's declaration makes clear that Plaintiff's participation in the IG investigation and any absences that may have resulted from such participation were not a factor in his rating decision.

## V.   *Mother Jones* Article

The Court's July 2 Order requires that the parties propose in their supplemental pretrial briefs "a means for introducing the article at trial that would balance the probative and prejudicial value of the article."  *Id.* at 6.  Defendant stands on its objection to the introduction of the article in any form because the witness has testified that he "did not learn from skimming the article that Mr. Youssef had filed any type of discrimination complaint against the FBI."  Zarone Decl. at 5, ¶ 21.  Further, Zarone's vague recollection of the article does not justify introduction of lengthy (or as Defendant contends any) portions of the highly prejudicial article.[5]

To the extent that the Court is inclined to allow Plaintiff to introduce a redacted version of the article, Defendant agrees that the Court's proposal is the best way to "balance the probative and prejudicial value of the article."  *See* July 2 Order at 6.  Specifically, the Court's

---

5   Zarone stated in his declaration that:

> I also recall that during my time as Acting Section Chief of CXS, I was advised of an online magazine article about Mr. Youssef. I briefly skimmed the article on my computer screen without getting to the end of it, and then returned to my work. I never read the article in its entirety, nor did I forward or discuss it with Mr. Youssef or anyone else at the FBI. I did not give the article further thought, until asked about it at a deposition that I gave in this section in October 2012.

Zarone Decl. at ¶ 20.

proposal is to allow Plaintiff to introduce the article, but "redact everything from the article except the two short references to Youssef's discrimination lawsuit and instruct the jury that the redacted portions of the article are not relevant to the claims at issue." *Id.* at 6-7. To avoid confusion, Defendant specifically requests that the title of the article be redacted and the jury be instructed that the article was about Youssef's career at the FBI. The unredacted references should be limited as follows:

(1) "[3] He's sued the bureau for discrimination …." This reference is in the first paragraph of the article and is the only arguable reference to a discrimination claim. The remainder of the sentence – "and has been sidelined to a paper-pushing job" is irrelevant and reflects Plaintiff's characterization of the harm he allegedly suffered based on his prior discrimination claim.

(2) "[I]n July 2003, Youssef …. filed suit for discrimination." The references to "Finally" at the beginning of the sentence and that "Youssef gave up hope" are irrelevant and self-serving and should be redacted.

## VI.   Classified Information

The Court's July 2 Order requires that Defendant shall indicate the outcome of the prepublication review of the redacted portions of Plaintiff's FD-954. Defendant advises the Court that the review process has been completed and that the FBI agreed to unredact some, but not all, of the previously redacted portions. The FBI sent the revised redacted material to Plaintiff's counsel by overnight courier on July 15, 2015.

Respectfully submitted,

VINCENT H. COHEN, JR.
Acting United States Attorney, D.C. Bar #471489

DANIEL VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By: ____/s/_____
JOHN G. INTERRANTE, PA Bar # 61373
JOSHUA M. KOLSKY, DC Bar # 993430
Assistant United States Attorneys
Civil Division
555 4th Street, N.W., Room E-4808
Washington, D.C. 20530
Tel: 202.252.2519
Fax: 202.252.2599
Email: John.Interrante@usdoj.gov